UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID MICCICHE,

Petitioner,

v.                                    Case No.:8:18-cv-1270-T-35JSS

SECRETARY, DEPARTMENT OF CORRECTIONS,

Respondent.
_____/

# Exhibit 10

1

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, STATE OF FLORIDA
CRIMINAL JUSTICE DIVISION

STATE OF FLORIDA,

       Plaintiff,          CASE NO:   12-CF-007866

vs.                     DIVISION:   J

DAVID MICCICHE,

       Defendant.

_____/

## TRANSCRIPT OF PROCEEDINGS

BEFORE:          **HONORABLE MICHELLE D. SISCO**

TAKEN AT:        Courtroom 10
                  Courthouse Annex
                  Tampa, Florida

DATE AND TIME:   November 17, 2015
                  1:30 p.m. docket

RECORDED BY:     Sherri Hughey
                  Electronic Court Reporter

TRANSCRIBED BY:  Carol Craven
                  Electronic Court Reporter

                        (ORIGINAL _____)
                        (COPY    _____)

*Record Transcripts Incorporated*
*501 East Kennedy Boulevard, Suite 170*
*Tampa, Florida 33602*
*(813) 514-5100*

2

A P P E A R A N C E S

REPRESENTING THE STATE:

        Joan Corces, Esquire
        State Attorney's Office
        800 East Kennedy Boulevard
        Tampa, Florida 33602

REPRESENTING THE DEFENDANT:

        Kay Murray, Esquire
        Office of the Public Defender
        700 East Twiggs Street
        Tampa, Florida  33602

3

I N D E X

PAGE

PROCEEDINGS.................................................... 4

WITNESSES FOR THE DEFENSE:
DAVID MICCICHE
      Direct Examination by Ms. Murray........................... 4
      Cross-Examination by Ms. Corces........................... 19

SALLY PEYTON
      Direct Examination by Ms. Murray.......................... 26
      Cross-Examination by Ms. Corces........................... 26
      Redirect Examination by Ms. Murray........................ 34

KATHERINE TINKER
      Direct Examination by Ms. Murray.......................... 35
      Cross-Examination by Ms. Corces........................... 37
      Redirect Examination by Ms. Murray........................ 45
      Voir Dire by The Court.................................... 45

WITNESSES FOR THE STATE:
DEBORAH MOSS
      Direct Examination by Ms. Corces.......................... 46
      Cross-Examination by Ms. Murray........................... 85
      Redirect Examination by Ms. Corces........................ 93

REBUTTAL WITNESS FOR THE DEFENSE:
DAVID MICCICHE
      Direct Examination by Ms. Murray.......................... 94

CERTIFICATE OF COURT REPORTER.................................. 97

4

1          P R O C E E D I N G S

2          THE COURT: Mr. David -- is it Ma-cheek-i?

3          MR. MICCICHE:  Ma-chick-i.

4          THE COURT:  Ma-chick-i. Okay.  And Ms. Murray, are you

5    ready to proceed?

6          MS. MURRAY:  I am.

7          THE COURT:  Okay, who is going to be your first witness?

8          MS. MURRAY:  My client.

9          THE COURT:  Okay, Mr. Micciche, please raise your right

10   hand.  Do you swear or affirm to tell the truth, the whole

11   truth, and nothing but the truth?

12         MR. MICCICHE:  I do.

13         THE COURT:  Okay, very good.  You may proceed.

14         MS. CORCES:  Judge, excuse me, just to the extent there

15   may be any other witnesses in the courtroom, the State would

16   invoke the Rule of Sequestration.

17         THE COURT:  Okay, if there are any other witnesses that

18   are going to be testifying in this hearing, you are to remain

19   outside and you're not to discuss your testimony with any

20   other witness until the hearing is completed.  Okay?  All

21   right, so with that, you may proceed.

22                    **DAVID MICCICHE,**

23   having been duly sworn, was examined and testified as follows:

24                  **DIRECT EXAMINATION**

25   BY MS. MURRAY:

5

```
 1        Q    All right, please state your name.

 2        A    David Micciche.

 3        Q    And are you the Defendant in Case Number 12-CF-7866?

 4        A    Yes, ma'am.

 5        Q    Did you retain Attorney Deborah Moss to represent you?

 6        A    Yes, I did.

 7        Q    And how did Mr. Lauro get involved in your case?

 8        A    Toward the end of the case, when Ms. Moss had told -- is

 9   that loud enough, by the way?  Can you hear me?

10             THE COURT:  Yes, I can hear you.

11             MR. MICCICHE:   Okay.

12   BY MS. MURRAY:

13        A    She had pretty much told me there was no hope; that I

14   had to settle, and Mr. Lauro was brought in to look over the

15   documents to see if there was anything overlooked.

16        Q    Okay, and ultimately, you ended up disposing of your

17   case by entering a guilty plea.  Prior to that how many times had

18   you met with Ms. Moss or Mr. Lauro?

19        A    I believe three.

20        Q    Had you had an opportunity to review the State's

21   discovery and ask them about any questions you had or issues that

22   you were concerned about?

23        A    Yes.

24        Q    In Claim 1 of our Amended Motion for Post-Conviction

25   Relief, you allege that your attorney rendered ineffective
```

6

assistance of counsel in failing to investigate false information

that was contained in the police reports.  Were those police

reports part of the State's discovery?

A     Yes, ma'am.

Q     And what was the false information that you saw in the

police report?

A     Well, on Page 31 of the police report, it listed my

occupation as a youth pastor.

Q     And is that incorrect?

A     That is -- yes, ma'am, that is incorrect.

Q     Okay.  Were you any kind of a pastor at all?

A     No, ma'am.

Q     Did you have any -- any sort of affiliation with any

religious group?

A     No, ma'am.  I volunteered during services as security,

but that was it, in the main church.

Q     And what other false information did you observe on the

police reports?

A     Um, it -- it - one, it says the interview was done in my

daughter's bedroom, which it wasn't.

Q     Okay, where was the interview done?

A     In my bedroom.

Q     All right.

A     Opposite side of the house.  It says that I -- I stated

that I'm the only one that uses that computer in the office.

7

Q    Did you make that statement to the police?

A    No, ma'am.  My statement was this is the only computer I use and that was twisted around to say I'm the only one that uses it.

Q    Okay.  What else?

A    Um, it stated that the computer was password protected and no one else had access to it.  It was password protected on startup only, but the computer was left on all the time since it was a server.

Q    Okay, well, I just want to make sure that when you're -- that what you're testifying to, um, are the misstatements that you observed in the police report.

A    Right.

Q    So the police report indicates the computer was password protected; correct?

A    Yes.

Q    Did you make that statement?

A    No.

Q    Okay, what else?

A    It was -- I have in quotes – "It was stated that he knew what he was doing was wrong," meaning, by that, I meant that pornography was morally wrong, but the report said that I stated that I view child pornography and I knew that was wrong.

Q    What else?

A    That -- that was never stated.

8

1    A    It stated, "When asked what his problem was, Micciche

2    viewed -- stated viewing pornography, both adult and child," which

3    was never stated.  It says, "He would only briefly look at child

4    porn, sometimes masturbate, and then delete it," which was

5    absolutely never stated.  Um, it says that "It was purposefully

6    downloaded because he was curious, but he would view it for 30

7    seconds and then delete it."  That was absolutely never stated.

8    The files were never even -- they were never downloaded.  They

9    said that "It was confirmed that -- I confirmed that I sometimes

10   masturbated to child pornography as well as adult pornography."

11   That was absolutely never stated.  It says that I recognized the

12   file names, which is -- I don't believe is possible when you say

13   'those file names."  And they said that I downloaded specific

14   files by name, which again, is not true.

15   Q    So when you say not true, you mean not a statement you

16   ever made to the police?

17   A    Correct, correct.

18   Q    Okay, go ahead.

19   A    She showed me several screen shots of images.

20        MS. CORCES:  Judge, I'm going to object to the form.

21   The "she," who are we talking she?  She who?

22        MR. MICCICHE:  The -- the detective.

23   BY MS. MURRAY:

24   Q    Do you mean, was it Detective Grow (ph.) or Detective

25   Dipaolo?

9

1      A    I don't know.  And I still don't know which one is

2  which, because several times I called to ask them questions and

3  they kept telling me they were different people -- the names --

4  they were changing names, so I never -- I don't know which one was

5  which.

6      Q    A detective with the Hillsborough County Sheriff's

7  Office?

8      A    Yes, ma'am.

9      Q    Okay.  Go ahead.

10     A    She showed me screen shots of particular images,

11 including groups of images, but it was previewed -- the partial

12 download that was saved.

13         MS. CORCES:  I'm going to object.  This is now outside

14     the scope of what the claim is.

15         THE COURT:  Well, I think -- the question was, what was

16     incorrect or false in the police report.  Are we still on

17     that same topic?

18         MR. MICCICHE:  They're -- oh.

19         MS. MURRAY:  Yes.

20         THE COURT:  Okay.

21 BY MS. MURRAY:

22     A    They're saying that I -- the police report states that I

23 knew the images and I recognized them, but what I told them was

24 that I recognized the -- in the recycling bin after the partial

25 was deleted -- it was in the recycling bin as a tiny image, a

10

thumbnail image, which is the only thing I saw.   I never saw -- I never possessed the actual image.

Q    What other statements are alleged that you said in the police report that you did not say?

A    Um, on Page 41 is says that I admitted to downloading, then deleting pornography, which was never stated.   Um, this is -- again, this confirms the last one.   "Mrs. Payton stated that her husband's computer was password protected."

Q    No, sir.   What statements did you make in the police report -- what statements are alleged that you made in the police report that are not true?

A    Okay.

Q    That did you not say?

A    That I said or that they said that -- okay.   Well, this says that there was a hidden camera, which was not true.

Q    Are you just talking about the hidden camera in Katherine's room?

A    Yes, ma'am.

Q    Okay, so in your stepdaughter's room?

A    Correct.

Q    So some of the questioning occurred in regard to the allegation that you possessed child pornography and that that possession occurred on your computer; is that correct?

A    That's correct.

Q    And some of the allegations involved a video recording

P887

11

1    of your stepdaughter; is that correct?

2       A    That's correct.

3       Q    Okay, so when the police questioned you about the video

4    recording of your stepdaughter, what is in the police report that

5    the police say you said that is not what you said?

6       A    It says, and I have it quoted here.  "Writer asked if

7    Mr. Micciche told her about the hidden camera so that she would

8    not walk around naked," and Ms. Tinker -- oh, that's her quote --

9    stated, "No, he did not tell her that."

10          MS. CORCES:  Objection, that's reporting on some other

11       statement.

12          MR. MICCICHE:  I know.  I'm sorry.  I didn't see that

13       until the end.

14   BY MS. MURRAY:

15       A    "Post Miranda, Mr. Micciche admitted to hiding a camera

16   in his stepdaughter's bedroom without her knowledge."  That was

17   untrue.  That was on Page 64. Um, "Mr. Micciche admitted to

18   downloading and viewing files depicting child pornography on his

19   computer," and again, those were only a couple that were

20   accidentally done halfway and then deleted.  They were never

21   downloaded.  They stated -- the police report stated that the --

22   well, I don't know if you want me to explain that one.

23       Q    I want any statement that is attributed to you in the

24   police report that is not what you told police.

25       A    Okay, I think that's it.

12

 Q     Okay, did you bring these issues to the attention of Ms. Moss or Mr. Lauro?

 A     Yes, ma'am.

 Q     Which one?

 A     Ms. Moss.

 Q     And what did she say?

 A     She had said, "If you click on it, you own it, and there's no -- no way around that.  If it was found on your computer, you're guilty."

 Q     What did she say specifically about you bringing to her attention that there were statements attributed to you in the police report that you told her you never said?

 A     When I told her everything that was wrong with the police report, she used the term "perfect storm," basically saying that the evidence in here would be impossible to prove; that it's my word against theirs and used the term "perfect storm," as, again, you know, basically, it's not something we can overcome.

 Q     Did you believe her?

 A     Yes.

 Q     Why is that?

 A     Because I was referred to her as a specialist and I assumed she -- she knew law.

 Q     Do you mean specialize in these types of cases?

 A     Yes, ma'am.

 Q     Okay.  And who was present when you gave your statement

13

1    to law enforcement?

2        A    My wife, Ms. Peyton.

3        Q    Did you ultimately learn that the fact that you were

4    misquoted in your statement did matter?

5        A    Yes.

6        Q    And how did it matter?

7        A    I actually found that out in my own research while I was

8    in prison.

9        Q    Okay, and how did it matter?

10       A    Because I -- we didn't know anything about what was

11    necessary to be proven.  I was told by Ms. Moss, basically,

12    "You're guilty.  Sign this paper."  I didn't know anything about

13    prongs that had to be proven.  I didn't know any, you know, in

14    order to get this conviction, the State has to prove this, this,

15    and this, and we didn't know anything about that.  I didn't know

16    anything about that until I did my own research.

17       Q    Okay, so in regard to Claim 1 where you allege that your

18    attorney rendered ineffective assistance of counsel for failing to

19    investigate the false information that was contained in the police

20    reports, would you have gone to trial if you knew -- would you

21    still have pleaded guilty or would you have gone to trial if you

22    knew that you could challenge the false information?

23       A    Oh, I would have gone to trial, yes.

24       Q    In Claim 2 of the original motion, it involves the

25    voyeurism chase.

14

| | | |
|---|---|---|
| 1 | A | Uh-huh. |
| 2 | Q | Did those charges arise from a VHS tape that was found |
| 3 | | when the police executed a search warrant at your house? |
| 4 | A | Yes, ma'am. |
| 5 | Q | Did the tape depict your stepdaughter in her room? |
| 6 | A | I -- now, yes, yes. |
| 7 | Q | Okay.  Um, at the time that you entered your plea, had |
| 8 | | you ever seen that tape? |
| 9 | A | No, ma'am. |
| 10 | Q | Have you since had an opportunity to view it? |
| 11 | A | Now, yes. |
| 12 | Q | Okay.  And by now, do you mean right before this |
| 13 | | hearing? |
| 14 | A | Correct. |
| 15 | Q | It was your understanding that she did not have clothes |
| 16 | | on in the video? |
| 17 | A | That's correct. |
| 18 | Q | Okay, did you tell the police that you had put a video |
| 19 | | camera in your stepdaughter's room? |
| 20 | A | Yes, ma'am. |
| 21 | Q | Did you explain why? |
| 22 | A | Yes, ma'am. |
| 23 | Q | Why? |
| 24 | A | To catch someone in my house that was stealing. |
| 25 | Q | Is this someone your son? |

15

1    A    Yes, ma'am.

2    Q    And how old was your son?

3    A    14, 15.

4    Q    Was he stealing from family members?

5    A    Yes, ma'am.

6    Q    Had you informed your stepdaughter that the camera was

7  in her room?

8    A    Yes, ma'am.

9    Q    And your stepdaughter is Katherine; is that correct?

10   A    Yes, ma'am.

11   Q    Okay.  Did Ms. Moss ever explain the elements of video

12 voyeurism to you?

13   A    No, ma'am.

14   Q    Did you put the camera in your stepdaughter's room for

15 the purpose of your own amusement, entertainment, sexual

16 arousement, gratification, profit, or for degrading, or abusing

17 her?

18   A    No, ma'am.

19   Q    Would you still have entered a guilty plea to the video

20 voyeurism charges if your attorney had explained the elements of

21 the crime?

22   A    Would I still have taken a plea?  Absolutely not.  No.

23 I wish I would have known.

24   Q    Okay, and in regard to these charges, let's talk about

25 Claim 6 of the Motion to Add Claims.  In that motion, Claim 6,

16

1    it's alleged that your attorney never explained to you that the

2    video voyeurism charges could be separated from the possession of

3    child pornography charges.  If she had told you this, would you

4    have chosen to go to trial on those charges?

5          A    I would have gone to trial, yes.

6          Q    Did you end up pleading guilty and being sentenced for

7    crimes you did not commit?

8          A    Yes, ma'am.

9          Q    In Claim 5 of the Motion to Add Claims, it's alleged

10   that your attorney rendered ineffective assistance for failing to

11   explain the elements of possession of child pornography.  Did Ms.

12   Moss ever explain that you that in order to be found guilty of

13   child pornography, the State had to prove that you knowingly

14   possessed or intentionally viewed child pornography?

15         A    No, she did not explain that.

16         Q    Did you tell her that you did not knowingly possess or

17   intentionally view images of child pornography?

18         A    Yes, ma'am.

19         Q    And did she ever tell you that was a defense?

20         A    No.  Again, she said -- she stated, basically, and I

21   don't know the exact words, but basically, if you clicked on it,

22   you owned it and you're guilty.

23         Q    During the time the case was pending in court did you

24   ever see the images the State says were on your computer?

25         A    No, ma'am.

17

Q    Did you ever explain to Ms. Moss how images might have appeared that you were unaware of?

A    Yes.

Q    What did you tell her?

A    Several -- a couple of them I did admit to accidentally clicking on and I deleted it before the image downloaded, and I also explained that, you know, this was a computer that was used by many people, including several teenage boys, neighbors.

Q    If Ms. Moss had explained to you that the State had to prove you knowingly possessed or intentionally viewed the images of child pornography, would you still have entered your guilty plea or would you have chosen to go to trial?

A    I would have gone to trial.

Q    In Claim 7 of the Motion to Add Claims, it's alleged that your attorney was ineffective for allowing you to plead guilty to offenses when there was an absence of evidence to prove those offenses.  Was computer equipment seized from your home pursuant to a search warrant?

A    Yes, ma'am.

Q    Describe that equipment.

A    Um, there was a regular tower computer, a server computer, many pieces of electronic equipment, I-pads, I-phones, video cameras, digital cameras, and all my recording media.

Q    Why do you have so much computer equipment?

A    That's my business, ma'am.

18

Q      What is your business?

A      Um, I own a home theatre company.  I sell and install media servers and computers.  I build computers for clients.  Um, I sell-and-install home theatre systems, surveillance systems.

Q      Okay.  Did any of this equipment actually contain depictions of child pornography?

A      No, ma'am.

Q      Was it your understanding that only one of the computers seized produced information of evidentiary value?

A      That is correct.

Q      And is that based on what you read in the police report?

A      Yes, ma'am.

Q      And was that computer identified in the police report as Exhibit 2?

A      Yes, ma'am.

Q      Do you know what evidence the State alleged was contained on that computer?

A      No, ma'am.

Q      In the police report, it was alleged that evidence was found on the unallocated space of that computer.  What is unallocated space?

A      Unallocated space is space on the hard drive that is not currently being used by the computer or any part of the computer.  It's generally outside of a partition that's not being used. Basically unused space.

19

1    Q   Did you know what was located in the unallocated space

2  of your -- of that computer?

3    A   No, ma'am.  Unallocated space generally can be part of a

4  previous installation of windows where it's -- it's on there and

5  you don't know it, and unfortunately, I do build my personal

6  computers with used parts from other clients.

7    Q   Okay, so is it possible that what is found in the

8  unallocated space is something that could have been put on there

9  by some other person independent of anyone in your family?

10    A   Yes, ma'am.

11    Q   Okay, would you have entered your guilty plea if you

12  knew the State did not actually have evidence that you were in

13  possession of child pornography or would you have chosen to go to

14  trial?

15    A   I would have gone to trial.

16    MS. MURRAY:  Your Honor, those are my questions.

17    THE COURT:  Okay, cross-examination.

18    MS. CORCES:  Just a couple of quick questions.

19                **CROSS-EXAMINATION**

20  BY MS. CORCES:

21    Q   Mr. Micciche, did you tell Ms. Moss about the existence

22  of unallocated space?

23    A   I'm sorry?  I can't hear you.  I'm having trouble.

24    Q   Did you tell Ms. Moss about this unallocated space and

25  its existence?

20

1    A    Yes, ma'am.

2    Q    Okay, and when was it in the course of her

3  representation that you had these discussions?

4    A    When we sat down and went over the discovery and it was

5  stated in there.

6    Q    Okay.  And where was it you understood the unallocated

7  space was located?

8    A    That's my business.

9    Q    No, where -- where in your understanding of the

10  evidence, where was your understanding that this unallocated space

11  was located?

12    A    As part of Exhibit 2, which would have been the office

13  computer hard drive.

14    Q    The hard drive of your office computer?

15    A    Yes, ma'am.

16    Q    Okay, so no I-Pads and I-Phones --

17    A    Oh, no.  No.

18    Q    Had unallocated space?  Okay, none of the recording

19  devices that we talked about a moment ago?

20    A    That's correct.

21    Q    Okay, and did you tell Ms. Moss when it was you would

22  get ahold of these -- these other -- other portions of the

23  computer that you said you may have used -- that were used?

24    A    I know I explained my business and what I do for a

25  living and that I do build my own computers.

21

Q    Okay.

A    Whether I specifically said that particular hard drive was used, I don't know.

Q    Did you tell her, then, that that particular hard drive was consisting of parts that had been rebuilt from other computers or other programs; things of that nature?

A    That I don't remember.  If I specifically said that, I don't remember.

Q    Do you think unallocated space was an important issue during the course of your pendency of your case?

A    Again, at that point, she had already told me the other ones were a definite guilty plea, so at that point, I didn't know how important --

Q    Which other ones?

A    The ones that -- the information that was on there.

Q    You mean the video voyeurism counts?

A    No, ma'am.

Q    So you're saying that the -- Ms. Moss had told you that the child pornography counts --

A    Correct.

Q    -- were pretty much a done deal; correct?

A    Correct.

Q    Okay, well, when you were talking about, just now, this defense of images being or possibly being on unallocated space, did that pertain to the pornography counts?

22

1    A    Yes, ma'am.

2    Q    So you didn't discuss that topic with Ms. Moss during

3    the time that she represented you?

4    A    Yes, ma'am.

5    Q    You did discuss that?

6    A    Yes.  Oh, yes.

7    Q    Okay, and when you discussed it with her, did you tell

8    her when these prior software installations might have occurred?

9    A    Specifically I don't remember.

10   Q    Okay, would it have been important for her to know, do

11   you think?

12   A    Um, again, from my point of view, not knowing the law,

13   when she had already told me that the other ten -- that they were

14   -- they were a definite guilty plea at that point.

15   Q    So you're saying that you never told Ms. Moss when these

16   prior installations of software might have occurred?

17   A    I'm not saying I didn't.  I'm saying I don't remember

18   specifically.  I know I told her that I do use extra -- spare

19   parts.

20   Q    Now, of the two of you -- this -- this was your

21   business; right?  You said you ran a home entertainment business;

22   isn't that correct?

23   A    Yes, ma'am.

24   Q    So you work with computers a lot?

25   A    Yes, ma'am.

23

1       Q   And so, between you and Ms. Moss, who was your lawyer,

2  were you the one better schooled in --

3       A   Oh, yes.

4       Q   -- in electronics?

5       A   Yes.

6       Q   Okay, so she had to kind of rely on what you would tell

7  her; right?

8       A   I would have thought so.

9       Q   Because of the two of you, you were --

10      A   Right.

11      Q   -- the more expert in the field of electronics?

12      A   Uh-huh.

13      Q   Okay.  Now, in the first claim that you discussed with

14  Ms. Murray, the claim about Ms. Moss failing to investigate false

15  information contained in the police report.

16      A   Yes, ma'am.

17      Q   You did tell Ms. Moss all about those things; correct?

18      A   Oh, yes, yes.

19      Q   Okay, and what was it you were expecting Ms. Moss to do

20  in an effort to develop defenses pertaining to this?

21      A   At the very least, investigate or have that report

22  stricken from evidence as untruthful.

23      Q   Well, would that have necessitated you, then, going to

24  trial?

25      A   Yes, ma'am.

24

1   Q    Did you ever discuss that with Ms. Moss?

2   A    I did, and she told me that it wasn't worth it because I

3   didn't stand a chance.

4   Q    Why was that?

5   A    Because she said that the information that was found on

6   there was enough to convict me.  That just clicking on something

7   is enough to be a conviction.

8   Q    Okay, so am I correct, then, in understanding that

9   you're saying that Ms. Moss told you that, even though the police

10  report contained statements that you felt were incorrect, that

11  that alone was not -- would not rise to the level of a defense to

12  the charges of possession of child pornography?

13  A    That's what Ms. Moss told me, yes.

14  Q    All right.  Short of trial, did Ms. Moss tell you that

15  there was anything else she could do or could consider doing in

16  order to challenge these statements that were contained in the

17  police report?

18  A    No, ma'am.

19  Q    Was there anything short of trial that you believe Ms.

20  Moss could have done to challenge those statements?

21  A    Yes.

22  Q    What's that?

23  A    I do.  I think depositions to find out what the

24  investigators meant when they wrote this report.

25  Q    Okay.

25

1    A    I mean, again, I'm not a lawyer, so I don't know.   I

2    don't know what the strategies would be.   I just feel, without

3    being told the legal aspect of what it was, I'm not -- I can't be

4    expected to make those decisions without --

5    Q    All right, so --

6    A    -- depending on her.

7    Q    -- you're saying that, other than trial, You think Ms.

8    Moss should have at least done some depositions that challenge the

9    statements?

10   A    Yes, ma'am.

11   Q    Okay.   And that would be -- depositions would have been

12   for purposes of actually confronting the police officers?

13   A    Yes, ma'am.

14   Q    Anything else?

15   A    Um, no.

16   Q    No?  Nothing further, Mr. Micciche.

17        THE COURT:   Okay, redirect?

18        MS. MURRAY:   Nothing, Your Honor.

19        THE COURT:   Okay.   Any additional witnesses, Ms. Murray?

20        MS. MURRAY:   Yes, Sally Peyton.

21        THE COURT:   Okay.   What's the last name?

22        MS. MURRAY:   Peyton.

23        THE COURT:   Please come forward, ma'am.   Please raise

24   your right hand.   Do you swear or affirm to tell the truth,

25   the whole truth, and nothing but the truth?

26

1       MS. PEYTON:  I do.

2       THE COURT:  Okay, have a seat.  You may proceed.

3                **SALLY PEYTON,**

4  having been duly sworn, was examined and testified as follows:

5              **DIRECT EXAMINATION**

6  BY MS. MURRAY:

7     Q   Please state your name.

8     A   Sally Peyton.

9     Q   Ms. Peyton, how are you related to Mr. Micciche?

10    A   I am his wife.

11    Q   And were you married to him at the time these cases,

12  these charges were pending?

13    A   Yes.

14    Q   Were you present during the interview when the police

15  came to your house and questioned your husband?

16    A   No.

17    Q   Did you ever hear him when he was talking to the police

18  about the case?

19    A   No.

20    Q   There's a part of the police report that says the

21  computer in the office is password protected.  Was it?

22    A   I don't recall because it was always on and logged in.

23    Q   Did other people use it?

24    A   Yes, they did.

25    Q   Who?

27

1    A    Um, myself, for one; his son, and family members -- and

2    friends of family members.

3    Q    And how old was Mr. Micciche's son?

4    A    Well, he lived with us, so it was during his teenage

5    years.

6    Q    Did you know that your husband had put a camera in

7    Katherine's bedroom?

8    A    Yes.

9    Q    Did you know why?

10   A    Yes, I did.

11   Q    Why?

12   A    It was to try to catch his son, Little David, in the act

13   of stealing money from the girls or from the boys.

14   Q    And did you or he -- or Mr. Micciche tell Katherine

15   about it?

16   A    Yes.

17        MS. MURRAY:   Those are all my questions, Your Honor.

18        THE COURT:   Cross-examination?

19        MS. CORCES:   Yes, ma'am.

20                     **CROSS-EXAMINATION**

21   BY MS. CORCES:

22   Q    Ms. Peyton, let me ask you.  Your husband's computer was

23   located in which room of the house?

24   A    It was in his office.

25   Q    In his office.  Was that next to your bedroom?

28

1     A     No.

2     Q     Where was that at in the house?

3     A     It was off the kitchen.

4     Q     Okay, this was a business computer, then, for his work?

5     A     It was used for business, yes.

6     Q     And how many computers were in the house?

7     A     There were several others.

8     Q     Well, where were all of the other computers located?

9     A     In different, various bedrooms.

10     Q     Such as?

11     A     The master bedroom.

12     Q     Okay.

13     A     I believe each -- each child had a computer in their

14 bedroom, as well.

15     Q     Each child had an individual bedroom, as well?

16     A     Yes, but it was -- they were all shared --

17     Q     Okay, so let me ask you --

18     A     -- by more than one member.

19     Q     Okay, I'm going to -- let's back up a little bit so The

20 Court can have some context.  Who were the people that were living

21 in the house with you and Mr. Micciche?

22     A     Okay, at the time, it would have been my -- my daughter,

23 Katherine.

24     Q     Uh-huh

25     A     And son, Miles (ph.), and then, on visitation times, Mr.

29

Micciche's children, as well, which would include his daughter,
Caitland, who shared a bedroom with Katherine, and the twins,
Casey and Connor, who shared a bedroom, and Little David, who I
believe he came to live with us full-time when he was 17.  He
shared a bedroom with my son, Miles.

Q    Okay.  So now let me ask you something.  Um, your
children first, Katherine and Miles, what year was Katherine born?

A    1993.

Q    And how about Miles?

A    1990.

Q    And the children of Mr. Micciche that you're talking
about, what year would Caitland have been born?

A    '93.

Q    And you mentioned twins, Casey and Connor.  Are these
male, female, one of each?

A    They are male.

Q    Okay, and what year were they born?

A    1996.

Q    And Little David, what year was he born?

A    1991.

Q    Okay, so he was actually older than your daughter,
Katherine?

A    Yes.

Q    Okay, all right, so when we say Little David, he was not
the youngest of all the children?

30

1     A   That is correct, just because he was the, obviously,

2  named for his father, he was referred to as Little David.

3     Q   Now, Little David came to live with you, you said, when

4  he was 17 years of age?

5     A   I believe that is correct, yes.

6     Q   And prior to that time, did he spend any time living

7  with you in your marital home?

8     A   Yes, he did, during visitation times.

9     Q   And when he would come at visitation time, who would he

10  stay with?

11     A   He had a -- shared a bedroom with his stepbrother,

12  Miles.

13     Q   Okay.  And did the twins have their own separate

14  bedroom?

15     A   Yes, they did.

16     Q   And then the two girls shared a bedroom?

17     A   Yes, they did.

18     Q   Okay.  So in addition to the master bedroom, you had at

19  least three bedrooms in the house?

20     A   Yes.

21     Q   And each of those three bedrooms had its own computer?

22     A   This is correct.

23     Q   Okay, was there also a computer in your master bedroom?

24     A   Yes.

25     Q   And then there was the main computer that we're talking

31

1   about today, which was in the office?

2       A    Yes.

3       Q    Any additional computers?

4       A    Not other than laptops, no.

5       Q    Okay, now, which of the children was the one that was

6   suspected of doing the stealing?

7       A    That would be Little David.

8       Q    Okay, and when was it that suspicion arose?

9       A    I believe -- I don't remember the exact date, year, but

10  it was when Katherine was, I believe, in grade school, so Little

11  David would have been probably in middle school at the time.

12      Q    Okay, so and there's a two-year difference.  Now, when

13  you say middle school that would put David's age at about -- or

14  what grade, about, would he have been?

15      A    Probably -- let me think.  He would have been 14-15 --

16  15-or-16 at the time.  Maybe he was in the high school.  I can't

17  remember.

18      Q    Okay.  So that would have put him in roughly tenth

19  grade, do you think?

20      A    It's hard to say.  He was --

21           MS. MURRAY:  Objection, relevance.

22           THE COURT:  Overruled.  Go ahead.

23           MS. PEYTON:  I'm trying --

24           THE COURT:  When did you first suspect Little David was

25      stealing?

32

1          MS. PEYTON:  Okay.  He was probably -- I'd say mid-

2      teens, maybe 15; 14-or-15.

3  BY MS. CORCES:

4      Q    Okay, so that -- do you recall approximately what --

5  what year of school that would have been?

6      A    Probably his last year of middle school; first year of

7  high school, maybe.

8      Q    Okay.  Now, in light of the fact that Mr. Micciche's

9  business was relating to home entertainment systems, did you

10  customarily allow the children to play on his work computer?

11     A    It wasn't for play.  Many times we would download music.

12  That was the primary computer from which we would do downloads.

13     Q    Okay, so people would not download music to the computer

14  in any of the bedrooms?

15     A    No.  And if they did, I was not aware.

16     Q    Okay, but all of those bedroom computers had the

17  capacity to download music; correct?

18     A    I can't answer that.  I don't know.  I assume they

19  could, but we didn't.

20     Q    Well, was it your belief that those other computers did

21  not have the capacity to download music?

22          MS. MURRAY:  Objection, relevance.

23          THE COURT:  Overruled.  Go ahead.

24  BY MS. CORCES:

25     A    I honestly don't know if they downloaded music, because

33

we all used that primary computer in David's office for
downloading music from LimeWire.

Q    Okay, so other than downloading music in the office
computer, was there any other purpose that the children had for
playing on his work computer?

A    If you're referring to his children, they would
sometimes go in the office and use it, but most of the time they
were on their own unless it was being -- it was being used -- the
bedroom computer was being used by the other children and then
they would go in his office and maybe do Facebook or My Space and
we did have, also, family friends that came and used that
computer.

Q    So you would allow friends of the family just to come
and use the business computer?

A    Yes.  It had a separate login for business.

Q    Did you -- did you tell all of this to Deborah Moss?

A    I never had a chance to tell this to Deborah Moss.

Q    Well, did you ever speak with Deborah Moss?

A    Not really.

Q    So you -- you did at some point speak with her?

A    I don't remember.  I don't remember ever speaking
directly to Deborah Moss.

Q    All right.  Now, do you remember specifically what year
it was that the camera -- the cameras were placed around the house
to try to catch Little David's thefts?

34

1    A    Let me think.  I honestly don't remember exactly what
2    year it was.

3    Q    What was the nature of the items being stolen?

4    A    Money.

5    Q    Money?

6    A    Yes.

7    Q    Who was it stolen from?

8    A    I know for a fact Katherine was missing money out of her
9    wallet.

10   Q    Okay.

11        MS. CORCES:  Nothing further, Ms. Micciche -- or excuse
12   me -- Ms. Peyton.

13        THE COURT:  Redirect?

14                   **REDIRECT EXAMINATION**

15   BY MS. MURRAY:

16   Q    Were you aware of a video that had been seized as part
17   of the search of your home that allegedly had your daughter on it?

18   A    I was not aware until the detectives brought it to my
19   attention.

20   Q    Have you seen the video?

21   A    Yes, I have.

22   Q    Can you tell -- estimate how old she was in that video?

23   A    I would think she was probably around twelve.

24        MS. MURRAY:  That would be all, Your Honor.

25        THE COURT:  Okay.  Thank you, ma'am.  Please step

35

outside.  Remain outside until instructed.  Don't discuss

your testimony with any other witnesses until the hearing is

concluded.  All right, Ms. Murray, any other witnesses?

    MS. MURRAY:  Katherine Tinker

    THE COURT:  Okay.

    MS. CORCES:  Your Honor, in light of the fact that Ms.

Tinker was listed in Counts -- I believe it was 11 and 12.

She was the victim in the case.

    THE COURT:  Okay.

    MS. CORCES:  We ask that the courtroom be cleared in

deference to her as the victim in this particular case.

    THE COURT:  Okay.  Um, that's fine, so I'm going to need

all audience members to please step outside.  We'll let you

know when you can come back in.  Okay, please raise your

right hand.  Do you swear or affirm to tell the truth, the

whole truth, and nothing but the truth?

    MS. TINKER:  I do.

    THE COURT:  Okay.  Put your hand down, please.  Okay,

Ms. Murray, you may proceed.

**KATHERINE TINKER,**

having been duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

BY MS. MURRAY:

    Q    Please state your name.

    A    Katherine Tinker.

36

Q     And Ms. Tinker, how are you related to the Defendant in
this case?

A     He's my stepfather.

Q     Did you know that he had put a video camera in your
room?

A     At the time I remember we had a family meeting because
things were going missing in the house and that was the solution
that we had come up with.

Q     And were you about twelve years old at the time?

A     About that.

Q     Okay, and when your stepfather was first charged with
the possession of child pornography cases, how old were you then?

A     18.

Q     Okay.  Were you aware that the -- there was a recording
of -- a recorded video of you coming out of the shower?

A     I did not.

Q     Okay.  If you knew that the camera was in your room, how
was it able to capture you coming out of the shower?

A     That was just an absent-minded day of mine.

Q     Are you saying you forgot the camera was in there?

A     Yeah.

Q     Okay.  Do you think that you're a victim?

A     Not of my stepfather.

MS. CORCES:  Objection, relevancy, Judge.

THE COURT:  Overruled.  Go ahead.

37

BY MS. MURRAY:

Q    I'm sorry?

A    Not of my stepfather.

Q    Of someone?

A    The State.

MS. MURRAY:  Your Honor, those are the only questions I have.

THE COURT:  Okay.  Cross-examination.

### CROSS-EXAMINATION

BY MS. CORCES:

Q    Katherine, tell us, when was it that your father said he was going to put cameras in your room?

A    It was around the seventh grade.  It was my stepfather, not father.

Q    I'm sorry.  Your stepfather.  Seventh grade, and how old were you in seventh grade?

A    About 12 or 13.

Q    Okay.  Now, at the time that your stepfather made this comment to you, had anything been stolen out of your bedroom?

A    I don't think anything of mine, but I think it was my stepsister who had some money that was missing.

Q    Okay.  And did your stepsister live with you all the time during that time frame?

A    Only Tuesdays and Thursdays.

Q    Now, um --

38

1    A    Tuesdays through Thursdays.  I'm sorry.

2    Q    Okay.

3    A    I just remembered.

4    Q    Tuesday through Thursday?

5    A    Yes.

6    Q    Okay, and during that time that she -- you and she would

7    share this bedroom; is that right?

8    A    Yes.

9    Q    You stated your recollection is that she may -- your

10   stepsister had some things stolen from her?

11   A    Yes.

12   Q    Do you remember what it was?

13   A    I think it was some money out of her wallet or it might

14   have been her wallet.  One of those two.

15   Q    And do you know where that wallet was kept?

16   A    Probably in her desk that we shared.

17   Q    You shared it?

18   A    Yes.

19   Q    Okay.  And did you ever tell anybody that you had been

20   informed that a camera would be placed in your room because your

21   wallet had been stolen?

22   A    I never thought it was necessary to tell anyone.

23   Q    Did you ever write a letter to anybody?

24   A    For the case or --

25   Q    Yes.  Did you ever write a letter to anybody?

39

1     A    I did write a letter for this case, but at the time.

2     Q    And who was the letter for?

3     A    The letter was -- oh, gosh.  It was in place of me

4 testifying in the flesh.

5     Q    Who asked you to write the letter?

6     A    I think it was suggested to me by several people, but I

7 chose to write it.

8     Q    Okay, who suggested you write the letter?

9     A    My mother.

10     Q    Your mother was at the time still living with Mr.

11 Micciche?

12     A    Yes.

13     Q    And they're still married to this day; correct?

14     A    Yes.

15     Q    Okay, I'm going to show you a three-page letter.  When

16 you wrote it, who did you give it to after you wrote it?

17     A    I sent it to my mom and she said that she would use it.

18     Q    Okay.  I'm going to show you a copy of the three-page

19 letter that I believe had been presented to The Court or at least

20 to Ms. Moss.  As far as you know, was it ever given to Ms. Moss?

21     A    Who is Ms. Moss?  Was she --

22     Q    His attorney.

23     A    I never had contact with Ms. Moss that I can remember.

24     Q    All right.

25     MS. CORCES:  Judge, if I could approach the witness?

40

BY MS. CORCES:

Q    Would you take a quick look at this and see if you recognize this three-page letter.  See if this is the letter that you wrote.

A    This seems pretty accurate to what I wrote.  I can't see anything other than the font that has been changed.

Q    The font changed?  So somebody else typed it up for you?

A    No, I typed it and I sent the word file, but I don't remember using that font.

Q    Okay, but other than the font --

A    Yeah.

Q    -- all those words that you just read, are those your words that you wrote in that letter?

A    Yes, ma'am.

Q    Okay, and what was your purpose, then, in writing that letter?  Who was it supposed to go to?

A    The prosecutors.

MS. CORCES:  Judge, I'm going to mark this as State's Exhibit Number 1 and introduce it into evidence.

THE COURT:  Any objection?

MS. MURRAY:  No objection.

THE COURT:  Okay, it will be admitted.

(State's Exhibit 1 was admitted into evidence.)

BY MS. CORCES:

Q    Okay, now, in your letter to the prosecutors, did you

41

1   ever once suggest that the one who was being victimized by these

2   thefts was your stepsister, Caitland?

3       A    Victimized by the thefts?

4       Q    Yes.

5       A    No, I did not remember at the time because this is 2012

6   and I can't easily recall something that happened in 2006 off the

7   bat.

8       Q    Well, in the letter that you wrote you mentioned having

9   your wallet stolen; is that correct?

10      A    Yes.

11      Q    Okay.  And when was it that you said your wallet was

12  stolen; do you remember?

13      A    About fourth-or-fifth grade.

14      Q    Okay, but even in the letter that you wrote, you

15  indicated fourth grade; is that correct, or did you say fourth or

16  fifth?

17      A    I wrote fourth.

18      Q    Okay.  Fourth grade.  Now, when you were in fourth grade

19  that's not the time frame in which Mr. Micciche said he was going

20  to install a camera in your bedroom?

21      A    I am aware.

22      Q    That that is not the time; is that correct?

23      A    Correct.

24      Q    Okay, and so the time frame in which you're talking

25  about Mr. Micciche telling you he was going to put a camera in

42

1   your bedroom, that's more like seventh or eighth grade; is that

2   correct?

3        A    Correct.

4        Q    Now, in the letter that you wrote, did you talk about

5   what was being stolen from you around seventh-or-eight grade?

6        A    I didn't because at the time it was so sudden, I can't

7   easily recall this accurately.

8        Q    Okay.  I'm going to ask you to take a look at the letter

9   again and ask you take a look at that second paragraph.

10       A    I didn't mention it in the letter because at the time I

11  could not recall that.

12       Q    In that letter, in the second paragraph, the last

13  sentence, did you not write, "In eighth grade, he ate my

14  strawberry cheesecake without asking and stole some of my Easter

15  candy.  I couldn't trust my stepbrother"?

16       A    That's correct, I did write that.

17       Q    Okay.  So at the time that the cameras were supposed to

18  have been placed in your bedroom, all that you were saying had

19  been stolen from you was candy and food; correct?

20       A    Correct.

21       Q    Okay, so you didn't tell anybody in this letter that it

22  was because somebody was stealing somebody out of the bedroom that

23  you shared with your stepsister, Caitland?

24       A    Okay, correct.

25       Q    Ms. Tinker, you've maintained a relationship with your

43

1    mother through all of this; haven't you?

2        A    I've tried.

3        Q    Um, and you've also made your efforts to try and make

4    peace with your family; right?

5        A    Yes.

6        Q    And part of this victimization that you're feeling is

7    because, as a result of this case, the family got separated; is

8    that right, but not that anybody has told you to tell a lie in

9    this case; is that correct?

10       A    Correct.

11       Q    Did anybody ever show you the video?

12       A    Yes.

13       Q    When were you shown the video?

14       A    I was shown around May 2012 when he had been first

15   arrested and someone came to question me.

16       Q    Okay.  And at the time that you were shown the video,

17   did it appear to you that that was the time frame in which you

18   were about in the fourth grade?

19       A    About seventh grade.

20       Q    Um, so that video was taken, then, in the timeframe in

21   which you weren't having your wallet or property stolen, were you?

22       A    Not that I would be able to recall.

23       Q    Now, when Mr. Micciche, you say, told you that he was

24   going to set up the security camera in your bedroom, did he tell

25   you where he was going to set it up at?

44

1    A    I have a faint memory of him mentioning something about

2    the top shelf in the room.  It was also meant to be more of a

3    deterrent as well as catching someone.

4    Q    Okay, the top shelf of what in your room?

5    A    The top shelf of the bookshelf right above the bed.

6    Q    Okay, so let me ask you, just so The Court can have a

7    mind's eye view.  This bedroom that you shared with your

8    stepsister, how many doors in and out of the bedroom were there?

9    A    One.

10   Q    And when you would walk into that bedroom door, what

11   would you -- what was on the facing wall?

12   A    The facing wall, there was the bunk bed to my left and

13   then the bookshelf to the right.

14   Q    Okay.  And was there a closet in the room?

15   A    There was a closet facing the bookshelf on the opposite

16   wall.

17   Q    Okay, so the closet faced a bookshelf.  All right.  And

18   so where would the items that would presumably to have been stolen

19   supposed to be located?

20   A    They would have been in the desk, which is in the wall

21   between the bookshelf and the closet.

22   Q    All right.  And when you saw the video, did it appear as

23   though the desk was the main feature of the video that you saw?

24   A    It's been awhile since I've seen it.  I remember the

25   desk was definitely in the frame.

45

Q    You don't recall at this time?

A    It's been awhile but I do believe the desk was in the frame, in the video.

MS. CORCES:   Nothing further for this witness, Judge.

THE COURT:   Okay, redirect?

MS. MURRAY:   Yes, ma'am.

**REDIRECT EXAMINATION**

BY MS. MURRAY:

Q    Ms. Tinker, Ms. Corces asked you about discrepancies between what you wrote in that letter and your testimony now.  The letter that you wrote, what was the time period between the time the video camera was placed in your room and the time you wrote that letter?

A    About six years.

Q    Did you have any difficulty remembering the details of something that had occurred six years prior?

A    Plenty.

Q    And were there thefts occurring in your home, like was your sister a victim of a theft around that time period?

A    I believe she was.

**VOIR DIRE**

BY THE COURT:

MS. MURRAY:   Your Honor, those are all my questions.

THE COURT:   Ms. Tinker, how old are you today?

MS. TINKER:   Twenty-two.

46

1       THE COURT:  Do you still live at home?

2       MS. TINKER:  I live at my dad's house.

3       THE COURT:  You live at your dad's house.  When did that

4  happen, when did you move in your dad's house?

5       MS. TINKER:  May 2012, in compliance with ordering it.

6       THE COURT:  Okay, so I just want you to know that, for

7  whatever reason your family broke apart, it wasn't your

8  fault.  You understand?

9       MS. TINKER:  Yes.

10      THE COURT:  It's not your fault; okay?  All right.

11  Okay.  Step on out and the audience can come back in.  Okay,

12  and who is going to be your next witness, Ms. Murray?

13      MS. MURRAY:  That was all, Your Honor.

14      THE COURT:  Okay.  Ms. Corces, who is going to be your

15  first witness?

16      MS. CORCES:  It will be Ms. Moss, Judge.

17      THE COURT:  All right.  Come on up.  Okay, good

18  afternoon.  Please raise your right hand.  Do you swear or

19  affirm to tell the truth, the whole truth, and nothing but

20  the truth?

21      MS. MOSS:  I do.

22      THE COURT:  Okay.  Very good.  You may proceed.

23             **DEBORAH MOSS, ESQUIRE**

24  having been duly sworn, was examined and testified as follows:

25               **DIRECT EXAMINATION**

47

BY MS. CORCES:

    Q    Please tell us your name.

    A    Deborah Moss.

    MS. CORCES:  Can you see me okay if I stay over here at the desk?

    THE COURT:  Sure.  Can you see?

    MS. MOSS:  Oh, I got to get my right glasses on, so I got my right glasses on.

BY MS. CORCES:

    Q    Ms. Moss, you are an attorney licensed to practice law in the state of Florida?

    A    I am.

    Q    How long have you been so licensed?

    A    I've been licensed since June of '87

    Q    And do you have a particular area of concentration to your practice?

    A    I have only practiced criminal defense and related trial matters.

    Q    How many times would you say you've gone to trial in a criminal case?

    A    Um, I believe it's over 150 times.  I am board certified.

    Q    Do you occasionally represent individuals charged on sex crimes?

    A    I do.

48

Q    And did you represent the individual that is here with us today, David Micciche?

A    I did.

Q    And when you came into represent Mr. Micciche, what was your understanding of the charges that were against Mr. Micciche?

A    I met Mr. Micciche shortly after the warrant was executed at his house.  He came to our office.  It was my understanding that he had numerous -- he had been arrested for numerous counts of child pornography, possession of child pornography.  At that time, he had also, I think the following day, they came to his house; they executed the warrant, and then it was either the following day or a few days later, they came back and rearrested him for video voyeurism.

Q    Now, at the time that you took on his case, were you already familiar with defense of crimes of this nature?

A    Yes.

Q    How many times do you think you may have met with your client to discuss this case?

A    Oh, ten-fifteen times.  We met quite often, so quite often.

Q    Okay.  Was he out on bond?

A    Yes.

Q    Okay, would he come to your office to speak with you?

A    Yes.

Q    Did you ever have occasion to speak with any other

49

1    members of his family?

2        A    Yes.

3        Q    Who else did you have occasion to speak with?

4        A    I spoke with his wife, although, I mean, my -- I don't

5    like to speak with the family members.  Obviously, my discussion

6    mostly about the case was with David, but I mean, she -- she did

7    indicate to me that there was issues involving her daughter, who

8    was the person in the video voyeurism, so -- and she had -- I

9    think she -- she may have been the one to give me the letter or

10   maybe it was even the State.  I don't remember who gave me the

11   letter.

12           MS. MURRAY:  Objection, nonresponsive.

13           THE COURT:  Okay.  What's the next question?  Go ahead.

14   BY MS. CORCES:

15       Q    So let me, then, when you obtained these -- the

16   information, did you then make a demand for discovery and get all

17   of the police reports sent to you in this case?

18       A    Yes.  Yes.

19       Q    Did you review them with your client?

20       A    Yes.

21       Q    And in reviewing the police reports with your client --

22   I'm just going to try and take these one by one.

23       A    Okay.

24       Q    With regard to Claim 1, did Mr. Micciche ever tell you

25   that the information that was contained in the police report was

50

1    false information; in other words, that misrepresented what he had

2    stated to law enforcement?

3        A    Yes.  He told me that he did admit -- well, he told me

4    that he did admit to masturbating to pornography, but he said that

5    he told them he did not masturbate to the child pornography.

6        Q    Okay.  Did he ever dispute with you that he was -- that

7    he told law enforcement officers he was the only one to ever use a

8    particular computer in his home?

9        A    No, I do not believe he disputed that.

10       Q    Okay, do you recall at any time in your discussions with

11   Mr. Micciche about his case, any discussion about the defenses

12   that could be raised?  Did Mr. Micciche ever indicate that he was

13   the only user of the computer that was the subject of where these

14   child porn images were located?

15       A    Yes.  And it was password protected.

16       Q    Okay, did he ever indicate -- did he ever indicate to

17   you that this password-protected computer was left open; in other

18   words, it did not necessitate password use?

19       A    No.

20       Q    If you logged onto it and it remained open?

21       A    No.

22       Q    What was your understanding -- which computer was it in

23   the house that he -- that these images were located on?

24       A    It was on one computer.  It was located in kind of an

25   office-bedroom area, I believe.

51

1    Q    Now, was this in a house with multiple computers?

2    A    I believe there were six.

3    Q    Okay, did you ever have any information to believe that

4    other individuals were using this particular office computer?

5    A    No.   I mean, that's -- that's clearly one of the first

6    things you look at, is who else would have access to this computer

7    that might have downloaded this.   Yes, we discussed that and it

8    appeared that he was the only person in the household with access.

9    Q    Okay.   Did you ever have any discussion with any other

10   individuals living in that house as to whether those other

11   individuals had access or in fact used that office computer?

12   A    I do not believe there was any indication that anyone

13   else had ever used that computer by anybody.

14   Q    Okay.   Now, did Mr. Micciche -- and I'm sorry.   Let me

15   just clarify because I don't know if I asked you already -- with

16   regard to that password protection --

17   A    Yes.

18   Q    -- on the computer

19   A    Yes.

20   Q    Did Mr. Micciche ever indicate to you that that -- that

21   password computer, once entered, would be allowed to remain open

22   such that it did not necessitate an additional password entry?

23   A    No.   I mean, we didn't -- no.   I mean, there really --

24   that really didn't seem to be an issue at all; that it was his

25   computer.   He was the one who had it, the password, and that other

52

1   people did not use it.

2       Q    Okay.  In your discussion with Mr. Micciche, with regard

3   to how law enforcement came to even execute a warrant on his

4   house, did you explain what law enforcement -- what information

5   law enforcement had that got them to where this case started?

6       A    Yes.

7       Q    And what did you tell him was -- how law enforcement

8   became involved in this case?

9       A    Um, well, I mean, law enforcement has the ability to

10  follow these digital images of known child pornography; images

11  that they know that images of these children are underage, that

12  they have hash values and SHA values, and that they can actually

13  identify these digital images as they pass through their servers.

14  I believe in this case, it was a server in Wyoming that had picked

15  it up and that they are able to follow these images to the IP

16  address.

17      Q    Okay, now, these images that we were talking about that

18  kind of piqued law enforcement's curiosity, were those images

19  pertaining to child pornography?

20      A    Yes.

21      Q    Okay, and was it your understanding that these images

22  were getting viewed sometime in late 2011 until the time of the

23  execution of the warrant in April 2012?

24      A    I want to say it was like August of '11 through -- yes,

25  that these images had been seen --

53

1          MS. MURRAY:  Your Honor, I'm going to object to hearsay.

2          THE COURT:  Overruled.  Go ahead.

3   BY MS. CORCES:

4      A    That these -- that these images were seen by law

5   enforcement --

6      Q    Uh-huh.

7      A    -- going to this IP address between 8/11 and April of

8   '12.

9      Q    Okay, and the IP address was Mr. Micciche's IP address?

10     A    Apparently, yes.

11     Q    Okay, now, did you discuss this timeframe of August of

12  '11 to April the 12th -- excuse me -- April 12th -- let me try

13  that again.  From August of 2011 to April of 2012?

14     A    Yes.

15     Q    In that time frame --

16     A    Yes.

17     Q    -- did Mr. Micciche ever lead you to believe that there

18  were items on his computer that had come from some other location?

19     A    Once we got the discovery, we discussed this FrostWire

20  and LimeWire, this -- it appeared to be file sharing.

21     Q    Okay.

22     A    Okay?  And he had indicated to me that he was

23  downloading large files of video and audio files.

24     Q    All right.

25     A    So that he thought maybe some of these images had come

54

1    in accidentally through that.  We did discuss that.

2         Q    And did you -- did he discuss with you whether or not

3    his computer was made up of parts scavenged from other locations

4    or other computers?

5         A    No.

6         Q    Okay.  Did he ever offer as a defense that portions of

7    his computer could have contained items that he would have been

8    unaware of?

9         A    No.  He never indicated that to me.  I hired an expert.

10        Q    Okay.

11        A    Who had indicated that that's always a possibility.

12        Q    Okay, and we'll get to that.

13        A    Okay.

14        Q    But I just want to -- addressing first the child

15   pornography issues, when you had your discussions with your

16   client, then, you discussed with him who -- who had access to the

17   computer --

18        A    Yes.

19        Q    -- is that correct?

20        A    Yes.

21        Q    And he indicated to you he was the only one using this

22   particular computer?

23        A    Correct.

24        Q    Okay.  Did you discuss with him what law enforcement had

25   stated where they located these images?

55

1      A    Yes.  Once I got the discovery.

2      Q    And that was located on the office computer; is that

3   correct?

4      A    Correct.

5      Q    Okay, did he offer you any other possible defenses to

6   the child pornography at the time?

7      A    He had thought that these files could accidentally end

8   up in his computer through this FrostWire or LimeWire.

9      Q    Now, in your review of the reports and your discussions

10  with detectives in this case --

11     A    Yes.

12     Q    -- this FrostWire or LimeWire, this data sharing, was

13  that how they initially locate that there are images going to this

14  particular IP address that goes to Mr. Micciche's house?

15     A    It -- well, I don't recall exactly whether or not they

16  are the ones that told me, but that was my understanding, is that

17  these images were coming, obviously, coming from, I believe this

18  file sharing and that's what LimeWire and FrostWire are, the file

19  sharing.  Peer-to-peer file sharing.

20     Q    Okay, now, this that they were talking to you, this

21  data-sharing process, that was information that was contained in

22  the application for the search warrant in the search warrant

23  itself; is that correct?

24     A    That is correct.  I was there.

25     Q    Okay, and when Mr. Micciche indicated to you that

56

1  perhaps these images were getting downloaded while he was looking

2  for other innocuous material in these data-sharing sites, did you

3  investigate that?

4       A    I did.

5       Q    And what did you do to investigate that?

6       A    I hired an expert.

7       Q    And who was that?

8       A    And his name was John Magliano.

9       Q    Now, when you -- did he provide a report for you?

10      A    I asked him not to write a report.

11      Q    Why is that?

12      A    Because he had -- he did not have anything that was

13  beneficial to my client, Mr. Micciche.  In fact, it was harmful.

14      Q    Okay, so what was it that you recall John Magliano

15  telling you about his evaluation?

16      A    Well, I was given, through discovery, the FDLE -- FDLE

17  has software that they attach to a computer that prints out all of

18  the searches, all of the files that were viewed.  I mean, it is an

19  exhaustive list.  It was contained on disks.  I provided that to

20  him and what he told me was -- is that --

21      Q    He, Mr. Micciche, you mean?

22      A    No, no.  My expert.

23      Q    Okay.

24      A    When I spoke to him about -- once he reviewed it -- he

25  indicated to me that there were active searches during the time

57

1    period that were alleged; that he -- that were for child

2    pornography. He's done a lot of this work. PTHC, Preteen Hard

3    Core, Several Google searches for Lolita, that he believed that

4    the State would be able to show through the introduction of this

5    evidence that there were active searches on that computer for

6    child pornography.

7        Q    Now, what your expert told you about there being active

8    searches or an active request for a particular type of images or

9    videos.

10       A    Yes, yes.

11       Q    Did that comport with what you had read in the

12   application for search warrant?

13       A    Yes.

14       Q    Did you advise Mr. Micciche of what your expert had

15   reported to you?

16       A    Yes.

17       Q    And what did he say to you about that?

18       A    Well, I'm not exactly sure when this occurred, but he

19   told me that he couldn't open those files; that his computer would

20   shut down. That was sometime later on in the case.

21       Q    Okay, so when he said he could not open the files, it

22   was at that point -- did you take that as an admission on his part

23   that he had in fact sought to have those files sent to him?

24       A    In so many words. "Yeah, those files were there, but I

25   couldn't even open them."

58

1    Q    Okay, and I -- I use the term, "Those files."  I want to

2  be clear.

3    A    The child pornography files.

4    Q    All right.  Um, now, did you ask your expert to do any

5  further evaluation as to possible explanations or other theories

6  of defenses as to how child pornography came to be on this

7  computer?

8    A    When we spoke, and I told him I did not want a report

9  based on what he had told me over the phone, he said, "I'll send

10  you one of my letters and it basically kind of outlines some other

11  avenues you might want to explore."

12    Q    And what were those other avenues that he asked you --

13  or that he outlined for you?

14    A    May I look at the letter?

15    Q    Absolutely.

16    A    Thank you.

17    Q    I can give it to you.

18    A    I have it.

19    Q    You have it?

20    A    It's January 20th of 2013.

21    Q    All right.

22    A    It says, "After extensively reviewing all the

23  information collected and examined of the evidence collected from

24  David Micciche, I have not found any defenses that would help his

25  case.  I have also found references to other data that was not

59

1    used against him that could be included in a trial."  He indicated

2    to me a surprise that my client was only charged with ten counts

3    based on what his examination of this -- of the documents I had

4    provided.  The conclusions --

5        Q    Excuse me.  Of the documents or the hard drive?  Did he

6    get to examine the actual hard drive?

7        A    No.  He examined the -- the, basically a case file

8    printed out from his FDLE report and the discovery, but he -- he

9    said -- he just kind of went on, but here are some other things,

10   "Was the Defendant in total control of the computer at all times?"

11   "Was the hard drive that was in the computer used and purchased

12   with data already on it?"  Okay, this is -- I had never -- there

13   had never been any indication of that.  "And was data downloaded

14   on the hard drive when the Defendant was not at home and can prove

15   it?" and we --

16       Q    Now, those three items that you just referenced --

17       A    Yes.

18       Q    -- that your expert offered to you as defenses you might

19   be able to --

20       A    Correct.

21       Q    Did you specifically address each of those three items

22   with Mr. Micciche?

23       A    I remember showing him a copy of this letter and telling

24   him why I wouldn't ask for the actual report to be written.

25       Q    Okay.

60

1    A    Um -- yes, so I guess the answer is yes.

2    Q    Okay.  So let's take those three items one by one.

3    A    Okay.

4    Q    That first item that your expert offers to you, to

5    inquire, one, was the Defendant in total control of the computer

6    at all times?

7    A    Yes.

8    Q    Did you inquire?

9    A    Did I inquire of that?

10    Q    Yes.

11    A    Yes.  We spoke about that early on.  I mean, control

12    meaning access through -- access into the computer.

13    Q    Okay, and did Mr. Micciche indicate that the computer

14    was ever under anybody else's control?

15    A    It was my understanding it was under his control at all

16    times and then that was also confirmed in the police report.

17    Q    Okay.  Second --

18    A    But that was asked by the detectives, of all the people

19    in the home.

20    Q    Secondly, was the hard drive that was on the computer,

21    paren, used, close paren, and purchased with data already on it?

22    A    I never had any indication of that.

23    Q    And you specifically asked Mr. Micciche about that?

24    A    I -- you know, I don't recall specifically saying, "Did

25    you ever purchase this hard drive?" but I mean, no, I never -- we

61

1   never -- that was never an indication that the hard drive had come

2   from somewhere else.

3       Q    Okay.  There has been a reference along the way of

4   something referred to as unallocated space?

5       A    Uh-huh.

6       Q    Do you remember having any discussions with Mr. Micciche

7   about unallocated space?

8       A    Um, I do.

9       Q    Did Mr. Micciche ever offer to you as an explanation

10  that these items could have been on unallocated space, meaning

11  from some -- something that he was not trying to safe?

12      A    I'm sorry?  Can you repeat that?  I'm sorry.

13      Q    Did Mr. Micciche ever offer in any way that unallocated

14  space could be utilized as an area of defense in this case?

15      A    No.

16      Q    Okay, do you recall what it was Mr. Micciche explained

17  to you would have been the value, if any, of this unallocated

18  space issue?

19      A    What I remember discussing about unallocated space, so

20  what I was told, I believe by Magliano and Detective Grow is that,

21  when you delete -- because most of these files had been deleted.

22      Q    Okay.

23      A    And that there is still evidence of that file that can

24  be stored in this unallocated space.

25      Q    Okay, and did Mr. Micciche ever indicate to you that

62

1   somebody other than himself would have downloaded and deleted

2   these files leaving him unallocated space?

3       A    No.

4       Q    Okay.  Um, if he had told you something to that effect,

5   would you have considered that a possible defense to the charges

6   of child pornography?

7       A    Yes.  I mean, I would have expected my expert to say,

8   "Okay, here's the situation.  You've got to unallocated space.

9   Someone else could have put these files there."

10      Q    Okay, and the expert seemed to negate that as a defense?

11      A    Yes.  Well, the expert went largely on what he saw as

12  recent searches, recent meaning just prior to the -- to the search

13  warrant and during the time that was alleged, that there were

14  active searches for what period on his computer.

15      Q    Okay, so let's explain that.

16      A    Yes.

17      Q    Let's take it just a little bit farther to The Court.

18      A    Yes.

19      Q    The items that were charged in the ten counts of

20  possession of child pornography --

21      A    Yes.

22      Q    -- were items of pornography that had previously been

23  deleted and were located on unallocated space; am I correct in

24  understanding you?

25      A    I believe that's what was explained, yes.

63

Q    Okay, so what was it that would have connected those older images to Mr. Micciche in 2012?

A    The searches, Google searches, Yahoo searches that my expert said were very plentiful, and that there were many, many, many, many images.

Q    Now, did you yourself ever go down and take a look at these items of child pornography?

A    Yes.

Q    Okay. Can you tell The Court the individuals that were depicted in those images? Are we talking about teenagers, preteens? What age are you talking about?

A    I saw -- I asked to see every -- the image or the -- what was on my client's computer that he was being charged with. Every -- every count, so I was -- I met Detective Grow and I believe it was a gentleman, Mr. Haverand (ph.), down at Falkenburg Road. They had set up, um, basically, on a computer, where they were able to take me to what looked like a thumbnail image and that they would click on it, and I asked if that was what was found on my client's computer, and they said the thumbnail was what was on the computer, and that this was what they could show had been there but deleted; okay?

Q    All right. And on those, quote, images, that were thumbnails --

A    Yes.

Q    -- what -- what age range are you saying that you saw

64

1    depicted on those images?

2         A    There was a baby in diapers being digitally penetrated.

3    There were obviously prepubescent children engaged in sexual acts;

4    specifically oral sex, giving a grown male oral sex.  There was, I

5    believe, also an image of a prepubescent -- what appeared to be a

6    prepubescent child being, um, penetrated by an adult penis.

7         Q    Let me ask you this.  The images that you just described

8    that you got to see --

9         A    Yes.

10        Q    -- when you went down to evidence --

11        A    Yes.

12        Q    -- did they comport with the nature of the searches that

13   law enforcement indicated Mr. Micciche was actively engaged in, in

14   2012?

15        A    Yes, and -- and my expert.

16        Q    Okay.  So, in your discussions with Mr. Micciche with

17   regard to the counts of possession of child pornography, did he

18   ever indicate to you that he had a defense of -- that there was no

19   knowing possession of child pornography?

20        A    Well, we discussed that -- that issue of they just ended

21   up when I was downloading large files from FrostWire or LimeWire,

22   that somehow they just snuck in there.  My expert said no, that's

23   not how this works.  These large file-sharing programs, if you

24   type in, "I want to see Gone with the Wind," and that's typically

25   what they're used for is to download large video and audio files,

65

1    that Gone with the Wind will go out to a bunch of different

2    computers and will take pieces of Gone with the Wind from

3    everybody's computer, but it won't take Lolita -- it -- it won't

4    pick Lolita up in that Gone with the Wind file.

5         Q    All right.  So -- so in order to receive an image of

6    preteen sex, one must specifically request an image of preteen sex

7    or Lolita or Pretty, Hot, and Tempting; something to that nature?

8         A    Yes.

9         Q    All right.

10        A    But there was no mistake that this was being searched

11   for and it was on his computer.  That -- my expert was like there

12   is no mistake here.

13        Q    And did you advise Mr. Micciche of this fact that there

14   would be no mistake --

15        A    Yes.

16        Q    -- in seeking these files?

17        A    Yes.

18        Q    All right.

19        A    I mean, I needed that answered for my -- I wasn't sure

20   if that was possible.  If -- if these files could put themselves

21   on your computer, if you, you know, searched for like Gone with

22   the Wind.

23        Q    When you went down and you saw the images, you said that

24   you did speak with detectives; correct?

25        A    I did.

66

Q    Did you actually ever depose detectives?

A    I did not.

Q    Why was that?

A    I met with, um, Jennifer Johnson and then Courtney Derry and Rita Peters on two occasions.

Q    And your purpose in doing that was what?

A    To -- to try to, after, you know, doing some work here and hiring an expert and all that, to tried to work out a resolution.

Q    Okay.

A    To see if there was a way that we could negotiate this.

MS. MURRAY:  For the record, could the witness identify Courtney Derry, Rita Peters, etc.?

MR. MICCICHE:  They're with the State Attorney's Office.

MS. CORCES:  Because the question was, did she ever -- why didn't she depose law enforcement officers?

THE COURT:  Oh, okay.

BY MS. CORCES:

A    Anyway, so the answer to that question -- the answer is, there wasn't anything that was -- I felt -- that was highly in dispute or that needed to be clarified outside the police report.

Q    Okay, now, let me ask you something.

A    Yes.

Q    Is that with regard to all of the counts or just the possession of child pornography counts?

P943

67

1    A    Just the possession of child pornography counts and the

2    reason I mentioned meeting with Courtney and Rita is that they had

3    already sent me early on the offer letter; that was the offer; if

4    we wanted to litigate, then that offer was off the table.

5    Q    And what was the offer they had sent you?

6    A    Ten years DOC followed by ten years of probation.

7    Q    Okay, and you conveyed that to Mr. Micciche early on?

8    A    Yes, oh, yes, I gave him his own copy of it.

9    Q    Was it his intent -- or was it your understanding it was

10   his intent -- excuse me -- that he wished to proceed to trial?

11   A    No.

12   Q    Okay, did you have a contrary understanding from him?

13   A    Oh, absolutely.  I mean, early on, before we got this --

14   I had him evaluated by Dr. Cotter.  He had indicated to me that,

15   yes, he had had a very serious pornography problem.  Um, he denied

16   the child pornography, but that he had had a serious pornography

17   problem; he had gotten help for it.  I mean, it was mostly dealing

18   with mitigation of sentencing; not -- not that these things don't

19   -- weren't on my computer.

20   Q    Not a guilt or innocence issue?

21   A    Correct.

22   Q    Did Mr. Micciche ever indicate to you that he wanted to

23   litigate this case due to the falsity of information contained in

24   the police report?

25   A    He disputed, in the police report Peggy Grow -- and I

68

1    actually spoke to her about this down at the -- when I went down

2    there -- that he disputed that he told her that he masturbated to

3    child pornography.

4        Q    Okay, did he dispute with you any other particular items

5    with regard to specifically that this computer was, although it

6    may have been password protected, it was not kept locked off?

7        A    No, that was not related to me.

8        Q    Did he dispute with you the purpose -- well, you just

9    said he indicated he downloaded images for innocuous reasons,

10   innocuous requests, and he offered that these images would have

11   been kind of brought in erroneously?

12       A    Yes.  He was -- he was downloading music and video files

13   and he thought that that was a reasonable explanation to see that

14   maybe these images came -- just snuck in on him.

15       Q    Did he indicate to you that it was false in the police

16   report that they reported he said that he recognized the file

17   names from the recycling bin?

18       A    Um, no, I don't think he disputed that, actually,

19   because he indicated -- initially -- I mean, and it kind of

20   progressed.  As I would try to address some of his concerns, then

21   it would kind of shift, so initially it was; um, "Well, they may

22   have been there, but I deleted them.  As soon as I realized they

23   were there, I deleted them."

24       Q    Okay.

25       A    "They came in.  I didn't search for them, they -- oh, my

69

gosh, what have I got here?" and he deleted them.

Q    Well, did he ever indicate to you that he wished to litigate this case in light of the fact that there were so many false statements attributed to him in the police report?

A    No, not litigate.  I mean, he wanted me to tell them that, but not go to trial.

Q    Okay.  So when you have your conversation with your client with regard to child pornography and you've gotten now that report from your expert.

A    Yes.

Q    That's when you elicit that first response -- that first offer from the State?

A    I think they gave it to me quickly after that.  I -- I sent him to Dr. Cotter.  I provided them with that -- what the -- Dr. Cotter's report.

Q    Did you discuss with your client --

A    Uh-huh.

Q    -- the possibility of filing a Motion to Suppress the Statements that were contained in the police reports?

A    We may have discussed -- I mean, but there was not a suppression issue.  He said he didn't say it and she said he did say it.  It's not an unconstitutional taking of a statement.

Q    Okay, and if he said she said as to the content of the statement?

A    That would be a trial issue.

P946

1     Q   Okay, and Mr. Micciche was clear he didn't want to

2 proceed to trial, even to pursue that -- that issue; is that

3 correct?

4     A   That's correct.

5     Q   All right.  Now, did you discuss the video voyeurism

6 count with Mr. Micciche?

7     A   Yes.

8     Q   Please tell The Court what it was he told you with

9 regard to those counts.

10     A   Well, I saw the -- when I went down, I was shown a

11 video.  It appeared that a 11, 12, 13 year old girl was coming out

12 of what appeared to be a bathroom, in various states of undress on

13 two different occasions.  He had -- he had discussed with me that

14 he had put cameras -- a camera in her room to catch his son

15 stealing.  The problem I had was that there was only these two

16 images.  There wasn't any clothed people; there wasn't any --

17 anything else, except these two, essentially two images of what I

18 believe to be Katherine Tinker coming in from the bathroom and --

19 from a shower with a towel and being undressed and dressing.  She

20 was young.

21     Q   Ms. Moss, I'm going to show you what is marked as

22 State's Exhibit Number 2 for identification.

23     A   Yes.

24     Q   I ask that you take a look at it.

25     A   Yes.

71

1        Q     And see if you believe this was a true-and-accurate copy

2    of the tape -- excuse me -- of the video you reviewed.

3        A     Right.   I -- what I saw was on a VHS tape; okay?   But I

4    have looked at it just prior to this and it -- yes, it is.

5              MS. CORCES:   Judge, I would move State's Exhibit 2 into

6         evidence.

7              THE COURT:   Any objection?

8              MS. MURRAY:   Your Honor, I have no objection to the

9         video coming into evidence and also I have no objection to

10        The Court viewing anything.

11             THE COURT:   Okay.

12             MS. CORCES:   And just for the record, Mr. Micciche has

13        had a chance to look at it.

14             THE COURT:   Okay, very good.

15   (State's Exhibit 2 was admitted into evidence.)

16   BY MS. CORCES:

17        Q     As long as the -- The Court will have a chance to look

18   at this at a later time.

19        A     Sure.

20        Q     Let's fill this in just a little bit more for The Court.

21   When you were viewing this evidence --

22        A     Uh-huh.

23        Q     -- I'm talking now just about the video voyeurism count;

24   okay?   Your understanding from your client was that he had placed

25   a camera in his stepdaughter's bedroom; correct?

72

1    A    Yes.

2    Q    Did he tell you where it was placed?

3    A    A light or something or a ceiling fan; something like

4    that.

5    Q    Did he tell you whether or not the camera was always

6    running?

7    A    No.

8    Q    What did he tell you about getting the video started?

9    A    He would hear the shower running and he would go hit the

10   record button.

11   Q    Okay.  When -- did he ever indicate to you when the

12   camera would be turned off?

13   A    No.

14   Q    Okay, do you recall if you pushed him on those

15   questions?

16   A    I don't recall.  I don't recall that conversation.  I

17   mean, we talked about it.  We talked about what I -- after I came

18   back and told him what I saw.

19   Q    Now, when you saw the videotape --

20   A    Yes.

21   Q    -- you indicated that it appeared to be two -- two

22   separate --

23   A    Instances.

24   Q    -- is that true?

25   A    Yes.  Two separate episodes, same girl, but clearly

73

1  she's coming from a shower or a bath in both of them.

2      Q    Can you tell The Court, in those two incidents that you

3  viewed --

4      A    Uh-huh.

5      Q    -- was there any period of time in which you see just

6  the room without the girl coming, going, or moving about the room?

7      A    There's a few seconds, I think.

8      Q    So in those few seconds of the video, did that comport

9  with the client's explanation that he would turn on the video only

10  when he heard the shower turn off?

11      A    Well, yes, because I mean, a few seconds, there might be

12  -- it seemed to be focused at a closet area or -- and then there

13  was a door, and you would see her emerge from what I thought was a

14  bathroom.

15      Q    Okay, well, did he indicate to you --

16      A    Or from a hallway that -- right.

17      Q    Let me clarify here.

18      A    Okay.

19      Q    Did he indicate to you that he would turn on the

20  recording device when he heard the shower start?

21      A    It was either start -- yes, I thought it was when he

22  heard the water running was my recollection of what he said.

23      Q    Okay, so no specific instance that it was when the water

24  started that he would turn it on?

25      A    No, when he heard the water running, I think was how it

74

1    was put.

2         Q    Now, was there anything about those two incidents or

3    episodes that you saw depicted in the videotape that you felt was

4    not comporting with your client's version of how he came to be in

5    possession of these -- these two -- this video voyeurism tape?

6         A    Well, I mean, I thought it was problematic that that was

7    the only thing on these two -- I mean, they're fairly short --

8    they are two, short clips of a young girl in the video coming from

9    what appeared to be a shower or a bath and dressing, and I mean,

10   that's all that's in it.  There's no -- there's nobody hanging up

11   clothes; there's nobody walking around with clothes on; there's

12   just this and I thought that was problematic.  If you're really

13   trying to catch somebody stealing, I would think there would be

14   other images that would be captured on something that was running.

15        Q    Did you suspect that he had -- that your client may have

16   edited the tapes that you had --

17        A    It looked that it did, yeah.  It either looked edited or

18   controlled taped.

19        Q    Controlled meaning monitored?

20        A    Yes, like I -- I go in and hit the play button or record

21   button specifically when I think someone is going to be doing

22   something in front of the camera.

23        Q    Did you confront your client about that?

24        A    Yes, I -- yes.

25        Q    What did you -- what did you tell him about that?

75

      A    I told him that I thought that that was -- that if it
was truly just a matter of trying to capture somebody stealing, I
thought it was a little odd that those cameras would be placed
only in this room, and that those would be the only images caught
on this, but I mean, he indicated to me that he had forgotten that
that was even there; it was seven years prior; he wasn't a
Christian before that happened.

      Q    And what relevance was his Christianity before or after
that happened?

      A    He had gotten help for what he called a problem when he
became a Christian.

      Q    And that happened after the videotape?

      A    Yes.  He sent me those points about his case.  He
thought that was important.

      Q    Okay.  Did he tell you that he had ever told his
stepdaughter that he had placed the camera there?

      A    I don't -- I mean, I'm assuming he did.  What I had was
a letter from Katherine -- somebody described as Katherine Tinker.

      Q    Uh-huh.

      A    And I think it was either given to me directly, or it
was provided to me in discovery.

      Q    All right.

      A    And that she indicates in that letter that she was aware
of the camera being in her room to catch her stepbrother taking
and she mentioned that there was a wallet found in a car that was

P952

76

1  hers in a seat where he would always sit and that he ate some of

2  her cheesecake.

3       Q    Okay.  And did you present that letter to The Court?

4       A    No.

5       Q    Do you remember?  Okay.  Did you yourself ever speak

6  with Katherine Tinker?

7       A    No.

8       Q    Why was that?

9       A    I was told if we spoke to Katherine Tinker, that deal

10 was off the table.  Her father came to many of the hearings.  Um,

11 we were told if we attempted to talk to Katherine Tinker that that

12 offer of ten years would be withdrawn immediately.

13          MS. MURRAY:  And, Your Honor, excuse me.  I would object

14     to hearsay.

15          THE COURT:  From who?  The prosecutor?

16          MS. MURRAY:  I don't know.

17 BY MS. CORCES:

18      Q    Who -- who told you that?

19      A    Courtney Derry and Rita Peters said, "If you attempt to

20 talk to Katherine Tinker, she -- we view her as a victim, and if

21 you attempt to talk to her or take her deposition, we are in

22 litigation mode, and there will be no offers."

23      Q    Did you advise Mr. Micciche of that fact?

24      A    Yes.  Yes.

25      Q    Did he want you to pursue her -- taking her deposition?

77

A     No.

Q     Why is that?

A     Because, from the get-go -- from when we determined that these images -- when my expert came back and told me these images were not accidentally -- they didn't fall onto this computer accidentally.  These were searched for; they were searched for during the time period that was alleged; he was surprised he wasn't charged with more, um, we were in trying to negotiate and my fear about that video voyeurism was that that would be the item that would keep Judge Tharpe from agreeing to accept this below guidelines negotiation.

Q     And why is that?

A     Because Judge Tharpe at the time had a reputation for not agreeing to go along with negotiated pleas between the State, and this was below guidelines.  It wasn't significantly below guidelines, but it was below guidelines, and if we deposed Katherine --

Q     Okay, just a minute ago -- sorry.  It took me a minute to find it -- you mentioned that you had gotten a letter from your client about points?

A     Yes.

Q     Okay.

A     I think he actually brought this in with him during one of our meetings.  I have it.

Q     Let me show you a copy of what I believe to be that, but

78

1    does that appear to be a pretty accurate copy of that letter?

2        A    Yes.

3        Q    Okay.

4            MS. CORCES:  I'll mark it as State's Exhibit 3 and

5        introduce it at this time, Judge.

6            THE COURT:  Okay, any objection?

7            MS. MURRAY:  As a statement of the Defendant, no.

8            THE COURT:  Okay.  Admitted.

9    (State's Exhibit 3 was admitted into evidence.)

10   BY MS. CORCES:

11       Q    Now, Ms. Moss, did you utilize this letter or summary of

12   points about the case from your client in preparation of your

13   defense?

14       A    I'm sorry?  Did I use this letter?

15       Q    Did you utilize this --

16       A    Well, some of it, I thought was -- I mean, you know --

17   okay, so one of the things I looked at was whether or not they

18   could -- if this video -- because the video was fairly old.  I

19   knew that Katherine was, I think, 18 at the time.  She had just

20   graduated from high school.

21       Q    At the time of the prosecution?

22       A    His arrest, yes.

23       Q    Okay.

24       A    So I did look into the statute of limitations.

25       Q    Right.

79

A     Okay, so I knew that that was not available to me.  Um, the issue of whether or not the videos played on this computer, that was kind of the fall-back position of the -- well, if they got there intentionally.  When I tried to view them, my computer would shut down.  I discussed this with John Magliano and John said he had nothing that indicated that, but the only way to determine that would be to go down, fire up the computer, and try to play one of these videos to see if it played.

Q     Okay.  Well, let me ask you.  There are some important points about the case --

A     Uh-huh

Q     -- specifically I'm going to be looking at, um, Point Number 4:  The video was never viewed by anyone, even me.

A     Okay.

Q     Now, you indicated earlier --

A     Uh-huh.

Q     -- that it appeared to you that the video had been edited.

A     Yes.

Q     Okay, so did that apparent editing, to you, negate this point of defense that your client had provided you with?

A     Yes, there were -- yes.

Q     Okay, so in the totality of the information that you had before you, did you find your client's explanation about how this video came to be in existence, and why was where it was at, to be

P956

80

1    a reasonable one?

2        A    No.

3        Q    So did you find that, in his explanation, you had a

4    reasonable defense by which you could --

5        A    I told him I thought it would be difficult for a jury to

6    understand that or to believe that.

7        Q    Now, did you express a willingness to your client to

8    proceed to trial?

9        A    Absolutely.

10       Q    -- on the voyeurism count?

11       A    It was his decision, absolutely.

12       Q    Okay, did you ever discuss with your client the

13   possibility of severing the video voyeurism counts from the child

14   pornography counts?

15       A    We discussed -- he never expressed any interest in going

16   to trial, period.  If we were going to try the case, obviously,

17   the State gets to determine what -- what gets tried first.  I

18   don't believe they would have tried the video voyeurism, and had

19   we been proceeding to trial on the possession of child

20   pornography, we clearly would have severed out the video

21   voyeurism.

22       Q    Did -- in the offer that you received, I understand that

23   it was conditional on not taking Ms. Tinker's deposition?

24       A    Yes.

25       Q    Was it an offer that pertained to all of the counts he

81

1   was charged with?  Was there an offer of dropping the counts?

2       A     Yes.   There was a sexual performance by a child, but I

3   -- I didn't think that they could proceed on that.  I didn't think

4   that they -- I mean, there was -- I did not believe that they

5   could proceed on that, and there was an offer to nolle pros that.

6       Q     Okay, and that in fact did take place?

7       A     Yes.

8       Q     Okay, and in the offer that you then received as to the

9   remaining counts, was there any indication or reasonable

10  likelihood that you believe the two video voyeurism counts would

11  likely be severed and taken to trial?

12      A     If that was what he wanted to do, we could do that,

13  absolutely.

14      Q     Was the offer conditioned it the being resoluted on all

15  --

16      A     Yes.

17      Q     -- all the counts?

18      A     Yes.  Yes.

19      Q     Okay, so if he had elected to proceed to trial on the

20  video voyeurism count that would have necessitated the trial also

21  on the child pornography counts?

22      A     I believe so, yes, uh-huh.

23      Q     And you explained that to your client?

24      A     Yes.

25      Q     And was he willing to try to sever the -- proceed to

82

1    trial on any of the counts?

2        A    No.   I mean, he didn't like the offer; I didn't like the

3    offer, but he didn't want to go to trial.

4        Q    Is it because you all couldn't get past the impasse on

5    the ten years prison or ten years probation that Mr. Lauro then

6    gets involved?

7        A    Yes, well, I don't know.   They went out -- I was told

8    that he was being hired and I was actually grateful at that point.

9        Q    Okay, did the offer change at all between --

10       A    No.

11       Q    -- the offer you got and the one --

12       A    One of the meetings -- I went first, and that was when

13   Jennifer Johnson was still the prosecutor on it; I met with her

14   and Rita Peters and then Mr. Lauro and I went and met with

15   Courtney Derry and Rita Peters, and he may have actually even gone

16   another time without me.

17       Q    Okay.

18       A    I'm not sure, but --

19       Q    The questions on whether to plead or go to trial --

20       A    Uh-huh.

21       Q    Did you discuss with your client the possibility of

22   calling other family members to say that they were aware video

23   cameras had been set up in the house and things of that nature?

24       A    I was aware that they -- that there were people who were

25   willing to come in and say there were video cameras set up.

83

Q    And you in fact had investigated that?

A    Uh-huh.  I believe it's in the police report that people acknowledged that there were -- that they knew that video cameras were set up in the house, yes.

Q    And even after discussing all of that, had he indicated he was willing to enter his plea after all?

A    Yes.  Yes.

Q    In Claim 4, your client -- your former client has alleged ineffective assistance of counsel for failing to depose witnesses; specifically, detectives and family members.  Did you perceive any reasonable likelihood of getting the police officers to change what was included in the police reports or anything of that nature?

A    No.  I mean, so initially I get the police report; I review it with David.  Most of what was in there, I mean, other than the fact that he said he didn't -- he thought these files had ended up his computer somehow through this Hotwire, FrostWire, peer-to-peer file sharing, it was correct.  One thing he disagreed with was that he disagreed that he stated he had masturbated to the child porn.  I asked Detective Grow when I went down there to view these things.  I said, "Are you sure that he said that or he just didn't admit that he had a pornography problem in general and he masturbated to pornography?"  She was 100 percent, "No, I specifically asked about the child porn.  We don't really care about the adult porn," was her --

84

1    Q    So did you feel you had conducted investigation to your

2    satisfaction in regard to --

3    A    I did not think she was going to change her story on

4    that, and that would be, again, he's saying, "I said this." Her

5    saying, "This was said," and that would be an issue for a jury.

6    Q    Okay.

7    A    There was no question there was Miranda. It was

8    actually done -- the interview was done at his house before he was

9    even arrested, but --

10   Q    In Claim 5 he's alleged that you failed to explain the

11   elements of child pornography to him and you've already testified

12   in detail that you had discussed whether or not he knowingly

13   possessed or intentionally viewed these images?

14   A    Yes.

15   Q    In light of the fact that you had those discussions, did

16   you explain to him what the elements of child pornography were?

17   A    Yes. That's one of my -- I actually go directly to the

18   statute that you're charged under and we read it together. A lot

19   of times we even look at jury instructions.

20           MS. CORCES:  If I may have just one moment, Judge.

21           THE COURT:  Sure.

22           MS. CORCES:  Nothing further of Ms. Moss.

23           THE COURT:  Any cross-examination?

24           MS. MURRAY:  Yes, ma'am.

25                        **CROSS-EXAMINATION**

85

BY MS. MURRAY:

Q    Ms. Moss, when you explained the elements of possession of child pornography to Mr. Micciche; you explained to him that one of the elements is that he had to intentionally possess child pornography --

A    Yes, uh-huh.

Q    -- correct?

A    Uh-huh.

Q    And his version of events is that he did not intentionally possess; correct?

A    That was his original -- that was the original, yes, yes.

Q    Did he ever, ever state to you that he did intentionally possess?

A    He never came out and said, "I -- I -- I'm coming clean. I downloaded this stuff." When I confronted him with what my expert -- when I said, "Listen, David, this is what my expert is saying," he would then switch, "Well, I hadn't been through my counseling. I might have done that when I wasn't through with my counseling," so it kind of went back and forth between -- he -- he placed a lot of emphasis on the counseling with his pastor.

Q    Okay, so let me make sure I understand what you're saying.

A    Yes.

Q    His original version of events is that he did not

86

1   intentionally download child pornography?

2       A    Yes.

3       Q    And when you confronted him with what your expert had

4   said, in the expert's evaluation, did it sound to you as if he was

5   admitting to it, but mitigating by not having gone through --

6       A    Yes.

7       Q    -- counseling?

8       A    Yes.

9       Q    When did that conversation occur?

10      A    When?

11      Q    Yes.

12      A    I can't give you an exact date and time but we had -- we

13  had that conversation on several -- several meetings.

14      Q    Do you keep notes of the substance of your

15  conversations?

16      A    Um, I haven't kept -- no, not in this case.  I have in

17  some cases, but not in this case, but I have a fairly -- I have --

18  I have reports with some notes on it.  I have -- I scanned his

19  points, and I do have on my calendar some of the dates that we

20  met.

21      Q    Okay.  Independent of Mr. Micciche's discussion or

22  comment about not having gone through counseling yet --

23      A    Uh-huh.

24      Q    -- if you looked at the State's evidence, isn't it true

25  that the evidence shows that these child pornography images were

87

1    located on -- on unallocated space in his computer?

2         A    As far as I remember, that is -- that may be true.

3         Q    And -- and the evidence, even if you had an expert

4    testify, would be that unallocated space is where the deleted

5    files go; correct?

6         A    Correct.   That's correct.

7         Q    So what evidence would the State have had that he ever

8    actually viewed them?

9         A    Well, my expert indicated to me that -- and -- okay, so

10   what evidence he had was that that was in the police report.   That

11   was a statement he gave Detective Grow saying, "I would view them

12   and then quickly delete them"; okay?

13        Q    Well, isn't it -- I'm sorry to interrupt --

14        A    Yes.

15        Q    -- but wouldn't his statement would have been, "I was

16   downloading a whole bunch of pornography" --

17        A    Yes.

18        Q    -- "and when this image popped up that was clearly not

19   adult pornography, I would immediately delete it"; correct?

20        A    Yes.

21        Q    And so wouldn't that indicate a failure of having an

22   intention to view child pornography?

23        A    Except for the searches that were clearly -- that my

24   expert -- and I honestly didn't know anything about this until my

25   expert looked at this and said, "Debbie, he's actively searching a

88

1  lot for Lolita, preteen hard core."  I forget the -- I mean, the

2  terms that are very common, I guess, in doing this.

3       Q    Okay, and so just to be clear, you used the analogy of

4  searching for Gone with the Wind, but that's not what we're

5  talking about here.  Are you saying that a person would have to

6  input specific words that would only have acquired child

7  pornography as opposed to words that would have a acquired adult

8  pornography and then, inadvertently, have downloaded child

9  pornography?

10      A    My expert said that the searches, the PTHC, which meant

11  nothing to me -- would not necessarily mean anything to anybody --

12  is a specific term, preteen hard core.  There was --

13      Q    Go ahead, I'm sorry.

14      A    -- there were Google searches for Lolita.  There were

15  Google searches for -- and this is -- without having a report.

16  There were Google searches -- he said there were many, many, many

17  searches.

18      Q    And what evidence would the State have had that it was

19  Mr. Micciche who inputted that search?

20      A    Well, you could tell the time, because, based on -- you

21  can tell the time and the date that these searches occurred.

22      Q    Yes.

23      A    And, according to what was in the police report and what

24  was -- seemed to be undisputed by Mr. Micciche and his family is

25  that this -- this is the only computer that was password protected

89

1    and this would have been the time period where he would have been

2    the only person with access to that computer.

3        Q    Okay, and that's based on information that the State

4    knew?

5        A    Uh, it's in the police report, because they went to

6    every single family member and said, "Which computer do you use?"

7    and they all said that's his computer; it's password protected;

8    we're not allowed to use it.

9        Q    Okay.

10       A    And my discussions with his family.

11       Q    So what family member told you that?

12       A    I believe Sally Peyton, his wife.

13       Q    Sally Peyton told you that the computer was password

14   protected and that no other family member used it?

15       A    That's correct.  She used the laptop.

16       Q    Okay, I don't care what computer she used.  What I'm

17   asking you is --

18       A    Uh-huh.

19       Q    -- Sally Peyton told you that that computer where the

20   child pornography was located was password protected and nobody

21   else used it?

22       A    Yes.  That -- we had that discussion with her present,

23   yes.

24       Q    How did Mr. Micciche indicate he did not want to go to

25   trial?

90

A    He -- well, I explained to him, you have the right to go to trial.   They will have to prove that you intentionally downloaded images that you knew to be child pornography and then it's up to the jury to view those images; make the determination that they are in fact child pornography, and he said he did not want to do that; that he was afraid of the outcome.

Q    In regard to his statement to you that his computer would shut down if he attempted to click on any of those, did you ever test the computer to see if it did that?

A    I did not.   That was very late in the game, so once my -- once my expert came back; said there were active searches; there were many images that he thought were -- would -- would qualify as child pornography, I met with my client and then that was kind of the -- well, when I tried to look at them, they would -- my computer would shut down and then I went back to my expert; said, "Do you have any idea if that is -- is that correct or is there anything that you saw that would indicate that?" and he said, "No, that the only way that you could -- he doubted that, but he said the only way you would be able to know for sure was if" --

Q    Right, your expert would not have known unless he had actually tested the computer --

A    Correct.

Q    -- correct?

A    Correct, correct.

91

Q    Okay.

A    And attempted to open the files that were found.

Q    In regard to the letter that your expert did provide for you --

A    Yes.

Q    -- where he gave three other options of investigating that could possibly provide defenses --

A    Yes.

Q    -- you said that you reviewed this letter with your client; correct?

A    Yes.

Q    Okay.  And specifically as to Number 2, was the hard drive that was in the computer used and purchased with data already on it?  Are you testifying that you specifically asked him about that?

A    We reviewed this letter and I had never been told that the hard drive had -- was from somewhere else.

Q    Meaning that Mr. Micciche never told you that?

A    Correct.  I mean, I gave him this letter.  I said, "This is the letter because I'm not having him write a report because I believe it would be discoverable by the other side," and I said, "This is the letter."  We sat down.  We looked at it, and there was no indication that the hard drive had come from some other computer.  I never had that indication.

Q    And he never told you that the computer was not in his

92

1   total control?

2      A   No, my understanding, that was never an issue in this

3   because that's the first thing.

4      Q   I just want to make sure.  He never told you --

5      A   Correct.

6      Q   -- that it was not in his total control?

7      A   That's correct.  Well, that anyone else had access to

8   that computer.  I mean, it was -- it was in a house where there

9   were people, but that, to his knowledge, no one else used that

10   computer.

11         MS. MURRAY:  Can I have just a moment, Your Honor?

12         THE COURT:  Yes.

13   BY MS. MURRAY:

14      Q   Do you have any notes in your file that reflect when you

15   discussed the expert's letter?

16      A   I don't have it when it was discussed.  It was -- it was

17   January of 2013 when it would have been written to me.

18      Q   Okay, and does your -- does your file have notes that

19   would reflect the substance of the conversation that you had with

20   Mr. Micciche at the time that you presented your expert's letter

21   to him?

22      A   No.

23      Q   Okay.

24         MS. MURRAY:  All right, Your Honor, that would be all I

25   have.

93

1       THE COURT:  Any redirect?

2       MS. CORCES:  Your Honor, just -- I'm going to have her

3    identify.

4                        **REDIRECT EXAMINATION**

5  BY MS. CORCES:

6       Q    Take a look at these files.  Is this a true-and-accurate

7  copy of that letter that you've made reference to several times as

8  coming from your expert?

9       A    Yes.

10       MS. CORCES:  Judge, I'm moving in State's 4.

11       THE COURT:  Okay.  Any objection?  Any objection?

12       MS. MURRAY:  To the introduction of the letter?

13       THE COURT:  Yes.

14       MS. MURRAY:  No, I think we've had a lot of testimony

15    about it.

16       THE COURT:  Okay.  Admitted.

17       MS. CORCES:  Thank you, Your Honor.

18  (State's Exhibit 4 was admitted into evidence.)

19       THE COURT:  Okay.  Anything else, Ms. Corces?

20       MS. CORCES:  No, Your Honor.

21       THE COURT:  Any rebuttal, Ms. Murray?

22       MS. MURRAY:  No.

23       THE COURT:  Thank you, Ms. Moss.

24       MS. MOSS:  Okay.

25       THE COURT:  You can step down.

94

1        MS. MOSS:  Thank you.

2        THE COURT:  And you are free to go.

3        MS. MOSS:  Thank you.

4        MS. MURRAY:  Your Honor, I do -- sorry -- I do need to

5   recall my client.

6        THE COURT:  Okay.  Mr. Micciche.  Go ahead.

7                        DAVID MICCICHE,

8   having been duly sworn, was recalled, examined, and testified as

9   follows:

10                     REBUTTAL EXAMINATION

11  BY MS. MURRAY:

12       Q    In regards to the letter that Mr. Magliano wrote, who

13  appears to be the computer expert that Ms. Moss hired, did you

14  have an opportunity to review that letter with Ms. Moss?

15       A    Yes, ma'am.

16       Q    And on the letter it states that there are three

17  possible ways to approach a child pornography case, and the first

18  one is, "Was the Defendant in total control of the computer at all

19  times?"  Did you ever tell Ms. Moss that you were not in total

20  control of that computer?

21       A    Absolutely.

22       Q    And did you provide her with the names of any other

23  people who might have used the computer?

24       A    I don't know about specific names but I said roughly

25  nine people that had continuous use of that computer.

95

Q    Okay, in regard to Number 2, "Was the hard drive that was in the computer used and purchased with data already on it?" that specifically relates to that portion of your claim where you indicate -- or you testified that you have other used parts at your home; correct?

A    Yes, ma'am.

Q    Did you ever tell Ms. Moss that your computers are comprised of used parts that are collected from other computers?

A    Yes, ma'am. I testified to that earlier.

Q    But you told her that?

A    Yes, I did.

Q    And what was her response when you told her these things?

A    Again, that was when she said, "All this stuff put together is too much to refute." She called it the perfect storm. "Even though it was based on lies or whatever, that there's no way we can argue it."

            MS. MURRAY:  All right, Your Honor.  That would be all.

            THE COURT:  Cross-examination?

            MS. CORCES:  No, Your Honor.

            THE COURT:  Okay, all right, very good.  So, Mr. Micciche, what's going to happen now is I'm going to be taking the matter under advisement so you will be sent back to Florida State Prison pending the issuance of my order.  If I grant your motion then you will be brought back to

96

1    Hillsborough County for further proceedings and essentially

2    you will be put back in the spot where you were when these

3    charges were first pending before you had been convicted.  If

4    I deny your motion, however, you do need to understand that

5    Ms. Murray's representation of you ends as of today, so if I

6    do deny your motion and you wish to file an appeal of my

7    denial, it would be your responsibility to get the Notice of

8    Appeal filed within 30 days of receiving any order.  Do you

9    understand?

10        MR. MICCICHE  Yes, ma'am.

11        THE COURT:  Okay.  All right.  Very good.  Thank you.

12   (The proceedings were concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

97

1                    **C E R T I F I C A T E**

2   STATE OF FLORIDA

3   COUNTY OF HILLSBOROUGH

4       I, Carol Craven, certify that the foregoing transcription is

5   true and correct of the proceedings in this matter, taken by way of

6   electronic recording.

7

8

9

10  Carol Craven, Electronic Court Reporter
    Record Transcripts Incorporated

11

12

13

14

15              Dated this November 30, 2015

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DAVID MICCICHE,

Petitioner,

v.                                          Case No.:8:18-cv-1270-T-35JSS

SECRETARY, DEPARTMENT OF CORRECTIONS,

Respondent.

_____/

# Exhibit 11

IN THE THIRTEENTH JUDICIAL CIRCUIT COURT
FOR HILLSBOROUGH COUNTY, FLORIDA
Criminal Justice and Trial Division

STATE OF FLORIDA                    CASE NO.:   12-CF-007866

v.

DAVID MICCICHE,                     DIVISION:   I/J
        Defendant.
_____/

### ORDER DENYING CLAIM TWO OF 3.850 MOTION FOR POSTCONVICTION RELIEF, CLAIMS ONE, THREE, AND FOUR OF AMENDED 3.850 MOTION FOR POSTCONVICTION RELIEF, AND CLAIMS FIVE, SIX, AND SEVEN OF DEFENDANT'S MOTION TO ADD CLAIMS TO HIS PREVIOUSLY FILED AMENDED MOTION FOR POST CONVICTION RELIEF

THIS MATTER is before the Court on Defendant's "3.850 motion for postconviction relief" filed January 15, 2014, pursuant to Florida Rule of Criminal Procedure 3.850. On April 23, 2014, the Court dismissed without prejudice claims one, three, and four of Defendant's "3.850 motion for postconviction relief" and reserved ruling on claim two of Defendant's "3.850 motion for postconviction relief." On May 12, 2014, Defendant filed an "amended 3.850 motion for postconviction relief (with incorporated 'memorandum of law')." On July 31, 2014, the Court ordered the State to respond to the allegations in claim two of Defendant's "3.850 motion for postconviction relief" and claims one, three, and four of Defendant's "amended 3.850 motion for postconviction relief" within forty-five (45) days.

On August 18, 2014, Defendant filed a "motion for leave to reply to State's response on motion for postconviction relief." On September 15, 2014, the State filed its response. On September 24, 2014, the Court granted Defendant's "motion for leave to reply to State's response on motion for postconviction relief" for twenty (20) days. On September 29, 2014, Defendant filed a "reply to the State's response." On October 14, 2015, the Court granted an

evidentiary hearing on claim two of Defendant's "3.850 motion for postconviction relief" and claims one, three, and four of Defendant's "amended 3.850 motion for postconviction relief." On May 18, 2015, Defendant, through counsel, filed "Defendant's motion to add claims to his previously filed amended motion for post conviction relief."

On May 28, 2015, the Court ordered the State to respond to claims five, six, and seven of "Defendant's motion to add claims to his previously filed amended motion for post conviction relief" within forty-five (45) days. On July 13, 2015, the State filed its response. On July 31, 2015, the Court granted an evidentiary hearing on claims five, six, and seven of "Defendant's motion to add claims to his previously filed amended motion for post conviction relief." On November 17, 2015, the Court held the evidentiary hearing. After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds as follows:

In case 12-CF-007866, on August 27, 2013, Defendant pleaded guilty pursuant to a negotiated plea agreement to ten counts of possession of child pornography (counts one through ten) and two counts of video voyeurism (counts eleven and twelve). (*See* plea form, plea letter, August 27, 2013, transcript, attached). The Court sentenced him to ten (10) years' prison on counts one through six, placed him on ten (10) years' probation on counts seven through ten, and five (5) years' prison on counts eleven and twelve, with counts one through six, eleven, and twelve to run concurrently with each other and counts seven through ten to run concurrently with each other, but consecutive to counts one through six, eleven, and twelve. (*See* judgment and sentence, order of sex offender probation, August 27, 2013, transcript, attached). Defendant did not appeal the judgment, sentence, or order of sex offender probation.

2

In his claims, Defendant alleges ineffective assistance of counsel. When ineffective assistance is alleged, the burden is on the person seeking collateral relief to allege the grounds for relief specifically, and to establish whether the grounds resulted in prejudice. Effective assistance of counsel does not mean that a defendant must be afforded errorless counsel or that future developments in law must be anticipated. *Meeks v. State*, 382 So. 2d 673 (Fla. 1980). In *Strickland v. Washington*, the U.S. Supreme Court provided the following standard for determining ineffective assistance of counsel after a defendant has been found guilty at trial:

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.... [T]he proper standard for attorney performance is of reasonably effective assistance.

*Strickland v. Washington*, 466 U.S. 668, 686-687 (1984). In *Downs v. State*, the Florida Supreme Court stated that a defendant must prove prejudice affirmatively. *See Downs v. State*, 453 So. 2d 1102 (Fla. 1984). "In order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

In claim one of his May 12, 2014, amended rule 3.850 motion, Defendant alleges ineffective assistance of counsel due to counsel's failure to investigate allegations of false information provided to the State in police reports considered to issue an arrest warrant and secure a conviction. Specifically, Defendant alleges on April 24, 2012, he was interviewed, post-*Miranda*, by Detective Karen DiPaolo of the Hillsborough County Sheriff's Office. Defendant alleges the interview took place during the execution of a search warrant that had

3

been issued in connection with information compiled that led police to believe that specific images of child pornography, that had been purposely planted by law enforcement, had been viewed at Defendant's address.

He alleges he waived his *Miranda* rights and chose to speak openly with Detective DiPaolo to protect his family and because he believed he had nothing to hide as his past behavior had nothing to do with any intentional viewing of child pornography. He alleges the interview was conducted in his home and in the presence of Detective Heaverin. However, he alleges the interview was neither videotaped nor recorded and no transcription is available for review.

He alleges he openly admitted to viewing adult pornography, but not child pornography. He alleges he admitted that sometimes images of children would come up when he was searching for adult pornography, but would quickly delete them when he realized they were of children in sexual situations. However, he alleges Detective DiPaolo drafted a document titled "Interview-suspect" and fabricated what would appear to be a confession to the allegations against Defendant. He alleges admissions that he provided pertaining to the viewing of adult/mature pornography were taken out of context and rewritten to apply to the child pornography in question.

Moreover, Defendant alleges he explained to his counsel that he did not confess to any crime involving child pornography and many statements provided in Detective DiPaolo's police report were either taken out of context or simply untrue. He alleges the false statements drafted in the detective's police report were material to the case and said statements were generated to create a confession when no confession was actually provided. He alleges this "confession evidence" was the single most pertinent piece of information provided to the State for the purpose of conviction.

4

He alleges his counsel's reliance upon the false police report was the functional equivalent of a failure to develop a viable defense to the alleged offenses. Defendant lists several examples of false statements and comments taken out of context which are contained in the detective's police report. He alleges he brought said fabrication to his counsel's attention, and she failed to follow through to protect Defendant's constitutional rights. He alleges had his counsel performed reasonably effective and investigated the allegations made by Defendant regarding these statements, a defense strategy could have been developed to refute these false statements, Defendant would not have entered a plea to an offense he did not commit, and he would have insisted on proceeding to a jury trial. After reviewing the allegations, the court file, and the record, the Court found Defendant's allegations were facially sufficient and ordered the State to respond.

In its response, the State asserted due to the nature of the allegations, it concedes to the need for an evidentiary hearing on claim one. (*See* State's response, attached). After reviewing the allegations, the State's response, the court file, and the record, the Court found Defendant was entitled to an evidentiary hearing on this claim.

At the evidentiary hearing, Defendant testified he retained Ms. Deborah Moss to represent him. (*See* November 17, 2015, transcript, p. 5, attached). He testified that after Ms. Moss advised him that there was no hope and he had to settle, Ms. Lauro was brought in to look over the documents to see if there was anything overlooked. (*See* November 17, 2015, transcript, p. 5, attached). He testified he met with Ms. Moss or Ms. Lauro three times prior to entering his plea. (*See* November 17, 2015, transcript, p. 5, attached). He admitted he had the opportunity to review the State's discovery and ask them questions he had or issues he was concerned about. (*See* November 17, 2015, transcript, p. 5, attached).

5

He admitted the police reports were part of the State's discovery. (*See* November 17, 2015, transcript, pps. 5-6, attached). He testified page 31 of the police report listed him as a youth pastor, which he was not. (*See* November 17, 2015, transcript, p. 6, attached). He testified the police report erroneously listed the interview was conducted in his daughter's bedroom, but it was conducted in his bedroom. (*See* November 17, 2015, transcript, p. 6, attached). He further testified the police report indicates he stated he is the only one who uses that computer in the office, but actually stated it was the only computer he uses. (*See* November 17, 2015, transcript, pps. 6-7, attached). He testified the police report erroneously indicated the computer was password protected and nobody else had access to it. (*See* November 17, 2015, transcript, p. 7, attached). However, he testified the computer was actually password protected on startup only and it was left on all the time since it was a server. (*See* November 17, 2015, transcript, p. 7, attached). He testified he stated pornography was morally wrong, but the report indicated he stated he viewed child pornography and he knew what he was doing was wrong. (*See* November 17, 2015, transcript, p. 7, attached). He further testified regarding other falsities contained within the police report. (*See* November 17, 2015, transcript, pps. 7-12, attached).

When asked about Ms. Moss' response after he indicated to her that there were false statements in the police reports attributed to him, he responded as follows:

> MICCICHE:   When I told her everything that was wrong with the police report, she used the term "perfect storm," basically saying that the evidence in here would be impossible to prove; that it's my word against theirs and used the term "perfect storm," as, again, you know, basically, it's not something we can overcome.

(*See* November 17, 2015, transcript, p. 12, attached). He testified his wife Ms. Peyton was present at the time he gave his statement to law enforcement. (*See* November 17, 2015,

6

transcript, pps. 12-13, attached). He admitted he ultimately found out that the fact he was

misquoted in his statement did matter. (*See* November 17, 2015, transcript, p. 13, attached). He

further testified as follows:

> MICCICHE:   Because I - - we didn't know anything about what
> was necessary to be proven. I was told by Ms.
> Moss, basically, "You're guilty. Sign this paper." I
> didn't know anything about prongs that had to be
> proven. I didn't know any, you know, in order to
> get this conviction, the State has to prove this, this,
> and this, and we didn't know anything about that. I
> didn't know anything about that until I did my own
> research.

(*See* November 17, 2015, transcript, p. 13, attached). He testified if he had known he could

challenge the false information, he would have gone to trial. (*See* November 17, 2015,

transcript, p. 13, attached).

On cross-examination, he admitted he advised Ms. Moss of all the falsities in the police

reports and wanted her to investigate or have the report stricken from evidence as untruthful.

(*See* November 17, 2015, transcript, p. 23, attached). He admitted it would have required him to

go to trial. (*See* November 17, 2015, transcript, p. 23, attached). However, he testified Ms.

Moss advised him that it was not worth going to trial and did not stand a chance because just

clicking on something is enough to be a conviction. (*See* November 17, 2015, transcript, p. 24,

attached). He further testified Ms. Moss could have challenged the statements by conducting

depositions to see what the investigators meant when they wrote the report. (*See* November 17,

2015, transcript, p. 24, attached).

At the same hearing, Defendant's wife Ms. Sally Peyton testified and denied being

present during the interview when the police were at the house and questioned Defendant. (*See*

November 17, 2015, transcript, p. 26, attached). She denied hearing Defendant when he was

7

talking to the police about the case. (*See* November 17, 2015, transcript, p. 26, attached). She did not recall whether the computer in the office was password protected because it was always on and logged in. (*See* November 17, 2015, transcript, p. 26, attached). She admitted other people used the computer in the office, including Defendant's son, family members, friends of family members, and herself. (*See* November 17, 2015, transcript, pps. 26-27, attached). She testified Defendant's son was a teenager at the time. (*See* November 17, 2015, transcript, p. 27, attached).

She testified she knew Defendant put a camera in Katherine's bedroom to catch his son Little David in the act of stealing money from the girls or from the boys. (*See* November 17, 2015, transcript, p. 27, attached). She admitted they told Katherine about the camera. (*See* November 17, 2015, transcript, p. 27, attached).

She testified the computer in the office was mostly used to download music. (*See* November 17, 2015, transcript, pps. 32-33, attached). She testified she did not remember ever speaking directly to Ms. Moss. (*See* November 17, 2015, transcript, p. 33, attached). She admitted to being aware of the video of Katherine after the detectives brought it to her attention. (*See* November 17, 2015, transcript, p. 34, attached). She testified she thought Katherine was around twelve years old in that video. (*See* November 17, 2015, transcript, p. 34, attached).

At the same hearing, Ms. Deborah Moss testified regarding her training and experience in criminal law. (*See* November 17, 2015, transcript, p. 47, attached). She admitted to representing Defendant. (*See* November 17, 2015, transcript, p. 48, attached). When asked about her understanding of the charges against Defendant at the beginning of her representation, she responded as follows:

> MOSS:     I met Mr. Micciche shortly after the warrant was
>           executed at his house. He came to our office. It

8

> was my understanding that he had numerous - - he
> had been arrested for numerous counts of child
> pornography, possession of child pornography. At
> that time, he had also, I think the following day,
> they came to his house; they executed the warrant,
> and then it was either the following day or a few
> days later, they came back and rearrested him for
> video voyeurism.

(*See* November 17, 2015, transcript, p. 48, attached). She testified she met with Defendant ten to

fifteen times because he was out on bond and would go to her office to speak with her. (*See*

November 17, 2015, transcript, p. 48, attached). She further testified she spoke with his wife.

(*See* November 17, 2015, transcript, p. 49, attached).

      She admitted to making a demand for discovery, obtaining all the police reports, and

reviewing them with Defendant. (*See* November 17, 2015, transcript, p. 49, attached). She

testified Defendant told her that he admitted to law enforcement that he masturbated to

pornography, but he told them he did not masturbate to child pornography. (*See* November 17,

2015, transcript, p. 50, attached). However, she testified Defendant did not dispute that he told

law enforcement he was the only one to ever use a particular computer in his home. (*See*

November 17, 2015, transcript, p. 50, attached).

      She testified Defendant indicated to her that he was the only user of the computer that

was the subject of where the child porn images were located and that it was password protected.

(*See* November 17, 2015, transcript, p. 50, attached). She denied that he ever indicated to her

that the password protected computer was left open and did not necessitate password use. (*See*

November 17, 2015, transcript, p. 50, attached). She testified the computer in question was

located in kind of an office bedroom area. (*See* November 17, 2015, transcript, p. 50, attached).

      She testified she discussed with Defendant who else would have access to this computer

and might have downloaded the child porn, but it appeared that he was the only person in the

9

household with access. (*See* November 17, 2015, transcript, p. 51, attached). She further

testified, "I do not believe there was any indication that anyone else had ever used that computer

by anybody." (*See* November 17, 2015, transcript, p. 51, attached). When asked if Defendant

ever indicated to her that the password, once entered, would be allowed to remain open and did

not necessitate additional password entry, she responded, "[n]o. I mean, we didn't - - no. I

mean, there really - - that really didn't seem to be an issue at all; that it was his computer. He

was the one who had it, the password, and that other people did not use it." (*See* November 17,

2015, transcript, p. 52, attached).

When asked what he told Defendant in terms of how law enforcement became involved

in this case, Ms. Moss responded as follows:

> MOSS:     Um, well, I mean, law enforcement has the ability
>           to follow these digital images of known child
>           pornography; images that they know that images of
>           these children are underage, that they have has
>           values and SHA values, and that they can actually
>           identify these digital images as they pass through
>           their servers. I believe in this case, it was a server
>           in Wyoming that had picked it up and they are able
>           to follow these images to the IP address.

(*See* November 17, 2015, transcript, p. 52, attached). She testified the child pornography images

were seen by law enforcement going to this IP address between August 2011 and April of 2012.

(*See* November 17, 2015, transcript, pps. 52-53, attached). She testified when she and Defendant

discussed this time frame, he indicated to her he was downloading large files of video and audio

files and thought maybe some of those images had come in accidentally through that. (*See*

November 17, 2015, transcript, p. 53, attached).

However, she denied that they discussed his computer being made up of parts scavenged

from other locations or other computers. (*See* November 17, 2015, transcript, p. 54, attached).

P614

She testified Defendant never indicated to her that portions of his computer could have contained items he was unaware of. (*See* November 17, 2015, transcript, p. 54, attached). She admitted Defendant indicated to her that he was the only one using that particular computer. (*See* November 17, 2015, transcript, p. 54, attached). She testified they discussed the discovery. (*See* November 17, 2015, transcript, pps. 54-55, attached). She testified Defendant advised her he thought the files could have accidentally ended upon on his computer thorough FrostWire or LimeWire. (*See* November 17, 2015, transcript, p. 55, attached).

She testified law enforcement located the images going to the particular IP address through file sharing such as LimeWire and FrostWire and all this information was contained within the application for the search warrant in the search warrant itself. (*See* November 17, 2015, transcript, p. 55, attached). She testified based on his explanation on how the files may have ended up on his computer, she hired expert John Magliano. (*See* November 17, 2015, transcript, p. 56, attached). However, she testified she asked Mr. Magliano not to write a report because he had nothing beneficial for Defendant and the information he could have provided was actually harmful to Defendant. (*See* November 17, 2015, transcript, p. 56, attached). When asked about John Magliano's evaluation, she responded as follows:

> MOSS: Well, I was given, through discovery, the FDLE - - FDLE has software that they attach to a computer that prints out all of the searches, all of the files that were viewed. I mean, it is an exhaustive list. It was contained on disks. I provided that to him and what he told me was - - is that - -
>
> CORCES: He, Mr. Micciche, you mean?
>
> MOSS: No, no. My expert.
>
> CORCES: Okay.

11

| MOSS: | When I spoke to him about - - once he reviewed it - - he indicated to me that there were active searches during the time period that were alleged, that he - - that were for child pornography. He's done a lot of this work. PTHC, Preteen Hard Core, Several Google searches for Lolita, that he believed that the State would be able to show through the introduction of this evidence that there were active searches on that computer for child pornography. |
|---|---|

(*See* November 17, 2015, transcript, pps. 56-57, attached). She admitted the expert's evaluation was consistent with what she read in the application for search warrant. (*See* November 17, 2015, transcript, p. 57, attached). She testified she advised Defendant about what the expert found and Defendant told her that he could not open those files and his computer would shut down. (*See* November 17, 2015, transcript, p. 57, attached).

She testified although Mr. Magliano did not generate a report, he provided her with a January 20, 2013, letter outlining some other avenues she may want to explore. (*See* November 17, 2015, transcript, p. 58, attached). The letter was admitted as State's exhibit 4. (*See* November 17, 2015, transcript, p. 93, attached). Ms. Moss read portions of the letter during the following:

| MOSS: | It says, "After extensively reviewing all the information collected and examined of the evidence collected from David Micciche, I have not found any defenses that would help his case. I have also found references to other data that was not used against him that could be included in a trial." He indicated to me a surprise that my client was only charged with ten counts based on what his examination of this - - of the documents I had provided - - |
|---|---|
| CORCES: | Excuse me. Of the documents or the hard drive? Did he get to examine the actual hard drive? |
| MOSS: | No. He examined the - - the, basically a case file printed out from his FDLE report and the discovery, |

12

> but he - - he said - - he just kind of went on, but
> here are some other things, "Was the Defendant in
> total control of the computer at all times?" "Was
> the hard drive that was in the computer used and
> purchased with data already in it?"  Okay, this is - -
> I had never - - there had never been any indication
> of that.  "And was data downloaded on the hard
> drive when the Defendant was not at home and can
> prove it?" and we - -

(*See* November 17, 2015, transcript, pps. 58-59, attached).

She testified she and Defendant reviewed all the points raised by Mr. Magliano in his letter and it was her understanding that the computer in question was under his control at all times, which was confirmed in the police report because it was asked by the detectives of all the people in the home. (*See* November 17, 2015, transcript, p. 60, attached).  She further testified she never had any indication that the hard drive on the computer was used and purchased with data already on it and had come from somewhere else. (*See* November 17, 2015, transcript, pps. 60-61, attached).

She admitted to having discussions with Defendant about unallocated space. (*See* November 17, 2015, transcript, p. 61, attached).  However, she denied that Defendant indicated to her that unallocated space would be used as an area of defense in this case. (*See* November 17, 2015, transcript, p. 61, attached).  She testified it was her understanding that with the unallocated space, if you delete a file, there is still evidence of that file that can be stored in this unallocated space. (*See* November 17, 2015, transcript, p. 61, attached).  However, she denied that Defendant ever indicated to her that somebody other than himself would have downloaded and deleted these files leaving them in unallocated space. (*See* November 17, 2015, transcript, pps. 61-62, attached).

13

She testified she believed the ten counts of child pornography were of items previously deleted and located on the unallocated space during the time that was alleged and there were active searches for that period on his computer. (*See* November 17, 2015, transcript, pps. 62-63, attached). When asked what was it that would have connected those older images to Defendant in 2012, she responded, "[t]he searches, Google searches, Yahoo searches that my expert said were very plentiful, and that there were many, many, many, many images." (*See* November 17, 2015, transcript, p. 63, attached). She admitted to viewing the items of child pornography and described them as follows:

> MOSS:  I saw - - I asked to see every - - the image or the - - what was on my client's computer that he was being charged with. Every - - every count, so I was - - I met Detective Grow and I believe it was a gentleman, Mr. Haverand (ph.), down at Falkenburg Road. They had set up, um, basically, on a computer, where they were able to take me to what looked like a thumbnail image and that they would click on it, and I asked if that was what was found on my client's computer, and they said the thumbnail was what was on the computer, and that this was what they could show had been there but deleted…

(*See* November 17, 2015, transcript, p. 63, attached).

She testified that on the thumbnail images, there was a baby in diapers being digitally penetrated, obviously prepubescent children engaged in sexual acts, including oral sex and a prepubescent child being penetrated by an adult penis. (*See* November 17, 2015, transcript, pps. 63-64, attached). She testified the images she saw were consistent with the nature of the searches law enforcement indicated Defendant had actively engaged in and were consistent with what her expert advised her. (*See* November 17, 2015, transcript, p. 64, attached).

14

When asked if Defendant ever indicated to her that he had a defense and there was no

known possession of child pornography, Ms. Moss testified as follows:

> MOSS: Well, we discussed that - - that issue of they just
> ended up when I was downloading large files from
> FrostWire or LimeWire, that somehow they just
> snuck in there. My expert said no, that's not how
> this works. These large file-sharing programs, if
> you type in, "I want to see Gone with the Wind,"
> and that's typically what they're used for is to
> download large video and audio files, that Gone
> with the Wind will go out to a bunch of different
> computers and will take pieces of Gone with the
> Wind from everybody's computer, but it won't take
> Lolita - - it - - it won't pick Lolita up in that Gone
> with the Wind file.

(*See* November 17, 2015, transcript, pps. 64-65, attached). She further testified, "[b]ut there was

no mistake that this was being searched for and it was on his computer. That - - my expert was

like there is no mistake here" and she advised Defendant of that. (*See* November 17, 2015,

transcript, p. 65, attached).

She testified she did not depose the detectives because she did not believe there was

anything that was highly in dispute or that needed clarification outside the police report. (*See*

November 17, 2015, transcript, p. 66, attached). She testified she received an offer of ten years'

prison followed by ten years' probation, but if they wanted to litigate, the offer was off the table.

(*See* November 17, 2015, transcript, p. 67, attached). She testified she conveyed the offer to

Defendant, but Defendant did not want to proceed to trial. (*See* November 17, 2015, transcript,

p. 67, attached). She further testified as follows:

> MOSS: I mean, early on, before we got this - - I had him
> evaluated by Dr. Cotter. He had indicated to me
> that, yes, he had had a very serious pornography
> problem. Um, he denied the child pornography, but
> that he had had a serious pornography problem; he
> had gotten help for it. I mean, it was mostly dealing

15

> with mitigation of sentencing; not - - not that these
> things don't - - weren't on my computer.

(*See* November 17, 2015, transcript, p. 67, attached).

When asked if Defendant ever indicated to her that he wanted to litigate the case because of the falsity of information contained in the police report, she responded, "[h]e disputed, in the police report Peggy Grow - - and I actually spoke to her about this down at the - - when I went down there - - that he disputed that he told her that he masturbated to child pornography." (*See* November 17, 2015, transcript, pps. 67-68, attached). She denied that Defendant ever relayed to her that the computer, although password protected, was not kept locked off. (*See* November 17, 2015, transcript, p. 68, attached). She testified she did not think Defendant disputed the fact that the police report indicated he said he recognized the file names from the recycling bin. (*See* November 17, 2015, transcript, p. 68, attached). She denied that Defendant ever wanted to litigate the case and go to trial. (*See* November 17, 2015, transcript, pps. 69-70, attached). She testified although they may have discussed filing a motion to suppress, there was no suppression issue because it was a trial issue involving "he said, she said." (*See* November 17, 2015, transcript, p. 69, attached).

On rebuttal, Defendant admitted to reviewing the expert's letter with Ms. Moss. (*See* November 17, 2015, transcript, p. 94, attached). He testified he told Ms. Moss he was not in total control of that computer and told her nine people had continuous use of that computer. (*See* November 17, 2015, transcript, p. 94, attached). He testified the hard drive on that computer was used and purchased with data already on it. (*See* November 17, 2015, transcript, p. 95, attached). He testified he told Ms. Moss his computers are comprised of used parts collected from other computers. (*See* November 17, 2015, transcript, p. 95, attached).

16

After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds Ms. Moss' testimony more credible than that of Defendant. Therefore, the Court finds Ms. Moss investigated the case, including the alleged false information. The Court finds to the extent that there were any discrepancies that could have been litigated, such would not have been proper in a pretrial motion, including a pretrial motion to suppress, because it was a "he said, she said" issue which would have been proper to address during a trial. However, the Court finds Defendant did not want to go to trial. Consequently, Defendant failed to prove that Ms. Moss acted deficiently or any resulting prejudice when she did investigate the alleged false information and was prepared to address any discrepancies at trial, but Defendant chose to enter a plea and did not want a trial. As such, no relief is warranted upon claim one of his May 12, 2014, amended rule 3.850 motion.

In claim two of his January 15, 2014, rule 3.850 motion, Defendant alleges ineffective assistance of counsel when counsel misadvised Defendant to enter a guilty plea to two counts of video voyeurism when a viable defense existed to demand an acquittal at trial. Specifically, Defendant alleges to prove the offense of video voyeurism, the State was required to prove that Defendant recorded images of the victim, his step-daughter, without her knowledge or consent. He alleges the State was required to prove that Defendant did so for his own amusement, entertainment, sexual arousal, gratification, profit, or for the purpose of degrading or abusing his step-daughter. Defendant alleges neither of these essential elements could have been proven at trial and Defendant's counsel possessed evidence to the contrary.

He alleges he had placed a camera in his step-daughter's bedroom years ago to catch his son stealing from her and his daughter. He alleges his step-daughter would have been available

17

to testify that she had knowledge of the camera. He alleges she wrote a letter to his counsel explaining and admitting to this knowledge of placement of the camera. He alleges her testimony would have given rise to doubt regarding the element that the recording was done without the victim's knowledge. He further alleges testimony could have been acquired from other family members who recalled the incidents of theft and the subsequent installation of surveillance equipment.

He alleges his counsel advised him that even if an acquittal could be obtained on these two counts, the remaining ten unrelated counts may be lost, and the State would seek a harsher penalty. He alleges the option to sever was never explored, nor was a trial strategy analysis performed to determine if proceeding on the severed counts would be a sound strategy. He alleges his counsel failed to contact his son David Jr. and his wife. He alleges his wife could have testified regarding her knowledge of the equipment. He alleges he advised his counsel about his family members being able to testify on his behalf. However, he alleges his counsel advised him they could also be charged with the same crime.

He alleges his counsel was ineffective for failing to move to sever the voyeurism counts from the possession counts and for failing to investigate and inform Defendant that a viable defense existed. He alleges had his counsel advised him that the two counts of video voyeurism could have been tried separately and that a viable defense existed to the alleged offenses, Defendant never would have entered into a negotiated plea agreement with the State for those two counts. He further alleges he would have insisted on having a jury hear testimony and evidence proving that not only did he not commit this crime, but that the elements required to secure a conviction could not be proven beyond a reasonable doubt. He alleges but for counsel's misadvice, he would have proceeded to trial. After reviewing the allegations, the court file, and

18

the record, the Court found Defendant's allegations were facially sufficient and ordered the State to respond.

In its response, the State asserted due to the nature of the allegations, it concedes to the need for an evidentiary hearing on claim two. (*See* State's response, attached). After reviewing the allegations, the State's response, the court file, and the record, the Court found Defendant was entitled to an evidentiary hearing on this claim.

At the evidentiary hearing, Defendant admitted the voyeurism charges arose from a VHS tape found when police executed a search warrant at his house. (*See* November 17, 2015, transcript, p. 14, attached). He admitted the tape depicted his stepdaughter in her room. (*See* November 17, 2015, transcript, p. 14, attached). He denied having seen the tape prior to entering his plea, but admitted he has since viewed the tape. (*See* November 17, 2015, transcript, p. 14, attached). He admitted she did not have clothes on in the video. (*See* November 17, 2015, transcript, p. 14, attached).

He admitted he told the police that he put a video camera in his stepdaughter's room to catch his son who was stealing from family members. (*See* November 17, 2015, transcript, pps. 14-15, attached). He admitted that he informed the stepdaughter Katherine that the camera was in her room. (*See* November 17, 2015, transcript, p. 15, attached). He denied that Ms. Moss ever explained the elements of voyeurism to him. (*See* November 17, 2015, transcript, p. 15, attached). He denied placing the camera in her room for his own amusement, entertainment, sexual arousement, gratification, profit, or for degrading or abusing her. (*See* November 17, 2015, transcript, p. 15, attached). He testified if Ms. Moss had explained to him the elements of the voyeurism charges, he would not have taken the plea. (*See* November 17, 2015, transcript, p. 15, attached).

19

At the same hearing, Defendant's stepdaughter Katherine Tinker testified when she was about twelve years old, they had a family meeting because things were going missing in the house and the solution they came up with was to put a video camera in her room. (*See* November 17, 2015, transcript, p. 36, attached). She testified she was eighteen years old when Defendant was first charged with possession of child pornography. (*See* November 17, 2015, transcript, p. 36, attached). She testified she was not aware that there was a recorded video of her coming out of the shower. (*See* November 17, 2015, transcript, p. 36, attached). She testified she forgot the camera was there. (*See* November 17, 2015, transcript, p. 36, attached).

On cross-examination, she testified she was about twelve years old and in about seventh grade when Defendant told her he was going to put cameras in her room. (*See* November 17, 2015, transcript, p. 37, attached). However, she testified nothing of hers had been stolen, but her stepsister, who she shared a bedroom with, had money that was missing. (*See* November 17, 2015, transcript, pps. 37-38, attached). She admitted to writing a letter to the prosecutors which was admitted into evidence as State's exhibit 1. (*See* November 17, 2015, transcript, pps. 39-40, attached).

She admitted the letter indicated her wallet was stolen in fourth or fifth grade and that was not the time frame when Defendant said he was going to install the camera in her bedroom. (*See* November 17, 2015, transcript, p. 41, attached). She admitted Defendant indicated to her that he was going to put the camera in her bedroom when she was in seventh or eighth grade. (*See* November 17, 2015, transcript, pps. 41-42, attached). She admitted the video was taken during a timeframe when she was not having her wallet or property stolen. (*See* November 17, 2015, transcript, p. 43, attached). On redirect examination, she testified she believed her sister

20

P624

was a victim of a theft around the time period that the thefts occurred in her home. (*See* November 17, 2015, transcript, p. 45, attached).

At the hearing, Ms. Moss testified she discussed with Defendant the video voyeurism counts. (*See* November 17, 2015, transcript, p. 70, attached). When asked about what Defendant told her, she responded as follows:

> MOSS:       Well, I saw the - - when I went down, I was shown
> a video.  It appeared that a 11, 12, 13 year old girl
> was coming out of what appeared to be a bathroom,
> in various states of undress on two different
> occasions.  He had - - he had discussed with me that
> he had put cameras - - a camera in her room to catch
> his son stealing.  The problem I had was that there
> was only these two images.  There wasn't any
> clothed people; there wasn't any - - anything else,
> except these two, essentially two images of what I
> believe to be Katherine Tinker coming in from the
> bathroom and - - from a shower with a towel and
> being undressed and dressing.  She was young.

(*See* November 17, 2015, transcript, p. 70, attached). The video tape was admitted into evidence as State's exhibit 2. (*See* November 17, 2015, transcript, pps. 70-71, attached).

She testified Defendant told her that he placed the camera in a light or ceiling fan, that it was not always running, and that he would hear the shower running and would hit the record button. (*See* November 17, 2015, transcript, pps. 72-74, attached). She testified Defendant's version of why the camera was in the bedroom was problematic because if you are trying to catch someone stealing there would be other images that would be captured on something that was running as opposed to the two clips involving the victim coming out of the shower. (*See* November 17, 2015, transcript, p. 74, attached). She further testified to the following:

> MOSS:       I told him that I thought that that was - - that if it
> was truly just a matter of trying to capture
> somebody stealing, I thought it was a little odd that
> those cameras would be placed only in this room,

P625

> and that those would be the only images caught on
> this, but I mean, he indicated to me that he had
> forgotten that that was even there; it was seven
> years prior; he wasn't a Christian before that
> happened.

(*See* November 17, 2015, transcript, p. 75, attached).

   She testified she did not speak to Katherine Tinker because she was told if she spoke to

her, the deal was off the table and she advised Defendant of that. (*See* November 17, 2015,

transcript, p. 76, attached). She testified Defendant did not want to pursue taking her deposition

and further testified to the following:

> MOSS:  Because, from the get-go - - from when we
> determined that these images - - when my expert
> came back and told me these images were not
> accidentally - - they didn't fall onto this computer
> accidentally. They were searched for; they were
> searched for during the time period that was
> alleged; he was surprised he wasn't charged with
> more, um, we were in trying to negotiate and my
> fear about that video voyeurism was that that would
> be the item that would keep Judge Tharpe from
> agreeing to accept this below guidelines
> negotiation.
> ...
> Because Judge Tharpe at the time had a reputation
> for not agreeing to go along with negotiated pleas
> between the State, and this was below guidelines. It
> wasn't significantly below guidelines, but it was
> below guidelines, and if we deposed Katherine - -

(*See* November 17, 2015, transcript, p. 77, attached).

   A letter Defendant sent to Ms. Moss advising her of some points regarding issues in his

case was admitted into evidence as State's exhibit 3. (*See* November 17, 2015, transcript, pps.

77-78, attached). She testified Defendant indicated in the letter that the video was never viewed

by anyone, but she believed the video appeared to be edited. (*See* November 17, 2015,

transcript, p. 79, attached). She testified that based on the totality of the information that she

P626

had, she did not find Defendant's explanation about how the video came to be in existence and why it was where it was at to be reasonable. (*See* November 17, 2015, transcript, pps. 79-80, attached). She further testified, "I told him I thought it would be difficult for a jury to understand that or to believe that." (*See* November 17, 2015, transcript, p. 80, attached). However, she testified she expressed a willingness to him to go to trial and it was his decision. (*See* November 17, 2015, transcript, p. 80, attached).

After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds Ms. Moss' testimony more credible than that of Defendant. The Court relies on the evidentiary hearing testimony set out in claim one and in this claim. Therefore, the Court finds although Ms. Moss was aware that there were individuals who would have testified that they were aware that the camera was placed in the bedroom, Ms. Moss believed it would be difficult for a jury to understand or believe Defendant's version of the facts because there were no video clips of anyone else in the house just performing normal tasks, but only two video clips of Katherine Tinker coming out of the shower undressed. The Court finds the fact that Katherine Tinker had consented to the placement of the cameras in her room several years prior did not negate any element of the video voyeurism charges involving the video taken several years later.

Moreover, the Court finds regardless of the strength of his case, Ms. Moss was willing to go to trial on the video voyeurism charges. However, the Court finds the State had made Defendant a plea offer to resolve all charges and if he chose to litigate the video voyeurism charges, the State indicated the plea offer would be off the table. The Court finds Defendant did not want to go to trial on any of the charges. Consequently, the Court finds Defendant cannot prove that Ms. Moss acted deficiently or any resulting prejudice when Ms. Moss was willing to

23

go to trial on the charges, but based on the strength of his case, he chose to enter the plea. The Court further finds the fact that Katherine Tinker consented to the placement of the cameras several years earlier did not provide a viable defense to the video voyeurism charges for the video taken several years later. The Court finds such would not have produced an acquittal at trial. As such, no relief is warranted upon claim two of his January 15, 2014, rule 3.850 motion.

In claim three of his May 12, 2014, amended rule 3.850 motion, Defendant alleges ineffective assistance of counsel due to counsel's failure to file a motion to suppress evidence in the State's possession that was falsely incriminating and would have given rise to a *Giglio* violation if presented at trial. Specifically, Defendant alleges his counsel was aware that the State possessed evidence that was falsified by the detective. Defendant alleges a viable defense existed to prove that Defendant could have been searching for adult pornography and had viewed the files in question without intending to download child pornography. He alleges his counsel could have argued that, unlike the vast majority of offenders of this type, no images of child pornography were present or stored on any computer or in a hidden location in Defendant's home.

He alleges had his counsel filed a motion to suppress the police report and the police report been excluded, it is doubtful that a conviction could have been obtained as no factual basis was available to support the plea, thereby making a reasonable probability that the outcome of the proceeding would have been different. He further alleges his counsel allowed the *Giglio* violation to go untested as the State would have been charged with constructive knowledge of the falseness of the confession. He alleges had his counsel filed a motion to suppress the false confession, a hearing would have been conducted and either the false confession would have

24

been suppressed or the issue would have been preserved for appellate review. He further alleges he would not have entered the plea and would have proceeded to trial with a reasonable expectation of acquittal or reversal on appeal.

After reviewing the allegations, the court file, and the record, the Court found "failure to preserve issues for appeal does not show the necessary prejudice under *Strickland*." *Strobridge v. State*, 1 So. 3d 1240, 1242 (Fla. 4th DCA 2009). However, because Defendant alleged if counsel had filed the motion to suppress, he would not have entered the plea and would have proceeded to trial, the Court found Defendant's allegations were facially sufficient and ordered the State to respond.

In its response, the State asserted this claim should be denied. (*See* State's response, attached). Specifically, the State asserted suppression of a confession is a remedy available for violation of an accused's constitutional rights. (*See* State's response, attached). The State asserted it is not a remedy for disputes regarding the credibility of the substance of the confession. (*See* State's response, attached). The State asserted the issue which Defendant raises concerns whether the statements made to law enforcement were in fact the statements made by Defendant or statements taken "out of context and re-written to apply to the child pornography in question." (*See* State's response, attached). The State asserted inasmuch as Defendant raises an allegation the detective misrepresented what Defendant said, Defendant raises an issue of credibility of the detective, not of the confession. (*See* State's response, attached). The State asserted Defendant does not raise a claim that his statements were taken in violation of his Fourth, Fifth, Sixth, or Fourteenth amendment constitutional rights. (*See* State's response, attached). Therefore, the State asserted counsel had no basis upon which to seek suppression and cannot be faulted for failure to do so. (*See* State's response, attached).

25

Moreover, the State asserted Defendant's claim that had counsel moved to suppress the evidence, a *Giglio* violation would have occurred is likewise unfounded. (*See* State's response, attached). The State asserted a *Giglio* claim is one which occurs when a prosecution witness testifies falsely to a material matter and the prosecution knows that the testimony is false. (*See* State's response, attached). The State asserted the question Defendant presents is a question of credibility, which is a question for the trier of fact to determine. (*See* State's response, attached). The State asserted by assuming the detective's version of the confession is false, Defendant improperly argues that a motion to suppress should have been filed and the resulting *Giglio* claim litigated when both issues are credibility issues for the trier of fact. (*See* State's response, attached). Therefore, the State asserted claim three should be denied. (*See* State's response, attached).

In his reply, Defendant asserted an issue regarding facts in dispute may form the basis for a motion to suppress. Defendant asserted his counsel was aware of the facts in dispute and any ruling in favor of Defendant would have weakened the State's case and may have been dispositive. Defendant asserts an evidentiary hearing is warranted on this claim.

After reviewing the allegations, the State's response, Defendant's reply, the court file, and the record, the Court found "[t]he trial court's ruling on a motion to suppress is a mixed question of law and fact." *Panter v. State*, 8 So. 3d 1262, 1265 (Fla. 1st DCA 2009) (quoting *Brye v. State*, 927 So. 2d 78, 80 (Fla. 1st DCA 2006)). "On a motion to suppress, the trial judge's role is to weigh the credibility of the witnesses and resolve the evidentiary conflicts." *Pavon v. State*, 12 So. 3d 287, 287 (Fla. 3d DCA 2009). The Court found neither the State's response, nor the record, refuted his allegation that his counsel was ineffective for failing to

26

suppress the false confession. As such, the Court found Defendant was entitled to an evidentiary hearing on this claim.

After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds it relies on the evidentiary hearing testimony set out in claims one and two and in this claim. The Court finds Ms. Moss' testimony more credible than that of Defendant. Therefore, the Court finds based on Ms. Moss' investigation of the facts, she determined that any alleged falsified evidence by the detective would have been properly addressed on cross-examination during the trial. The Court finds Ms. Moss determined that such would not have been proper in a motion to suppress because it was just a "he said, she said" issue which cannot be raised in a motion to suppress and is more appropriately litigated at trial. However, the Court finds Defendant did not want to go to trial. Consequently, Defendant failed to prove that Ms. Moss acted deficiently or any resulting prejudice when she did investigate the alleged false information and was prepared to address any discrepancies at trial, but Defendant chose to enter a plea and did not want a trial. The Court further finds any even if Ms. Moss has filed the alleged motion to suppress evidence, it would have been denied. As such, no relief is warranted upon claim three of his May 12, 2014, amended rule 3.850 motion.

In claim four of his May 12, 2014, amended rule 3.850 motion, Defendant alleges ineffective assistance of counsel due to counsel's failure to depose State and defense witnesses who would have provided exculpatory testimony and doubt regarding the allegations against Defendant and the reliability of the State's evidence. Specifically, Defendant alleges he has always maintained his innocence regarding allegations of knowingly and intentionally viewing child pornography and videotaping his underage step-daughter for illicit purposes. He alleges his

27

counsel was aware of such, but advised him that due to the evidence against him and the statements made to detectives, it was the "perfect storm" and his innocence did not matter, thereby leaving the acceptance of a plea to be in his best interest.

He alleges his counsel chose to ignore his innocence and assisted the State in securing a conviction. He alleges he accepted poor advice and entered into a negotiated plea agreement because he was ignorant to the law, did not know that a viable defense existed, that a trial strategy could have been developed, and that false evidence could have been suppressed. He alleges his counsel advised him that if his family members became involved, they may also be charged with a crime. He alleges his counsel failed to depose the detectives. He alleges had his counsel succeeded in proving through depositions that the police reports were falsified, there is a reasonable probability that the outcome of the entire proceeding would have been different. He further alleges had his counsel deposed family members regarding the allegations against Defendant, it may have become evident that the elements required to prove the crimes charged could not be proven. He alleges had his counsel conducted pretrial depositions, it is probable an effective attorney would have been able to use the testimony and develop a viable defense strategy. He alleges had this occurred, Defendant would not have felt compelled to enter a plea, but would have insisted on proceeding to trial with a reasonable expectation of acquittal. After reviewing the allegations, the court file, and the record, the Court found Defendant's allegations were facially sufficient and ordered the State to respond.

In its response, the State asserted with respect to the allegation of failure to depose law enforcement, Defendant alleges had counsel taken the depositions, counsel would have succeeded in proving the police reports were falsified and the outcome of the proceedings would reasonably, likely been different. (*See* State's response, attached). The State asserted while

28

depositions may be an effective tool for discovery, nothing requires an attorney to engage in such discovery. (*See* State's response, attached). The State asserted their usefulness for purposes of proof as envisioned by Defendant is speculative. (*See* State's response, attached). The State asserted Defendant's contention that depositions of officers or detectives would have resulted in the establishment of the falsity of the report of the confession presumes law enforcement would have admitted as such. (*See* State's response, attached). The State asserted this presumption is speculative at best and this portion of claim four should be denied. (*See* State's response, attached). Lastly, the State asserted with respect to Defendant's claim that depositions of family members would have revealed the elements of the crimes charged could not be proven, it concedes to the need for an evidentiary hearing. (*See* State's response, attached).

In his reply, Defendant asserted the only reason the conclusions are speculative is because his counsel failed to perform a required duty to investigate and prepare for trial by deposing State witnesses. After reviewing the allegations, the State's response, Defendant's reply, the court file, and the record, the Court found "[m]ere speculation regarding possible error is not enough to satisfy *Strickland*." *Bruno v. State*, 807 So. 2d 55, 67 (Fla. 2001). However, "*Bruno*'s statement concerning 'mere speculation' is an assessment of particular evidence adduced at an evidentiary hearing." *Rangel-Pardo v. State*, 879 So. 2d 19, 20 (Fla. 2d DCA 2004). Therefore, the Court found Defendant was entitled to an evidentiary hearing on this claim.

At the hearing, Ms. Moss testified she did not perceive any reasonable likelihood of getting the police officers to change what was included in the police reports. (*See* November 17, 2015, transcript, p. 83, attached). She further testified as follows:

> MOSS:  … I mean, so initially, I get the police report; I
> review it with David. Most of what was in there, I

29

> mean, other than the fact that he said he didn't - - he thought these files had ended up his computer somehow through this Hotwire, FrostWire, peer-to-peer file sharing, it was correct. One thing he disagreed with was that he disagreed that he stated he had masturbated to the child porn. I asked Detective Grow when I went down there to view these things. I said, "Are you sure that he said that or he just didn't admit that he had a pornography problem in general and he masturbated to pornography?" She was 100 percent, "No, I specifically asked about the child porn. We don't really care about the adult porn..."

(*See* November 17, 2015, transcript, p. 83, attached). She testified Miranda was not an issue.

(*See* November 17, 2015, transcript, p. 84, attached).

After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds it relies on the evidentiary hearing testimony set out in claims one, two, and this claim. The Court finds Ms. Moss' testimony more credible than that of Defendant. Therefore, the Court finds Ms. Moss thoroughly counseled Defendant regarding the charges, the penalties, and the evidence against him. The Court finds Ms. Moss did not depose the police officers because she did not believe they were going to change their version of the facts. The Court finds Ms. Moss was willing to go to trial, but Defendant chose to enter the plea and never wanted to go to trial. Consequently, the Court finds Defendant failed to prove that Ms. Moss acted deficiently or any resulting prejudice when after discussing charges, penalties, evidence against him and the State's offer to dispose of all charges, Defendant made the decision to accept the negotiated plea and never indicated to her that he wanted to go to trial. As such, no relief is warranted upon claim four of his May 12, 2014, amended rule 3.850 motion.

30

In claim five of his May 18, 2015, motion, Defendant alleges ineffective assistance of counsel due to counsel's failure to adequately explain the elements of possession of child pornography. Specifically, he alleges in order to be convicted of possession of child pornography, the State must prove Defendant knowingly possessed or intentionally viewed an image that Defendant knew to include any sexual conduct by a child. He alleges during his initial conference with his counsel, he explained to his counsel that he did not intentionally possess or view images containing child pornography. He alleges he surmised if these images were contained on his computer, it occurred accidentally either at the time he was viewing adult pornography, or through the use of used computer parts he obtained when building his own computer.

However, he alleges his counsel advised him that the fact that depictions of child pornography were allegedly found on a computer he used was sufficient to establish he committed the offenses. He alleges his counsel never explained that the offense required proof of knowingly possessing or intentionally viewing. He alleges had his counsel fully advised him of the elements of the offense of possession of child pornography, he would not have entered a guilty plea to the offenses and would have exercised his right to a jury trial.

In its May 28, 2015, order, the Court found Defendant's allegations were facially sufficient and could not be conclusively refuted from the record. Therefore, the Court ordered the State to respond to this claim.

In its response, the State asserted because the nature of the claim raised necessitates inquiry into matters not contained within the record, it concedes to the need for an evidentiary hearing on this claim. (*See* State's response, attached). After reviewing the allegations, the

31

State's response, the court file, and the record, the Court found Defendant was entitled to an evidentiary hearing on this claim.

At the evidentiary hearing, Defendant testified Ms. Moss did not explain to him that in order to be found guilty of child pornography, the State would have to prove he knowingly possessed or intentionally viewed child pornography. (*See* November 17, 2015, transcript, p. 16, attached). He admitted he told Ms. Moss that he did not knowingly possess or intentionally view images of child pornography. (*See* November 17, 2015, transcript, p. 16, attached). He testified she told him that if he clicked on it, then he owned it. (*See* November 17, 2015, transcript, p. 16, attached). He denied seeing the images the State said were on his computer. (*See* November 17, 2015, transcript, p. 16, attached).

However, he admitted to explaining to Ms. Moss how the images might have appeared. (*See* November 17, 2015, transcript, p. 17, attached). When asked what he told Ms. Moss, he responded, "[s]everal - - a couple of them I did admit to accidentally clicking on and I deleted it before the image downloaded, and I also explained that, you know, this was a computer that was used by many people, including several teenage boys, neighbors." (*See* November 17, 2015, transcript, p. 17, attached). He testified if Ms. Moss had explained to him that the State had to prove he knowingly possessed or intentionally viewed the images of child pornography, he would have gone to trial. (*See* November 17, 2015, transcript, p. 17, attached).

Ms. Moss admitted she discussed with Defendant in detail whether or not he knowingly possessed or intentionally viewed these images. (*See* November 17, 2015, transcript, p. 84, attached). She admitted she explained to Defendant the elements of child pornography going directly to the statute and reading it together and looking at jury instructions. (*See* November 17, 2015, transcript, p. 84, attached).

32

On cross-examination, she admitted she explained to him that he had to intentionally possess the child pornography. (*See* November 17, 2015, transcript, p. 85, attached). She testified his original version of events was that he did not intentionally possess child pornography. (*See* November 17, 2015, transcript, p. 85, attached). However, when asked if he ever stated to her that he intentionally possessed child pornography, she testified as follows:

> MOSS: He never came out and said, "I - - I - - I'm coming clean. I downloaded this stuff." When I confronted him with what my expert - - when I said, "Listen, David, this is what my expert is saying," he would then switch, "Well, I hadn't been through my counseling. I might have done that when I wasn't through with my counseling," so it kind of went back and forth between - - he - - he placed a lot of emphasis on the counseling with his pastor.

(*See* November 17, 2015, transcript, p. 85, attached). She testified Defendant told Detective Grow that he would view them and then quickly delete them. (*See* November 17, 2015, transcript, p. 87, attached). When asked if that would have been indicative of not having an intent to view child pornography, she responded, "[e]xcept for the searches that were clearly - - that my expert - - and I honestly didn't know anything about this until my expert looked at this and said, 'Debbie, he's actively searching a lot for Lolita, preteen hard core.'" (*See* November 17, 2015, transcript, pps. 87-88, attached).

She testified the police report indicated and it was undisputed by Defendant and his family that it was the only computer that was password protected and it was the time period when Defendant was the only person with access to that computer. (*See* November 17, 2015, transcript, pps. 88-89, attached). She testified Defendant's wife told her the computer was password protected and no other family member used it. (*See* November 17, 2015, transcript, p.

33

89, attached).  When asked if Defendant indicated he did not want to go to trial, she responded as follows:

> MOSS:       He - - well, I explained to him, you have the right to go to trial.  They will have to prove that you intentionally downloaded images that you knew to be child pornography and then it's up to the jury to view those images; make the determination that they are in fact child pornography, and he said he did not want to do that; that he was afraid of the outcome.

(*See* November 17, 2015, transcript, p. 52, attached).

After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds it relies on the evidentiary hearing testimony set out in claims one, two, and four and in this claim.  The Court finds Ms. Moss' testimony more credible than that of Defendant.  Therefore, the Court finds Ms. Moss adequately explained to Defendant the elements of possession of child pornography, including that he had to have knowingly possessed or intentionally viewed child pornography.  The Court finds although Defendant admitted to Ms. Moss that he had a pornography problem, he did not admit to viewing child pornography.

However, the Court finds Ms. Moss hired an expert who advised her that the computer in question showed several active searches for child pornography during the time period in question.  The Court finds Defendant did not indicate to her that anyone else had access to that computer during the time period in question.  Consequently, the Court finds Defendant failed to prove that Ms. Moss acted deficiently or any resulting prejudice when Ms. Moss adequately explained to Defendant the elements of child pornography, including that the State must prove Defendant knowingly possessed or intentionally viewed an image that Defendant knew to include any sexual conduct by a child.  As such, no relief is warranted upon claim five.

34

In claim six of his May 18, 2015, motion, Defendant alleges ineffective assistance of counsel due to counsel's failure to move to sever the voyeurism counts from the possession of child pornography counts. Specifically, he alleges he was charged in counts one through ten with possession of child pornography and in counts eleven through fourteen, he was charged with video voyeurism. He alleges the first ten counts allegedly related to allegations that he accessed the internet and obtained images of child pornography. He alleges the information alleged these offenses occurred on April 24, 2012.

He alleges counts eleven through fourteen related to allegations arising out of the discovery of a video tape that allegedly showed two video recordings of Defendant's step-daughter. He alleges the State's theory was that he set up a video camera in his step-daughter's room and surreptitiously recorded her while she was undressed. He alleges it appears undisputed that at the time Defendant was charged with the offense, his step-daughter was eighteen years old and at the time of the recording, she was twelve years old.

He alleges he explained to the police and his counsel that he had set up a camera in his step-daughter's room six years earlier to catch his son who was suspected of stealing from family members. He alleges he explained he had no knowledge of the recording or that an edited version of any recording had been produced. He, relying on section 827.071(5)(a), Florida Statutes, alleges the image of his step-daughter on the video does not constitute child pornography because it does not depict a child engaged in sexual conduct. He alleges due to the length of time between the event depicted on the video recording and the alleged possession of child pornography, and the dissimilarity between the offense of video voyeurism and possession of child pornography, severance of the offense would have been appropriate. However, he

35

alleges his counsel failed to move to sever the offenses and failed to advise Defendant of this option.

He alleges he was prejudiced because he pled guilty to crimes he did not commit and gave up his right to trial on those charges. He alleges counts thirteen and fourteen also related to the video recording of his step-daughter. He alleges counts thirteen and fourteen were nolle prossed by the State because there was no evidence to support those charges. He alleges it is assumed that had his counsel moved to sever, the State would have still exercised its professional responsibility and dismissed these charges.

In its May 28, 2015, order, the Court found Defendant's allegations were facially sufficient and could not be conclusively refuted from the record. Therefore, the Court ordered the State to respond to this claim.

In its response, the State asserted Defendant has failed to establish prejudice. (*See* State's response, attached). The State asserted he pled guilty to the voyeurism charges, but he does not allege how counsel's failure to sever the trial of the voyeurism charges from that of the pornography charges affected his decision to plead guilty to the voyeurism charges. (*See* State's response, attached). The State asserted whether counsel should or should not have moved to sever the trials of the differing charges is an issue that only becomes relevant upon Defendant in fact exercising his right to trial. (*See* State's response, attached). The State asserted Defendant did not exercise his right to trial and, therefore, this claim should be denied. (*See* State's response, attached).

After reviewing the allegations, the State's response, the court file, and the record, the Court found Defendant alleged ineffective assistance of counsel due to counsel's failure to move to sever the voyeurism counts from the possession of child pornography counts. The Court

36

found Defendant further alleged his counsel failed to advise him of the option to sever the charges. The Court found Defendant alleged he was prejudiced because he pled guilty to crimes he did not commit and gave up his right to trial on those charges. The Court found Defendant has alleged prejudice as he alleges he would not have pled to the video voyeurism charges if he knew they could have been severed from the other charges. Because this claim may involve attorney/client communications outside of the record, the Court found Defendant was entitled to an evidentiary hearing on this claim.

At the evidentiary hearing, Defendant testified if Ms. Moss had told him that the video voyeurism charges could be separated from the possession of child pornography charges, he would have gone to trial. (*See* November 17, 2015, transcript, pps. 15-16, attached). He admitted he ended up pleading guilty and being sentenced for crimes he did not commit. (*See* November 17, 2015, transcript, p. 16, attached).

Ms. Moss testified Defendant never expressed any interest in going to trial. (*See* November 17, 2015, transcript, p. 80, attached). However, she testified, "[i]f we were going to try the case, obviously, the State gets to determine what - - what gets tried first. I don't believe they would have tried the video voyeurism, and had we been proceeding to trial on the possession of child pornography, we clearly would have severed out the video voyeurism." (*See* November 17, 2015, transcript, p. 80, attached). She admitted the State's offer was conditioned upon not taking Katherine Tinker's deposition and conditioned on resolving all counts. (*See* November 17, 2015, transcript, pps. 80-81, attached). Therefore, she testified she believed if Defendant wanted to go to trial on the video voyeurism counts, he would have had to go to trial on the child pornography counts and she explained that to Defendant. (*See* November 17, 2015, transcript, p. 81, attached).

37

Ms. Moss testified Defendant was not willing to sever the charges because although he did not like the offer, he did not want to go to trial. (*See* November 17, 2015, transcript, pps. 81-82, attached). She testified she was then told that Defendant was going to hire Mr. Lauro and she was actually grateful at that point. (*See* November 17, 2015, transcript, p. 82, attached). She testified she was aware that family members were willing to testify that they were aware video cameras had been set up in the house and she believed the police report indicated people acknowledged they knew the cameras were set up in the house. (*See* November 17, 2015, transcript, pps. 82-83, attached). However, she testified despite that fact, Defendant indicated he was willing to enter the plea after all. (*See* November 17, 2015, transcript, p. 83, attached).

After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds it relies on the evidentiary hearing testimony set out in claims one, two, four, five and this claim. The Court finds Ms. Moss' testimony more credible than that of Defendant. Therefore, the Court finds Defendant was not willing to sever the charges because although he did not like the offer, he did not want to go to trial. The Court finds Defendant was aware of the possibility of severing the charges. However, the Court finds because the State's offer was to resolve all charges, if Defendant chose to go to trial on the video voyeurism charges, he had to go to trial on the possession of child pornography charges. The Court finds Defendant never indicated to Ms. Moss that he wanted to go to trial on any of the charges. Consequently, the Court finds Defendant failed to prove that Ms. Moss acted deficiently or any resulting prejudice when Defendant did not want to sever the charges and go to trial, but chose to accept the State's negotiated plea offer which included disposition of all charges. The Court finds as long as Defendant maintained that he did not want to go to trial and wanted to accept the plea, severance

38

was not an option because if they chose to sever, depose Katherine Tinker, and litigate the video voyeurism charges, the State's plea offer was off the table. As such, no relief is warranted upon claim six.

In claim seven of his May 18, 2015, motion, Defendant alleges ineffective assistance of counsel when counsel allowed Defendant to plead guilty to offenses when there was no evidence to prove the offenses of possession of child pornography. Specifically, he alleges the police report reflects law enforcement officers seized a number of items of electronic equipment from Defendant's home pursuant to a search warrant. He alleges the only item that produced information of evidentiary value was the computer located in Defendant's office. He alleges the police report reflects law enforcement reviewed a report for the computer registry, including viewing a "Google Chrome History," a "Typed URL History Internet Explorer report," a "Keywords report," a "Google Web typed text report," and a "Frostwire Props File 3-12-12," and "4-16-12." He alleges although these searches revealed titles of files that appear to describe child pornography, there is nothing in the police report to indicate these titles actually depicted images of child pornography contained on Defendant's computer.

Defendant alleges the police report also indicates an examination was done of the "unallocated space" on Defendant's computer and images were located which did appear to depict child pornography. However, he alleges "unallocated space" is miscellaneous data that is left from previous installations of Windows software. He alleges he built and sold computers and would frequently utilize used parts when making his own computers. Therefore, he alleges the fact that images purported to have been child pornography were located on the unallocated space of his computer does not establish that he 1) placed the images there, or 2) knew the

39

images were located there as these images, if they exist, were contained on a portion of the computer that had come from someone else's computer.

However, he alleges his counsel took the position that Defendant was guilty of the offense simply because images were allegedly located on his computer without consideration for the knowledge and intent elements of the offense and allowed him to enter a guilty plea when there was insufficient evidence to support a finding of guilt. He alleges had his counsel properly advised him, he would not have entered a guilty plea and would have exercised his right to go to trial.

In its May 28, 2015, order, the Court found Defendant's allegations were facially sufficient and could not be conclusively refuted from the record. Therefore, the Court ordered the State to respond to this claim.

In its response, the State asserted the record refutes this claim. (*See* State's response, attached). Specifically, the State, relying on the August 27, 2013, transcript, asserted at the time of Defendant's plea, the State's factual basis included, "[p]ost Miranda, the defendant admitted to downloading the child pornography and to viewing that child pornography at times, deleting it after he would view it. The defendant can be identified and all events occurred in Hillsborough County." (*See* State's response, attached). Therefore, the State asserted, contrary to Defendant's assertion, there was evidence to prove the charges of child pornography and some of that evidence included Defendant's own statements. (*See* State's response, attached). As such, the State asserted this claim should be denied.

After reviewing the allegations, the State's response, the court file, and the record, the Court found the State was relying on the factual basis provided at the plea hearing. However, the Court found "[i]n establishing a factual basis, the prosecutor is reporting facts obtained from the

witnesses to the offense, and thus the prosecutor's statements constitute hearsay." *Speas v. State,* 887 So. 2d 416, 418 (Fla. 2d DCA 2004); *see also Neal v. State,* 697 So. 2d 903, 906. (Fla. 2d DCA 1997) (holding that the prosecutor's reporting of facts developed by a third party constitutes hearsay). The Court found if the State read the factual basis from the criminal report affidavit, such is also hearsay as the information contained in police reports is ordinarily considered hearsay and inadmissible in an adversary criminal proceeding. *See Burgess v. State,* 831 So. 2d 137, 140, 142 (Fla. 2002) (finding that "the information contained in police reports is ordinarily considered hearsay and inadmissible in an adversary criminal proceeding" and that "there would be great mischief in treating such reports as undisputed facts for purposes of a rule 3.800(a) motion."). Because the Court was unable to conclusively refute Defendant's allegations from the limited record, the Court found Defendant was entitled to an evidentiary hearing on this claim.

At the evidentiary hearing, Defendant admitted computer equipment was seized from his home pursuant to a search warrant and described the equipment as a regular computer tower, a server computer, many pieces of electronic equipment, I-pads, I-phones, video cameras, digital cameras, and all his recording media. (*See* November 17, 2015, transcript, p. 17, attached). He testified he owns a home theatre company and sells and installs media servers and computers. (*See* November 17, 2015, transcript, p. 18, attached). He further testified he builds computers for clients, sells and installs home theatre systems, and sells and installs surveillance systems. (*See* November 17, 2015, transcript, p. 18, attached).

However, he denied that any of that equipment contained depictions of child pornography. (*See* November 17, 2015, transcript, p. 18, attached). He testified it was his understanding that only one computer (identified in the police report as exhibit 2) produced

41

information of evidentiary value. (*See* November 17, 2015, transcript, p. 18, attached). However, he denied knowing what evidence the State alleged was on the computer. (*See* November 17, 2015, transcript, p. 18, attached). Defendant explained what unallocated space is, but denied knowing what was contained on the unallocated space on his computer because he had used parts from other clients to build his personal computers. (*See* November 17, 2015, transcript, pps. 18-19 attached). He admitted it was possible that the unallocated space contained things put there by someone independent of anyone in his family. (*See* November 17, 2015, transcript, p. 18, attached). He testified if he had known the State did not actually have evidence that he was in possession of child pornography, he would have chosen to go to trial. (*See* November 17, 2015, transcript, p. 19, attached).

On cross-examination, he admitted he advised Ms. Moss about the existence of the unallocated space at the time they discussed the discovery. (*See* November 17, 2015, transcript, pps. 19-20, attached). However, he did not remember whether he told Ms. Moss that the particular hard drive consisted of parts that had been rebuilt from other computers or other programs. (*See* November 17, 2015, transcript, p. 21, attached). He also did not remember whether he told her when the prior software installations might have occurred. (*See* November 17, 2015, transcript, p. 22, attached).

After reviewing the allegations, the testimony, evidence, and arguments presented at the November 17, 2015, evidentiary hearing, the court file, and the record, the Court finds it relies on the evidentiary hearing testimony set out in claims one, two, four, five, six and in this claim. The Court finds Ms. Moss' testimony more credible than that of Defendant. Therefore, the Court finds based on her investigation of the facts of the case, her discussions with Defendant that he was the only one who used the computer, his admissions to her that he did download and view

42

adult pornography, her review of all discovery, her discussions with computer expert Mr. Magliano, and her review of Mr. Magliano's January 20, 2013, letter, Ms. Moss believed there was sufficient evidence to prove the possession of child pornography counts, did not believe Defendant had any defenses to the possession of child pornography counts, and feared there was additional data that could be included at trial. The Court finds Ms. Moss advised Defendant of all the above, and Defendant chose to enter the plea and never indicated to her that he wanted a trial on any charges. Consequently, the Court finds Defendant failed to prove that Ms. Moss acted deficiently or any resulting prejudice when there was sufficient evidence to prove the offenses of possession of child pornography and Defendant never indicated to her that he wanted to go to trial on those charges. As such, no relief is warranted upon claim seven.

It is therefore **ORDERED AND ADJUDGED** that claim two of Defendant's "3.850 motion for postconviction relief," claims one, three, and four of Defendant's "amended 3.850 motion for postconviction relief," and claims five, six, and seven of "Defendant's motion to add claims to his previously filed amended motion for post conviction relief" are hereby **DENIED.**

**Defendant has thirty (30) days from the date of this Final Order within which to appeal. However, a timely-filed motion for rehearing shall toll the finality of this Order.**

**DONE AND ORDERED** in Chambers in Hillsborough County, Florida, this 14th day of Dec., 2015.

MICHELLE SISCO, Circuit Judge

43

Attachments:
>    plea form
>    plea letter
>    August 27, 2013, transcript
>    judgment and sentence
>    order of sex offender probation
>    3.850 motion for postconviction relief
>    amended 3.850 motion for postconviction relief
>    State's responses
>    Defendant's motion to add claims to his previously filed amended motion for post conviction relief
>    November 17, 2015, transcript
>    exhibits

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of this Order has been furnished to David Micciche (DC# T82787), Madison Correctional Institution, 382 Southwest MCI Way, Madison, Florida 32340-4430, by regular U.S. Mail; to Kay Murray, Assistant Public Defender, 700 East Twiggs Street, Tampa, Florida 33602, by inter-office mail; to Deborah Moss, Esquire, 250 North Belcher Road, Suite 102, Clearwater, Florida 33765-2622, by regular U. S. Mail; and to Joan Corces, Assistant State Attorney for Division J, 419 Pierce Street, Tampa, Florida 33602, by inter-office mail, on this _14th_ day of _Dec_, 2015.

_____
**DEPUTY CLERK**

44

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
EN LA CORTE DEL CIRCUITO DEL DECIMOTERCER CIRCUITO JUDICIAL
HILLSBOROUGH COUNTY, FLORIDA
ESTADO DE FLORIDA, EN Y PARA EL CONDADO DE HILLSBOROUGH
CRIMINAL JUSTICE DIVISION
DIVISIÓN DE JUSTICIA PENAL

**FILED**

STATE OF FLORIDA
ESTADO DE FLORIDA

AUG 27 2013

CLERK OF CIRCUIT COURT

CASE NO: 12-CF-007866
NO DE CASO:

DIVISION: H
DIVISIÓN:

_Dzun Micciane_

UNIFORM PLEA ACKNOWLEDGMENT AND WAIVER OF RIGHTS FORM
FORMULARIO UNIFORME DE DECLARACIÓN, RECONOCIMIENTO Y RENUNCIA DE DERECHOS

| CHARGE(S) CARGO(S) | MANDATORY MINIMUM PENA MÍNIMA OBLIGATORIA | MAXIMUM PENALTY PENA MÁXIMA |
|---|---|---|
| 10 COUNTS | Possession of child porn over 10 | 2° 15 F |
| 2 counts | Video voyeurism | 3rd ° 5 F |

For sections 1 and 2, check either "a" or "b." Para la sección 1 y 2, marque "a" o "b."

☑ 1(a)   I am pleading guilty, and acknowledge (my guilt) I feel it is in my best interests to do so).
Me declaro culpable y reconozco (mi culpabilidad) (pienso que es lo que más me conviene hacer).

OR / O

☐ 1(b)   I am pleading *nolo contendere*, and acknowledge I feel it is in my best interest to do so
Me declaro no me opongo, y reconozco que es lo que más me conviene hacer.

☐ 2(a)   I am pleading open to this Court and understand there is no agreement as to what sentence I will receive, and the Court can sentence me within its discretion.
Me declaro abiertamente ante el juez y entiendo que no existe ningún acuerdo relacionado con la sentencia que voy a recibir y que el juez puede sentenciarme a su discreción.

OR / O

☐ 2(b)   I am pleading pursuant to a plea agreement and the terms of that agreement are as follows:
Me declaro conforme a un acuerdo de declaración y los términos son los siguientes:

FSP  10 years   Psychological evaluation and treatment if necessary
Prisión Estatal de Florida  Evaluación psicológica y tratamiento (de ser necesario)

County Jail _____   Probation 10 years   Specified Residency _____
Cárcel del Condado _____   Probatoria Sex offender   Residencia Especificada _____

Page 1 of 4

12-CF-007866    F44-9423033523-413
MICCICHE, DAVID    4 PAGES
R MCLEOD    08/27/2013    FFFF

Community Control _____
Reclusión Domiciliaria

Community Control II _____
Reclusión domiciliaria II

Restitution to: _____ in the amount of _____ to be paid monthly @ _____
Restitución a: _____ por la cantidad de: _____ para pagarse mensualmente a

Drug/Alcohol Evaluation (within 30 days) and treatment if necessary (counseling/urine screens)_____
Evaluación de Alcohol/Drogas (dentro de 30 días) y tratamiento de ser necessario (con un consejero/ exámenes de orina)

Community Service _____SD_____          Driver's License Revocation _____
Servicio Comunitario                    Revocación de Licencia de Conducir
at ___S___ hours per month              GED _____
a          horas por mes                GED

Other _____
Otros

3.  I understand if probation or community control is part of the plea agreement the court may impose any
    special conditions it believes it should but such special conditions will be orally pronounced by the Court at the
    time of sentencing. I understand the court may require me to pay up to $1 per month to "First Step of
    Hillsborough, Inc." as a special condition of probation or community control pursuant to section 948.039, Florida
    Statutes.
    Entiendo que si la probatoria o la reclusión domiciliaria forman parte del acuerdo declaratorio, la corte podrá
    imponer cualesquiera condiciones especiales que crea deba imponer, pero dichas condiciones especiales se
    pronunciarán oralmente por el juez en el momento de la sentencia. Entiendo que la corte me requerirá pagar hasta
    $ 1 por mes para "First Step of Hillsborough, Inc." como una condición especial de probatoria o reclusión
    domiciliaria de acuerdo a la sección 948 039, Estatutos de la Florida

4.  I understand I have a right to plead not guilty and the right to be tried by a jury to determine whether I am
    guilty or not guilty. I understand I have the right to be represented by an attorney at the trial and if I cannot afford
    one, the Court will appoint an attorney to represent me. I understand I have the right to compel the attendance of
    witnesses on my behalf, the right to confront and cross examine all witnesses testifying against me, and the right to
    remain silent. I understand if I plead guilty or nolo contendere, there will be no trial and I waive all the rights that
    go along with a trial.
    Entiendo que tengo el derecho de declararme no culpable y el derecho de ser juzgado por un jurado que decidirá
    si soy culpable o no. Entiendo que tengo el derecho de ser representado por un abogado para el juicio y que si no
    tengo los medios para contratar a uno, la corte nombrará un abogado para que me represente. Entiendo que tengo
    el derecho de obligar la comparecencia de testigos para que declaren a mi favor, el derecho de repreguntar a todos
    los testigos de cargo y el derecho de permanecer en silencio. Entiendo que si me declaro culpable o no me opongo,
    no habrá juicio y renuncio a todos los derechos propios de un juicio.

5.  I understand I have the RIGHT TO APPEAL the judgment and sentence of the Court within thirty (30) days
    from the date of sentence. I understand if I wish to take an appeal and cannot afford an attorney to help me
    in my appeal, the Court will appoint an attorney to represent me for that purpose. I understand if I plead
    guilty or nolo contendere without reserving the right to appeal, I am waiving my rights to appeal all matters
    relating to the judgment including the issue of my guilt or innocence. I admit there is a factual basis for the
    charge(s) to which I am entering a plea.
    Entiendo que tengo EL DERECHO APELAR el fallo y condena/ sentencia
    de la corte dentro del término de treinta (30) días a partir de la fecha de la sentencia. Entiendo que si deseo
    apelar y no tengo los medios para contratar a un abogado para que me ayude en mi apelación, la corte nombrará
    a un abogado para que me represente con este propósito. Entiendo que si me declaro culpable o no me opongo sin
    reservar mi derecho de apelar, estaré renunciando a mi derecho de apelar todos los asuntos propios de la sentencia,
    incluso lo relativo a mi culpabilidad o inocencia. Admito que hay fundamento para el (los) cargo (s) al (a los)
    cual (es) me estoy declarando

6.  I understand there are facts the State could use to prove the charge(s) against me.

P650



Entiendo que existen hechos que el Estado podria usar para probar el o los cargos en mi contra.

7   I understand if I plead guilty or *nolo contendere* the judge may ask me questions about the charge(s) to which I have just pled and if I am untruthful, my answer(s) may later be used against me in a prosecution for perjury.
Entiendo que si me declaro culpable o no me oponga, el juez podría hacerme preguntas respecto al cargo al cual me acabo de declarar y que si falto a la verdad, mis respuestas podrían ser usadas en mi contra en un proceso por perjurio.

8   I understand if I plead guilty or *solo contendere* and am not a United States citizen, my plea may cause immigration problems, including DEPORTATION, exclusion and problems for adjustment of immigration status pursuant to the laws and regulations governing the United States Naturalization and Immigration Service.
Entiendo que si no soy ciudadano (a) de los Estados Unidos y me declaro culpable o no me oponga, esto podría ocasionarme problemas con inmigración, incluyendo DEPORTACIÓN, exclusión o problemas en su modificación de estado migratorio, conforme a las leyes y reglamentos que gobiernan el Servicio de Naturalización e Inmigración de los Estados Unidos.

9.   I understand this plea could result in my driver's license being suspended or revoked if the charge(s) to which I am pleading is one where motorists, mandatory suspension or revocation is required by law.
Entiendo que esta declaración podría resultar en la suspensión o revocación de mi boaneos de conducir si el cargo al cual me estoy declarando es un delito donde se requiere la suspensión o revocación automática obligatoria por la ley.

10.   I understand if I plead guilty or *nolo contendere* to a sexually violent offense or a sexually motivated offense, or if I have been previously convicted of such an offense, the plea may subject me to involuntary civil commitment as a sexually violent predator upon completion of any prison sentence on this or any other case.
Entiendo que si me declaro culpable o no me opongo a un delito sexual con violencia, o a un delito motivado sexualmente, o si previamente he sido condenado por dicho delito, esta declaración me sujetará a un confinamiento involuntario civil como un depredador sexual violento una vez que haya concluido cualquier sentencia en esto o cualquier otro caso

11.   I understand if I plead guilty or *nolo contendere* to a qualifying sexual offense, or if I have been previously convicted of such an offense or if I have been designated a sexual predator, I will be subject to mandatory electronic monitoring pursuant to section 948 30(3), Florida Statutes.
Entiendo que si me declaro culpable o no me opongo a un delito de categoría sexual, o si he sido condenado previamente por dicho delito, o se me ha catalogado como depredador sexual, estaré sujeto a un control electrónico obligatorio conforme a la sección 948 30 (3), de los Estatutos de la Florida.

12.   I understand my pleading guilty or *nolo contendere* will result in the Court imposing MANDATORY statutory costs. I also understand my plea may result in the Court imposing certain other costs and attorney's fees and I do not object to the imposition or amount of such costs and fees and I waive my right to a hearing on the imposition and amount of such costs and fees. I have had an opportunity to review the Uniform Order Assessing Costs, Fines & Surcharges with my attorney   I understand if I fail to pay the imposed costs and fees my driver's license may be suspended.
Entiendo que si me declaro culpable o no me opongo usaré como resultado que el juez imponga las costas OBLIGATORIAS de ley  Asímismo, entiendo que mi declaración podría hacer que el juez imponga ciertos costos y honorarios del abogado  No me opongo a la imposición o la cantidad de costos y honorarios y renuncio a mi derecho a una evidencia respecto a la imposición y la cantidad de costos y honorarios. He tenido la oportunidad de revisar con un abogado, la Orden Uniforme de Imposición de Costas, Multas y sobrecargos. Entiendo que si no pago los costos y honorarios impuestos, mi licencia de conducir podría ser suspendida.

13.   I understand a conviction for an offense to which I am pleading guilty or *nolo contendere* may serve to enhance the sentence for any offense for which I may be convicted of in the future
Entiendo que una condena por un delito al cual me estoy declarando culpable o no me opongo podría servir para aumentar la sentencia por cualquier delito por el cual se me podría condenar en el futuro.

14   I am not under the influence of drugs, an alcoholic beverage or medication, but I am taking this medication:

No me encuentro bajo los efectos de drogas ni bebidas alcohólicas, porque estoy tomando este medicamento:

15.   I do not have any mental illness that would keep me from understanding this plea and its consequences

Page 3 of 4

No padezco de ninguna enfermedad mental que podría impedirme entender esta declaración y sus consecuencias

16. I certify that no one has threatened or coerced me in any way in order to get me to enter this plea, and I am pleading freely and voluntarily. Other than the terms of the plea negotiation as set forth above (if applicable), no one has promised me anything upon which I have relied in order to influence me to enter this plea.
Certifico que nadie me ha amenazado ni coaccionado de ninguna manera para que yo asiente esta declaración y me declaro libre y voluntariamente. Aparte del acuerdo declaratorio, como se estipula en el párrafo antes mencionado (si es aplicable), nadie me ha prometido nada en lo cual yo me ha basado con el motivo de influenciarme para que yo asiente esta declaración.

17. I certify that I have discussed the charges with my attorney including the maximum possible and mandatory minimum (if any) penalties and possible defenses and am fully satisfied with the representation of my attorney. I understand by entering this plea there is no guarantee what gain time, if any, the Department of Corrections or any county jail may award me.
Certifico que he revisado los cargos con mi abogado, incluso las penas máximas posibles y mínimas obligatorias (si las hubiera) y defensas posibles y estoy completamente satisfecho con la representación de mi abogado. Entiendo que al asentar esta declaración no hay garantía del tiempo ganado, de haberlo, que el Departamento de Correccion o cualquier cárcel del condado podría conceder me

18. I have reviewed my criminal punishment code scoresheet and it is correct.
He revisado mi hoja de puntuación y está correcta.

19. I have reviewed the standard terms of supervision and I understand I must follow them as well as any special conditions the court thinks are appropriate
He revisado las condiciones generales de supervisión y entiendo que debo cumplirlas, así como cualesquiera otras condiciones que la corte considere apropiadas

20. I understand no one, including my attorney, can accurately predict the actual time I will serve on a sentence and I may be required to serve the entire sentence.
Entendo que nadie, incluyendo mi abogado, puede predecir con certeza el tiempo real que cumpliré por una sentencia y que podría requerirse
que cumpla la sentencia completa.

21. I certify that there are not any other witnesses I want my attorney to investigate or call, nor is there any other type of discovery or investigation I want my attorney to do prior to entering this plea
Certifico que no hay otros testigos que quiero que mi abogado investigue o llame, ni tampoco existe otro tipo de prueba o investigación que quiero que mi abogado haga antes de asentar esta declaración.

22 I certify that no one, including my attorney, has made any promises concerning the jail credit or prison credit I am to receive other than the fact that I am going to receive credit for every day I actually spent incarcerated on this case
Certifico que nadie, incluyendo mi abogado (a) me ha hecho ninguna promesa respecto al tiempo que será acreditado de la cárcel o prisión además del hecho que voy a recibir crédito por cada día que realmente pasé encarcelado en esta (os) caso (s).

_____    9/27/13
Defendant / Acusado                 Date / Fecha

STATEMENT OF ATTORNEY
I, as the attorney for the above Defendant, state that I have reviewed this plea form and the Uniform Order Assessing Costs, Fines & Surcharges with my client and it is my belief the Defendant fully understands their contents.

_____    8-27-13
Attorney                            Date  8·27·13

Page 4 of 4



## State Attorney

**MARK A. OBER**
Thirteenth Judicial Circuit
419 N. Pierce Street
Tampa, FL 33602-4022
(813) 272-5400

**FILED**

**AUG 27 2013**

**CLERK OF CIRCUIT COURT**

August 26, 2013

Debra Moss
250 North Belcher Road, Suite 102
Tampa, FL 33765

RE: STATE OF FLORIDA V. DAVID MICCICHE
CASE NUMBER: 12-CF-007866

Dear Ms. Moss,

Your client in the above referenced case is charged with ten counts of Possession of Child Pornography (Ten or More Images and Content of Images) and two counts of Video Voyeurism (Def. 24 or Older, Victim less than 16).

Please be advised that your client will be permitted to enter a plea of guilty as charged for an adjudication of guilt and a sentence of ten years Florida State Prison, followed by ten years sexual offender probation

The following special conditions would be imposed as part of your client's supervision

1    That he shall abide by a mandatory curfew 10 p.m to 6 a m  (F.S. 948.30(1)(a))

2    That he shall not live within 1,000 feet of a school, child care facility, park, playground, or other place where children regularly congregate, as prescribed by the court. (F.S  948. 30(1)(b)).

3    That within thirty (30) days after release from incarceration/sentencing he shall enroll in and thereafter remain continuously enrolled in an outpatient sex offender program at his expense.  He shall actively participate in the treatment program until discharged by the therapist as having successfully completed the treatment program.  [F.S. 948. 30(1)(c)).  He shall complete the outpatient sex offender treatment program within 4 years of release from incarceration/sentencing, unless additional time to complete the treatment program is recommended by the therapist and approved by the court

4    That he shall not have any contact with the victim, directly or indirectly, including through a third person, for the duration of the sentence imposed   The sentencing court may allow contact only upon a request by the victim made at any time after the victim has attained 18 years of age, and only if contact with the victim is approved by the defendant's therapist   The defendant shall not be allowed contact unless the sentencing court conducts an evidentiary hearing and determines that a change in circumstances has occurred which warrants a change in the court order prohibiting contact with the victim, and the court determines that contact is in the best interest of the victim   [F.S. 948 30(1)(d) and F S. 921.244].

5.    That he shall have no contact with a child under the age of 18.   The court may approve supervised contact with a child under the age of 18 if the approval is based upon a recommendation for supervised contact with a child under the age of 18 and is issued by a qualified practitioner who is basing the recommendation on a risk assessment [F.S 948 30(1)(e)]

6.    That he shall not work for pay or as a volunteer at any school, child care facility, park, playground, pet store, library, zoo, theme park, mall or other place where children regularly congregate. [F S   948 30(1)(f)]

7    That he shall not view, access, own or possess any obscene, pornographic, or sexually stimulating visual or auditory material, including telephone, electronic media, computer programs, or computer services that are relevant to the defendant's deviant behavior pattern. [F S. 948   30(1)(g)].

8.    That he shall not access the Internet or other computer services   The court may allow access only after a risk assessment is completed by the a qualified practitioner who approves and implements a safety plan for the defendant's accessing or using the Internet or other computer services.   [F S. 948.30(1)(h)].

9.    That he shall provide a specimen of blood or other approved biological specimen to the Florida Department of Law Enforcement to be registered with the DNA data bank. [F S 943 325/948   30(1)(i)]

10.    That he shall make restitution to the victim for all necessary medical and related professional services relating to physical, psychiatric, and psychological care. [F.S. 948. 30(1)(j)]

11.    That he shall submit to warrantless searches by the community control or probation officer of the defendant's person, residence, or vehicle. [F S 948   30(1)(k)]

12.    That as part of his treatment program, he shall participate at least annually in polygraph examinations to obtain information necessary for risk management and treatment and to reduce the defendant's denial mechanisms.   All polygraph examinations must be conducted by a polygrapher certified to conduct post conviction polygraph examinations on sex offenders and shall be paid by the defendant   The results of the polygraph examination shall not be used as evidence in court to prove that a violation of community supervision has occurred [F.S. 948. 30(2)(a)].

13    That he shall maintain a driving log and shall not operate a motor vehicle alone without the prior approval of the community control or probation officer (F.S 948 30(2)(b)).

14.   That he shall not obtain or use a post office box without the prior approval of the community control or probation officer (F S 948 30(2)(c)).

15    That he shall submit to an HIV test at his expense. The results are to be released to the victim and/or the victim's parent or guardian (F.S 948.30(2)(d)/F S 775 0877)

16.   That he shall be electronically monitored when deemed necessary by the community control or probation officer and his or her supervisor, and ordered by the court at the recommendation of the Department of Corrections (F S 948 30(2)(e)).

17    That he shall not visit schools, child care facilities, parks, playgrounds, or other location ordered by the court, without the prior approval of the community control or probation officer. (F.S. 948.30(4)(a)).

18.   That he shall not distribute candy or other items to children on Halloween, wear a Santa Claus costume or other costume to appeal to children on or preceding Christmas, wear an Easter bunny costume to appeal to children on or preceding Easter, entertain at children's parties, or wear a clown costume without prior approval from the court. (F.S 948 30(4)(b))

19.   That he shall pay costs in an amount to be set by the Court

20.   That he shall pay an additional court cost of $151 00 pursuant to F S. 938.10, for crimes against minors.

21.   That he shall pay costs of prosecution in the amount of $150.

22.   That he shall pay restitution to the Crimes Compensation Trust Fund for any payments awarded in this case under the Florida Crimes Compensation Act. (F.S 906 17).

23.   That he shall pay the cost of investigation in the amount of $130 to the Hillsborough County Sheriff's Office (F S 939 01)

24.   That he shall make restitution to the victim for restitution not related to medical, physical, psychiatric or psychological care

25.   That within thirty (30) days after release from incarceration/sentencing, he shall submit to a Psychological/Mental Health Assessment and shall follow through with any treatment recommended by the evaluator, at his expense. He shall complete any recommended treatment within three (3) years of release from incarceration/sentencing

26.   ~~That within thirty (30) days after release from incarceration/sentencing, he shall be evaluated for substance abuse and thereafter successfully complete any recommended treatment program by the evaluator, at his expense~~

27.   That he shall present himself for random testing for the presence of drug/alcohol the request of the community control or probation officer.

28.  That he shall perform 50 hours of community service to be completed within the first 5 years of supervision at the minimum rate of 5 hours per month

29.  That he shall forfeit to the Hillsborough County Sheriff's Office all evidence seized during the investigation of this case

30.  That he shall abide by any other condition which the Court finds appropriate to impose

31   That he shall be deemed a Sexual Offender and shall fulfill all requirements of s. 943 0435, Florida Statutes  He shall report as required by s  943.0435(2), Florida Statutes, within 48 hours of release from incarceration/sentencing

32.  This offense is a "sexually violent offense" under Sections 394.910 - 394.931, Florida Statutes, regarding Involuntary Civil Commitment of Sexually Violent Predators  The defendant will be considered for involuntary civil commitment as a sexually violent predator before release from any Florida State Prison sentence he serves.  The defendant understands and agrees that the State may pursue any legal action against the defendant for involuntary civil commitment as a sexually violent predator at the discretion of the State and in accordance with governing Florida law  This plea agreement does not prohibit, restrict or otherwise limit the ability of the State to seek an involuntary civil commitment against the defendant.

Your client will have until August 27, 2013 to accept or reject this offer. If your client accepts this offer, please have this case added onto the Court's docket as soon as possible.

Sincerely,

MARK A. OBER
STATE ATTORNEY

Courtney B  Derry
ASSISTANT STATE ATTORNEY

CBD

Enclosure

I, DAVID MICCICHE, understand that a plea has been negotiated between myself, my lawyer, and the Office of the State Attorney for the 13th Judicial Circuit, Hillsborough County, Florida. This plea negotiation includes, among other things, a term of community control/probation with specified special conditions that I must accomplish in order to successfully complete my term of supervision. I have read the attached special conditions of community control/probation, and I agree to abide by them. I am pleading guilty to the charge because I am, in fact, guilty. I further understand that successful completion of an outpatient sex offender treatment program will require my acknowledgement of responsibility in a group therapy setting for improper sexual conduct.

_____8/27/13_____
Signature of Defendant/Date

I, LUKE LIROT / DEBRA ROSS, being attorney of record for the above named defendant, state that I have personally reviewed the attached Special Conditions of community control/probation with my client, and that to the best of my knowledge and belief he fully understands the Special Conditions of community control/probation.

_____  8-27-13
Signature of Attorney/Date

Moss  8-27-13

1

1   IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL
    CIRCUIT IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

2

3             CIRCUIT CRIMINAL DIVISION

4   STATE OF FLORIDA,
            Plaintiff,

5                              Case No.: 12-CF-007866
    vs.

6                              Division: H

7   DAVID MICCICHE,
            Defendant.
    _____/

8

9

10

11

12        This case came on to be heard before the
    HONORABLE Chet A. Tharpe, Circuit Judge, at the

13  Hillsborough County Courthouse Annex, Tampa, Florida, on
    August 27th, 2013, commencing at approximately 9:40 a.m.

14

15

16  APPEARANCES:

17  Courtney Derry, Assistant State Attorney,
    800 East Kennedy Boulevard,

18  Tampa, Florida 33602
    On behalf of the State.

19

20  Deborah Moss, Esquire,
    250 N. Belcher Road, Suite 102

21  Clearwater, Florida 33765-2622
    On behalf of the Defendant.

22

    Luke Lirot, Esquire

23  2240 Belleair Road, Suite 190
    Clearwater, Florida 33764-1703

24  On behalf of the Defendant.

25

              AOC CIRCUIT COURT REPORTERS
              HILLSBOROUGH COUNTY, FLORIDA

2

1          (THE FOLLOWING PROCEEDINGS ENSUED IN OPEN
2     COURT.)
3          MS. JOHNSON   Page 23, David Micciche.
4          MR. LIROT:  Good morning, Your Honor.
5          THE COURT·  Good morning.
6          MS  MOSS.  Morning, Your Honor.  Deborah Moss
7     here on behalf of Mr. Micciche.
8          MR. LIROT:  Judge, Luke Lirot on behalf of Mr.
9     Micciche.
10         MS. MOSS   Judge, we have negotiated a
11    disposition in Mr. Micciche's case.  In case number
12    12-CF-007866 for a guilty plea, the state has
13    indicated they would nol-pros counts 13 and 14.  He
14    would plead guilty as charged to counts 1 through
15    12.
16         The agreed upon disposition is he would be
17    sentenced to ten years of Florida State Prison to
18    be followed by ten years of sex offender
19    probation.  I believe we've talked about counts
20    one through six being the ten year Florida State
21    Prison sentence, count 7 through 12 be the ten
22    years of probation to follow.
23         He would have the sex offender conditions.  We
24    have signed a plea letter that outlines those
25    conditions.  There's 50 hours of community service

3

1    that he will have to complete as well.  He has

2    signed the acknowledgment that there's no D.N.A.

3    in this case that could be tested and we have

4    reviewed the cost sheets with him.

5         THE COURT.  Would you pass them to my clerk,

6    please.  Was there a -- you said there was a plea

7    letter?

8         MS. MOSS.  There was, Judge.

9         THE COURT·  Where is it?  Has it been signed by

10   the defendant?

11        MS MOSS.  It has.

12        THE COURT.  Okay.  Sir, raise your right hand

13   and be sworn.  Do you swear or affirm the testimony

14   you're about to give will be the truth, the whole

15   truth and nothing but the truth?

16        THE DEFENDANT:  I do.

17        THE COURT  Put your hand down, please.  Tell

18   me your name.

19        THE DEFENDANT:  David Micciche.

20        THE COURT:  Sir, are you under the influence of

21   any narcotics or alcohol right now?

22        THE DEFENDANT  No, Your Honor.

23        THE COURT  You're charged with ten counts of

24   possession of child pornography, ten or more

25   images.  Each of those counts is a second degree

4



1    felony punishable by 15 years in the Florida State
2    Prison.  How do you plead?
3         THE DEFENDANT·  Guilty.
4         THE COURT   You're also charged with two counts
5    of video voyeurism.  Each of those counts are a
6    third degree felony punishable by five years in the
7    Florida State Prison.  How do you plead?
8         THE DEFENDANT·  Guilty.
9         THE COURT:  Sir, do you understand that by
10   entering a plea of guilty to these charges that
11   you're now giving up your right to have a jury
12   trial, to call witnesses on your behalf, to

13   confront the witnesses against you, to testify or
14   not to testify and to appeal any errors that may
15   have occurred during the trial?
16        THE DEFENDANT   Yes, Your Honor.
17        THE COURT.  Are you a citizen of the United
18   States?
19        THE DEFENDANT:  Yes, Your Honor.
20        THE COURT   Do you understand that if you were
21   not a citizen, you would be deported?
22        THE DEFENDANT·  Yes, sir.
23        THE COURT·  Do you also understand that if this
24   was a sexually violent offense or a sexually
25   motivated offense or if you have previously been

5



1    convicted of such an offense that these pleas may

2    subject you to involuntary civil commitment as a

3    sexually violent predator upon the completion of

4    your sentence?

5         THE DEFENDANT   Yes, sir.

6         THE COURT   Sir, I have a form in front of me

7    entitled uniform plea acknowledgment and waiver of

8    rights form.  Is that your signature on the fourth

9    page?

10         THE DEFENDANT·  Yes, Your Honor.

11         THE COURT:  Did you have sufficient time to go

12    over this form with your attorney?



13         THE DEFENDANT:  Yes, sir.

14         THE COURT.  Did you understand it?

15         THE DEFENDANT.  Yes.

16         THE COURT·  Do you have any questions about it?

17         THE DEFENDANT.  No.

18         THE COURT:  I also have a plea letter dated

19    August the 26th, 2013.  It's addressed to your

20    attorney, Ms. Moss.  This appears to be the entire

21    plea agreement between you, your attorneys and the

22    State of Florida.  It consists of five pages and on

23    the fifth page, it appears to have your signature.

24    Is that, in fact, your signature?

25         THE DEFENDANT:  Yes, Your Honor.

6



1    THE COURT   Did you have sufficient time to go

2    over this plea agreement in its entirety with your

3    attorneys?

4        THE DEFENDANT:  Yes, sir.

5        THE COURT.  Did you understand it?

6        THE DEFENDANT·  Yes, sir.

7        THE COURT·  Do you have any questions about it?

8        THE DEFENDANT·  No, Your Honor.

9        THE COURT:  Factual basis.

10       MS. DERRY:   April the 24th of 2012, a

11   court-authorized search warrant was executed on the

12   residence where the defendant lived.  The results

13   of the search warrant produced numerous images of

14   child pornography located on the computer that was

15   pass word protected and utilized by the defendant.

16       The search warrant also revealed a copy of a

17   V.H.S. tape that was shown to Mr. Micciche.  Post

18   Miranda, the defendant admitted to knowing that

19   the V.H.S. tape contained naked images of his

20   12-year-old stepdaughter who was roughly 12 years

21   of age at the time that the images were captured.

22   The defendant admitted to placing the video camera

23   in her bedroom.

24       The child pornography that was found on the

25   computer contained images of children under the

AOC CIRCUIT COURT REPORTERS
HILLSBOROUGH COUNTY, FLORIDA

7

1    age of ten and at various times.  Also the content

2    of the images meets the criteria for the second

3    degree felony enhancement including containing at

4    least one image of a child under the age of five

5    or sexual battery or a movie within those images.

6        Post Miranda, the defendant admitted to

7    downloading the child pornography and to viewing

8    that child pornography at times, deleting it after

9    he would view it.  The defendant can be identified

10   and all events occurred in Hillsborough County.

11       THE COURT.  Are there any additions, deletions

12   or modifications to the factual basis?

13       MS. MOSS   No, Your Honor.

14       THE COURT.  The court finds there's a factual

15   basis for his pleas as reflected in the criminal

16   report affidavit.  The court accepts his pleas of

17   guilty to the charges finding that they're freely

18   and voluntarily entered.  He is adjudicated as to

19   all counts.

20       He'll be sentenced to ten years in the Florida

21   State Prison on counts one through six.  They will

22   run concurrent with each other.  He'll be

23   sentenced to ten years sex offender probation on

24   counts seven through ten.  Those will be

25   consecutive to the prison sentence.  He will

8



1    receive five years in the Florida State Prison on
2    counts 11 and 12.
3         They will run concurrent with counts one
4    through six.  He'll be given credit for whatever
5    time that he is legally entitled to.  As a
6    condition of your -- are we all good?
7         MS. MOSS:  Yes.
8         THE COURT:  Okay.  There was nothing said with
9    regard to 11 and 12.  That's why I made it the way
10   that it is.
11        MS. MOSS.  I was explaining that to him.
12        MS  DERRY.  And, Judge, I don't know if I
13   already said it, but for the record, the state
14   would announce a nol-pros of counts 13 and 14.
15        THE COURT:  Thank you.  As a condition of your
16   supervision, sir, you shall abide by a mandatory
17   curfew of ten p.m. to six a.m.  Do you understand
18   that?
19        THE DEFENDANT   Yes, sir.
20        THE COURT    You shall not live within a
21   thousand feet of a school, child care facility,
22   park, playground or other place where children
23   regularly congregate as prescribed by the court.
24   Do you understand that condition?
25        THE DEFENDANT.  Yes, sir.

9

1      THE COURT·  Within 30 days after release from
2   incarceration or sentencing, you shall enroll in
3   and thereafter remain continuously enrolled in an
4   out-patient sex offender treatment program at your
5   own expense.  You shall actively participate in the
6   treatment program until discharged by the therapist
7   as having successfully completed the treatment
8   program.

9      You shall complete the out-patient sex
10  offender treatment program within four years of
11  release from incarceration or sentencing unless
12  additional time to complete the treatment program
13  is recommended by the therapist and approved by
14  the court.  Do you understand that condition?

15      THE DEFENDANT:  Yes, sir.

16      THE COURT.  You shall not have any contact with
17  the victim directly or indirectly including through
18  a third person for the duration of the sentence
19  imposed.  The sentencing court may allow contact
20  only upon a request by the victim made at any time
21  after the victim has obtained 18 years of age and
22  only if contact with the victim is approved by the
23  defendant's therapist.

24      The defendant shall not be allowed contact
25  unless the sentencing court conducts an

10



1    evidentiary hearing and determines that a change

2    in circumstances has occurred which warrants a

3    change in the court order prohibiting contact with

4    the victim and the court determines that contact

5    is in the best interest of the victim.  Do you

6    understand that condition?

7         THE DEFENDANT·  Yes, Your Honor.

8         THE COURT·  You shall have no contact with a

9    child under the age of 18.  The court may approved

10   supervised contact with a child under the age of 18

11   if the approval is based upon a recommendation for

12   supervised contact with a child under the age of 18



13   and is issued by a qualified practitioner who is

14   basing the recommendation on a risk assessment.  Do

15   you understand that condition?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  You shall not work for pay or as a

18   volunteer at any school, child care facility, park,

19   playground, pet store, library, zoo, theme park,

20   mall or other place where children regularly

21   congregate.  Do you understand that condition?

22        THE DEFENDANT   Yes, sir.

23        THE COURT:  You shall not view, access, own or

24   possess any obscene, pornographic or sexually

25   stimulating visual or auditory material including

P667

11



1      telephone, electronic media, computer programs or

2      computer services that are relevant to the

3      defendant's deviant behavior pattern.  Do you

4      understand that condition?

5           THE DEFENDANT·  Yes, sir.

6           THE COURT·  You shall not access the internet

7      or other computer services.  The court may allow

8      access only after a risk assessment is completed by

9      a qualified practitioner who approves and

10     implements a safety plan for the defendant's

11     accessing or using the internet or other computer

12     services.  Do you understand condition?



13          THE DEFENDANT:  Yes, sir.

14          THE COURT·  You shall provide a specimen of

15     blood or other approved biological specimen to the

16     Florida Department of Law Enforcement to be

17     registered with the D.N.A. data bank.  Do you

18     understand that condition?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT   You shall make restitution to the

21     victim for all necessary medical and related

22     professional services relating to physical,

23     psychiatric and psychological care.  Do you

24     understand that condition?

25          THE DEFENDANT   Yes, sir.

12

1        THE COURT:  You shall submit to warrantless
2    searches by the community control or probation
3    officer of your person, your residence or your
4    vehicle.  Do you understand that condition?
5        THE DEFENDANT   Yes, sir.
6        THE COURT.  As part of your treatment program,
7    you shall participate at least annually in
8    polygraph examinations to obtain information
9    necessary for risk management and treatment and to
10   reduce the defendant's denial mechanisms.  All
11   polygraph examinations must be conducted by a
12   polygrapher certified to conduct post-conviction
13   polygraph examinations on sex offenders and shall
14   be paid by the defendant.
15       The results of the polygraph examination shall
16   not be used as evidence in court to prove that a
17   violation of community supervision has occurred.
18   Do you understand that condition?
19       THE DEFENDANT:  Yes, sir.
20       THE COURT.  You shall maintain a driving log
21   and shall not operate a motor vehicle alone without
22   the prior approval of the community control or
23   probation officer.  Do you understand that
24   condition?
25       THE DEFENDANT   Yes, sir.

13



1     THE COURT   You shall not obtain or use a post

2   office box without the prior approval of the

3   community control or probation officer.  Do you

4   understand that condition?

5        THE DEFENDANT:  Yes, sir.

6        THE COURT   You shall submit to an H.I.V. test

7   at your own expense.  The results are to be

8   released to the victim and or the victim's parent

9   or guardian.  Do you understand that as well?

10        THE DEFENDANT   Yes, sir.

11        THE COURT   You shall be electronically

12   monitored when deemed necessary by the community



13   control or probation officer and his or her

14   supervisor and ordered by the court at the

15   recommendation of the Department of Corrections.

16   Do you understand that condition?

17        THE DEFENDANT.  Yes, sir.

18        THE COURT·  You shall not visit schools, child

19   care facilities, parks, playgrounds or other

20   locations ordered by the court without the prior

21   approval of the community control or probation

22   officer.  Do you understand that condition, sir?

23        THE DEFENDANT·  Yes, sir.

24        THE COURT·  You shall not distribute candy or

25   other items to children on Halloween, wear a Santa

14



1   Clause costume or other costume to appeal to

2   children on or preceding Christmas, wear an Easter

3   Bunny costume to appeal to children on or preceding

4   Easter, entertain at children's parties or wear a

5   clown costume without prior approval from the

6   court.  Do you understand that as well?

7        THE DEFENDANT·  Yes, sir.

8        THE COURT:  You shall pay the mandatory court

9   costs in this case.  You shall pay an additional

10   court cost of $151 for crimes against minors.  You

11   shall pay the cost of prosecution in the amount of

12   $150.  You shall pay restitution to the Crimes



13   Compensation Trust Fund for any payments awarded in

14   this case under the Florida Crimes Compensation

15   Act.

16        You shall pay the cost of investigation in the

17   amount of $130 to the Hillsborough County

18   Sheriff's Office.  You shall make restitution to

19   the victim for restitution not related to medical,

20   physical, psychiatric or psychological care.  All

21   of these costs will be in the form of a lien.

22        Within 30 days after release from

23   incarceration or sentencing, you shall submit to a

24   psychological mental health assessment and shall

25   follow through with any treatment recommended by

P671

15



1   the evaluator at your own expense.  You shall

2   complete any recommended treatment within three

3   years of release from incarceration or sentencing.

4   Do you understand that condition?

5       THE DEFENDANT:  Yes, Your Honor.

6       THE COURT·  You shall present yourself for

7   random testing for the presence of drugs or alcohol

8   at the request of the community control or

9   probation offer.  Do you understand that condition?

10      THE DEFENDANT:  Yes, sir.

11      THE COURT:  You shall perform 50 hours of

12  community service to be completed within the first

13  five years of supervision at the minimum rate of

14  five hours per month.  Do you understand that as

15  well?

16      THE DEFENDANT.  Yes, sir.

17      THE COURT  You shall forfeit to the

18  Hillsborough County Sheriff's Office all evidence

19  seized during the investigation of this case.  Do

20  you understand that condition?

21      THE DEFENDANT.  Yes, sir.

22      THE COURT:  You shall abide by any other

23  condition which the court finds appropriate to

24  impose.  Do you understand that condition, sir?

25      THE DEFENDANT:  Yes, sir.



AOC CIRCUIT COURT REPORTERS
HILLSBOROUGH COUNTY, FLORIDA

16

```
 1          THE COURT·  You shall be deemed a sexual
 2     offender and shall fulfill all requirements of
 3     section 943.0435 of the Florida statutes.  You
 4     shall report as required by section 943.0435
 5     subsection (2) of the Florida statutes within 48
 6     hours of release from incarceration or sentencing.
 7     Do you understand that condition?
 8          THE DEFENDANT   Yes, sir.
 9          THE COURT:  This offense is a sexually violent
10     offense under sections 394.910 through 394.931 of
11     the Florida Statutes regarding involuntary civil
12     commitment of sexually violent predators.  The
13     defendant will be considered for involuntary civil
14     commitment as a sexually violent predator before
15     release from any Florida State Prison sentence he
16     serves.
17          The defendant understands and agrees that the
18     state may pursue any legal action against the
19     defendant for involuntary civil commitment as a
20     sexually violent predator at the discretion of the
21     state and in accordance with governing Florida
22     law.  This plea agreement does not prohibit,
23     restrict or otherwise limit the ability of the
24     state to seek an involuntary civil commitment
25     against the defendant.  Anything further on behalf
```

17

1    of the state or the defense?

2         MS. DERRY.  No, Judge.

3         MS. MOSS:  No, Your Honor.

4         THE COURT:  Sir, you'll have 30 days in which

5    to appeal the judgment and sentence of the court.

6    Good luck.

7         MR. LIROT:  Thank you, Judge.

8         THE COURT·  Thank you, sir.  Thank you, ma'am.

9         (Whereupon, the proceedings concluded.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P674

18

1                    CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA
      COUNTY OF HILLSBOROUGH

4

5             I, Ashley J. Hulme, AOC Circuit Court Reporter,
      hereby certify that I was authorized to and did report
6     the foregoing proceedings had in the previously-styled
      cause; and that the preceding transcript attached hereto
7     is a true, accurate, and correct computerized
      transcription of said proceedings.

8             I further certify that I am not employed by or
      related to any of the parties in this matter, nor am I
9     financially or otherwise interested in this action.

10            IN WITNESS WHEREOF, I have hereunto set my hand
      in Tampa, Hillsborough County, Florida, this 13th day of
11    August, 2014.

12

13

14    _____
      Ashley J. Hulme, RPR
15    AOC Circuit Court Reporter

16

17

18

19

20

21

22

23

24

25

                    AOC CIRCUIT COURT REPORTERS
                    HILLSBOROUGH COUNTY, FLORIDA

IN THE CIRCUIT COURT, 13TH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
DIVISION     H
CASE NUMBER :   12-CF-007866
OBTS NUMBER  :   2937019399

STATE OF FLORIDA
VS
MICCICHE, DAVID, J
DEFENDANT

---------------------------JUDGMENT---------------------------

THE DEFENDANT MICCICHE, DAVID, J              BEING PERSONALLY BEFORE
THIS COURT REPRESENTED WITH PRIVATE ATTORNEY LIROT, LUKE, C
THE ATTORNEY OF RECORD AND THE STATE REPRESENTED BY ASSISTANT STATE ATTORNEY
DERRY, COURTNEY, HANSEN, AND HAVINS

Entered a plea of Guilty to the following crime(s) .1,2,3,4,5,6,11,12

| COUNT CRIME | | OFFENSE STATUTE NUMBER | DEGREE OF CRIME | COURT ACTION | DATE |
|---|---|---|---|---|---|
| 1 | POSS OF CHILD PORNOGRAPHY 10 0 827071 5A | -CHAB6101 | PS | ADJG | 27-AUG-2013 |
| 2 | POSS OF CHILD PORNOGRAPHY 10 0 827071 5A | -CHAB6101 | PS | ADJG | 27-AUG-2013 |
| 3 | POSS OF CHILD PORNOGRAPHY 10 0 827071 5A | -CHAB6101 | PS | ADJG | 27-AUG-2013 |
| 4 | POSS OF CHILD PORNOGRAPHY 10 0 827071 5A | -CHAB6101 | PG | ADJG | 27-AUG-2013 |
| 5 | POSS OF CHILD PORNOGRAPHY 10 0 827071 5A | -CHAB6101 | PS | ADJG | 27-AUG-2013 |
| 6 | POSS OF CHILD PORNOGRAPHY 10 0 827071 5A | -CHAB6101 | PS | ADJG | 27-AUG-2013 |
| 11 | VIDEO VOYEURISM (DEF 24 OR OLD 810145 2ABA | -VOYR2007 | FT | ADJG | 27-AUG-2013 |
| 12 | VIDEO VOYEURISM (DEF 24 OR OLD 810145 2ABA | -VOYR2007 | FT | ADJG | 27-AUG-2013 |

Enhancement Codes  Counts 1-6  775 0847 (2) (3)

And no cause being shown why the defendant should not be adjudicated guilty,
it is ordered that the defendant is hereby adjudicated guilty of the above
crime(s).

The following count(s) have no information filed  15,16,17,18,19,20,21,22,23,24,25,
26

The following count(s) Nolle Prossed  13,14

IF YOU ARE A "QUALIFYING OFFENDER" UNDER SECTION
943.325, FLORIDA STATUTES, YOU ARE REQUIRED TO SUBMIT A
DNA SAMPLE IN A MANNER CONSISTENT WITH FLORIDA LAW
PAGE 01



STATE OF FLORIDA

VS.

Michicle   David

DEFENDANT

# FINGERPRINTS OF DEFENDANT

| 1. Right Thumb | 2. Right Index | 3. Right Middle | 4. Right Ring | 5. Right Little |
|---|---|---|---|---|
| | | | | |
| 6. Left Thumb | 7. Left Index | 8. Left Middle | 9. Left Ring | 10. Left Little |
| | | | | |

Fingerprints taken by: _____   _____

NAME                                          TITLE

I HEREBY CERTIFY that the above and foregoing are the fingerprints of the defendant, _____ , and that they were placed thereon by the defendant in my presence in open court this date.

DONE AND ORDERED in open court in Hillsborough County, Florida, this ____ day of
_____, 20 ___.

_____
JUDGE

IN THE CIRCUIT COURT, 13TH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
DIVISION      H
CASE NUMBER    12-CF-007866
OBTS NUMBER    2937019399

STATE OF FLORIDA
VS
MICCICHE, DAVID, J
DEFENDANT

------------------------------CHARGES/COSTS/FEES------------------------------

A sum of $49.00 pursuant to Section 938 03(1), Florida Statutes
(Crime Compensation Trust Fund)

A sum of $1 00 pursuant to Section 938.03(1), Florida Statutes
(Crime Compensation Trust Fee)

$2 00 pursuant to Section 938 15, Florida
Statutes (Criminal Justice Education by Municipalities and Counties)

A sum of $65 00 pursuant to Section 939 185, Florida Statutes
(Circuit Criminal Additional Court Costs)

A sum of $225.00 pursuant to Section 938 05(1)(A), Florida
Statutes (Criminal Justice Trust Fund)

A sum of $130.00 pursuant to Section 938 27 Florida Statutes
(Investigative Costs to be remitted to the Hillsborough County Sheriff's
Office)

A sum of $3.00 as a Court Cost pursuant to Section 938.01,
Florida Statutes (Assessments - Florida (Criminal Justice Trust Fund));

A sum of $50.00 pursuant to Section 775.083 Florida Statutes
(BOCC - County Crime Prevention)

A sum of $150 00 pursuant to Section 938 27, Florida Statutes
(Prosecution Costs)

DONE AND ORDERED IN HILLSBOROUGH COUNTY, FLORIDA, THIS 27TH DAY OF August 2013

JUDGE

------------------------------PAGE 03------------------------------

```
DEFENDANT MICCICHE, DAVID, J
                                    DIVISION    : H
                                    CASE NUMBER  . 12-CP-007866
                                    OBTS NUMBER    2937019399
```

---------------------------------- SENTENCE ----------------------------------

AS TO COUNT(s) : 1,2,3,4,5,6

THE DEFENDANT, BEING PERSONALLY BEFORE THIS COURT, ACCOMPANIED BY THE
DEFENDANT'S ATTORNEY OF RECORD, PRIVATE ATTORNEY  LIROT, LUKE, C
AND HAVING BEEN ADJUDGED GUILTY HEREIN, AND THE COURT HAVING GIVEN
THE DEFENDANT AN OPPORTUNITY TO BE HEARD  AND TO OFFER MATTERS IN MITIGATION OF
SENTENCE, AND TO SHOW CAUSE WHY THE  DEFENDANT SHOULD NOT BE SENTENCED AS
PROVIDED BY LAW AND NO CAUSE BEING   SHOWN

IT IS THE SENTENCE OF THE COURT THAT THE DEFENDANT :
Is hereby committed to the custody of the Department of Corrections for a
term of  10 Years

------------------------------PAGE 04----------------------------------

DEFENDANT MICCICHE, DAVID, J

DIVISION        B
CASE NUMBER    12-CF-007866
OBTS NUMBER    2937019399

-------------------------------- OTHER PROVISIONS --------------------------------
AS TO COUNT(s) : 1
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED :
----------------------------------------------------------------------------------
JAIL CREDIT      It is further ordered that the defendant shall be allowed a
                 total of  4 Days  as credit for time incarcerated before
                 imposition of this sentence

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  2,3,4,5,6,11,12

-------------------------------------PAGE 05-------------------------------------

DEFENDANT MICCICHE, DAVID, J

DIVISION        · H
CASE NUMBER    · 12-CF-007866
OBTS NUMBER    2937019399

-------------------------- OTHER PROVISIONS --------------------------
            AS TO COUNT(s)    2
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED .
----------------------------------------------------------------------
JAIL CREDIT·    It is further ordered that the defendant shall be allowed a
            total of  4 Days  as credit for time incarcerated before
            imposition of this sentence

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS. 1,3,4,5,6,11,12

-------------------------- PAGE 06 --------------------------

DEFENDANT MICCICHE, DAVID, J

DIVISION    · H
CASE NUMBER    . 12-CF-007866
OBTS NUMBER    · 2937019399

-------------------------- OTHER PROVISIONS --------------------------------
·AS TO COUNT(s) . 3
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED .
----------------------------------------------------------------------------
JAIL CREDIT:    It is further ordered that the defendant shall be allowed a
                total of  4 Days  as credit for time incarcerated before
                imposition of this sentence

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
·TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS· 1,2,4,5,6,11,12

------------------------------PAGE 07------------------------------------



DEFENDANT MICCICHE, DAVID, J

DIVISION          H
CASE NUMBER       12-CP-007866
OBTS NUMBER       2937019399

------------------------------ OTHER PROVISIONS ------------------------------
                AS TO COUNT(s) · 4
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED :
------------------------------------------------------------------------------
JAIL CREDIT·      It is further ordered that the defendant shall be allowed a
                  total of  4 Days  as credit for time incarcerated before
                  imposition of this sentence

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS. 1,2,3,5,6,11,12

------------------------------PAGE 08------------------------------

DEFENDANT MICCICHE, DAVID, J

DIVISION      . H
CASE NUMBER  : 12-CF-007866
OBTS NUMBER  . 2937019399

------------------------------- OTHER PROVISIONS -------------------------------
AS TO COUNT(s) . 5
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED ·
--------------------------------------------------------------------------------
JAIL CREDIT:    It is further ordered that the defendant shall be allowed a
                total of  4 Days  as credit for time incarcerated before
                imposition of this sentence

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  1,2,3,4,6,11,12

-----------------------------------PAGE 09-----------------------------------

DEFENDANT MICCICHE, DAVID, J

```
                                        DIVISION          H
                                        CASE NUMBER    12-CF-007866
                                        OBTS NUMBER    2937019399
```

---------------------------- OTHER PROVISIONS ----------------------------
                    AS TO COUNT(s)   6
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED .
--------------------------------------------------------------------------
JAIL CREDIT:      It is further ordered that the defendant shall be allowed a
                  total of   4 Days   as credit for time incarcerated before
                  imposition of this sentence.

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  1,2,3,4,5,11,12

---------------------------------PAGE 10-----------------------------------

```
DEFENDANT MICCICHE, DAVID, J
                                        DIVISION        . H
                                        CASE NUMBER   . 12-CF-007866
                                        OBTS NUMBER   · 2937019399
----------------------------------------------------------------
------------------------------ SENTENCE -------------------------
                AS TO COUNT(s) : 7,8,9,10
----------------------------------------------------------------
THE DEFENDANT, BEING PERSONALLY BEFORE THIS COURT, ACCOMPANIED BY THE
DEFENDANT'S ATTORNEY OF RECORD, PRIVATE ATTORNEY  LIROT, LUKE, C
AND HAVING BEEN ADJUDICATED GUILTY HEREIN, AND THE COURT HAVING GIVEN
THE DEFENDANT AN OPPORTUNITY TO BE HEARD  AND TO OFFER MATTERS IN MITIGATION OF
SENTENCE, AND TO SHOW CAUSE WHY THE   DEFENDANT SHOULD NOT BE SENTENCED AS
PROVIDED BY LAW AND NO CAUSE BEING   SHOWN
----------------------------------------------------------------
IT IS THE SENTENCE OF THE COURT THAT THE DEFENDANT
Placed on  10 Years  Probation under supervision of the Department of
Corrections according to the terms and conditions of supervision set forth in
a separate order entered herein
     Count 7: SEX OFFENDER
     Count 8: SEX OFFENDER
     Count 9· SEX OFFENDER
     Count 10  SEX OFFENDER
```

-----------------------------------PAGE 11----------------------------------

DEFENDANT MICCICHE, DAVID, J.

DIVISION      . H
CASE NUMBER   . 12-CF-007866
OBTS NUMBER   . 2937019399

------------------------------ OTHER PROVISIONS ------------------------------
                    (AS TO COUNT(S) : 7
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED :
------------------------------------------------------------------------------

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONSECUTIVE
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS. 1,2,3,4,5,6;11,12

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS. 8,9,10

-------------------------------PAGE 12----------------------------------

DEFENDANT MICCICHE, DAVID, J

DIVISION         · H
CASE NUMBER   · 12-CF-007866
OBTS NUMBER   · 2937019399

------------------------- OTHER PROVISIONS -----------------------------
------------------ AS TO COUNT(s) · 8
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED ·
--------------------------------------------------------------------------

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONSECUTIVE
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  1,2,3,4,5,6,11,12

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  7,9,10

P688

ságHeader

DEFENDANT MICCICHE, DAVID, J

DIVISION      H
CASE NUMBER   · 12-CP-007866
OBTS NUMBER   , 2937019399

------------------------- OTHER PROVISIONS -------------------------
AS TO COUNT(s) . 9
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED
--------------------------------------------------------------------

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONSECUTIVE
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  1,2,3,4,5,6,11,12

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  7,8,10

-------------------------------PAGE 14-------------------------------

DEFENDANT MICCICHE, DAVID, J

```
                                DIVISION      .  H
                                CASE NUMBER  :  12-CF-007866
                                OBTS NUMBER  :  2937019399
```

```
---------------------------- OTHER PROVISIONS ----------------------------
                AS TO COUNT(s) . 10
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED :
--------------------------------------------------------------------------
```

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONSECUTIVE
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS  1,2,3,4,5,6,11,12

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS · 7,8,9

P690

```
D3FENDANT NICCICHE, DAVID, J

                              DIVISION    · H
                              CASE NUMBER · 12-CF-007866
                              OBTS NUMBER · 2937019399
```

```
-------------------------- SENTENCE --------------------------------
                  AS TO COUNT(s) : 11
-------------------------------------------------------------------
```

THE DEFENDANT, BEING PERSONALLY BEFORE THIS COURT, ACCOMPANIED BY THE
DEFENDANT'S ATTORNEY OF RECORD, PRIVATE ATTORNEY  LIROT, LUKE, C
AND HAVING BEEN ADJUDGED GUILTY HEREIN, AND THE COURT HAVING GIVEN
THE DEFENDANT AN OPPORTUNITY TO BE HEARD  AND TO OFFER MATTERS IN MITIGATION OF
SENTENCE, AND TO SHOW CAUSE WHY THE   DEFENDANT SHOULD NOT BE SENTENCED AS
PROVIDED BY LAW AND NO CAUSE BEING   SHOWN

IT IS THE SENTENCE OF THE COURT THAT THE DEFENDANT
'Is hereby committed to the custody of the Department of Corrections for a
term of:  5 Years

---------------------------PAGE 16---------------------------------------

DEFENDANT MICCICHE, DAVID, J

.DIVISION            H
CASE NUMBER     12-CF-007866
OBTS NUMBER  :  2937019399

----------------------- OTHER PROVISIONS -----------------------------
AS TO COUNT(s)    11
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED :
----------------------------------------------------------------------

JAIL CREDIT·     It is further ordered that the defendant shall be allowed a
total of  4 Days  as credit for time incarcerated before
imposition of this sentence.

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS. 1,2,3,4,5,6

----------------------------------------PAGE 17·······························

```
DEFENDANT MICCICHE, DAVID, J
                                         DIVISION      · H
                                         CASE NUMBER  : 12-CF-007866
                                         OBTS NUMBER  . 2937019399
----------------------------------- SENTENCE -----------------------------------
                    AS TO COUNT(s) . 12
```

THE DEFENDANT, BEING PERSONALLY BEFORE THIS COURT, ACCOMPANIED BY THE
DEFENDANT'S ATTORNEY OF RECORD, PRIVATE ATTORNEY  LIROT, LUKE, C
AND HAVING BEEN ADJUDGED GUILTY HEREIN, AND THE COURT HAVING GIVEN
THE DEFENDANT AN OPPORTUNITY TO BE HEARD  AND TO OFFER MATTERS IN MITIGATION OF
SENTENCE, AND TO SHOW CAUSE WHY THE   DEFENDANT SHOULD NOT BE SENTENCED AS
PROVIDED BY LAW AND NO CAUSE BEING   SHOWN

IT IS THE SENTENCE OF THE COURT THAT THE DEFENDANT .
Is hereby committed to the custody of the Department of Corrections for a
term of:  5 Years

```
-----------------------------PAGE 18--------------------------
```

DEFENDANT NICCICHE, DAVID, J

DIVISION · H
CASE NUMBER · 12-CF-007866
OBTS NUMBER · 2937019399

------------------------------ OTHER PROVISIONS ------------------------------
AS TO COUNT(s) · 12
THE FOLLOWING MANDATORY/MINIMUM PROVISION(S) APPLY TO THE SENTENCE IMPOSED .
--------------------------------------------------------------------------------
JAIL CREDIT·      It is further ordered that the defendant shall be allowed a
                  total of  4 Days  as credit for time incarcerated before
                  imposition of this sentence

IT IS FURTHER ORDERED THAT THE SENTENCE FOR THIS COUNT SHALL RUN CONCURRENT
TO THE SENTENCE SET FORTH IN THE FOLLOWING COUNTS· 1,2,3,4,5,6
IT IS FURTHER ORDERED THAT THE COMPOSITE TERM OF ALL SENTENCES IMPOSED FOR
THE COUNTS SPECIFIED IN THIS ORDER SHALL RUN CONCURRENT WITH THE FOLLOWING
SPECIFIC SENTENCES.
      Count 12: CTS. 1 THRU 6

DEFENDANT MICCICHE, DAVID, J

DIVISION              H
CASE NUMBER    12-CF-007866
OBTS NUMBER    2937019399

---------------------------- OTHER PROVISIONS ----------------------------
Sentencing Guidelines filed

IN THE EVENT THE ABOVE SENTENCE IS TO DEPARTMENT OF CORRECTIONS, THE SHERIFF
OF HILLSBOROUGH COUNTY, FLORIDA, IS HEREBY ORDERED AND DIRECTED TO DELIVER
THE DEFENDANT TO THE DEPARTMENT OF CORRECTIONS AT THE FACILITY DESIGNATED
BY THE DEPARTMENT TOGETHER WITH A COPY OF THIS JUDGEMENT AND SENTENCE AND
ANY OTHER DOCUMENTS SPECIFIED BY FLORIDA STATUTE
     THE DEFENDANT IN OPEN COURT WAS ADVISED OF THE RIGHT TO APPEAL FROM THIS
SENTENCE BY FILING NOTICE OF APPEAL WITHIN 30 DAYS FROM THIS DATE WITH THE
CLERK OF THIS COURT AND THE DEFENDANT'S RIGHT TO THE ASSISTANCE OF COUNSEL IN
TAKING THE APPEAL AT THE EXPENSE OF THE STATE ON SHOWING OF INDIGENCY.
DONE AND ORDERED IN HILLSBOROUGH COUNTY, FLORIDA, THIS 27TH DAY OF August 2013

JUDGE

--------------------------------- PAGE 20 ---------------------------------

STATE OF FLORIDA

-VS-

MICCICHE, DAVID J.
Defendant
***CSEN***
Local Jurisdiction Identification Number _____

IN THE THIRTEENTH JUDICIAL
CIRCUIT COURT, IN AND FOR
HILLSBOROUGH COUNTY

CASE NUMBER   DIV. H: 12-7866

DC NUMBER   T82787

## ORDER OF SEX OFFENDER PROBATION

This cause coming before the Court to be heard, and you, the defendant, being now present before the court, and you having

- ☒ entered a plea of guilty to
- ☐ entered a plea of nolo contendere to
- ☐ been found guilty by jury verdict of
- ☐ been found guilty by the court trying the case without a jury of

| Count 7 - 10 | POSSESSION OF CHILD PORNOGRAPHY - TEN OR MORE IMAGES AND CONTENT | Count _____ | |
| Count _____ | _____ | Count _____ | |
| Count _____ | _____ | Count _____ | |
| Count _____ | _____ | Count _____ | |

### SECTION 1: JUDGMENT OF GUILT

☒  The court hereby adjudges you to be guilty of the above offense(s).

Now, therefore, it is ordered and adjudged that the imposition of sentence is hereby withheld and that you be placed on Probation for a period of _____ under the supervision of the Department of Corrections, subject to Florida law

### SECTION 2: ORDER WITHHOLDING ADJUDICATION

☐  Now, therefore, it is ordered and adjudged that the adjudication of guilt is hereby withheld and that you be placed on Probation for a period of _____ under the supervision of the Department of Corrections, subject to Florida law

### SECTION 3: INCARCERATION DURING PORTION OF SUPERVISION SENTENCE .

It is hereby ordered and adjudged that you be:

☒  committed to the Department of Corrections
for a term of ten years for counts one through six (Possession of Child Pornography - Ten or More Images and Content), and five years for counts eleven and twelve (Video Voyeurism : Defendant 24 or Older, Victim Less Than 16) (Counts eleven and twelve are to run concurrently with counts one through six,) probts with credit for all unimported jail time, followed by Sex Offender Probation for a period of ten years for counts seven through ten under the _____ supervision of the Department of Corrections, subject to Florida law.
or

☐  confined in the County Jail
for a term of _____ with credit for _____ jail time. After you have served _____ of the term, you shall be placed on Probation for a period of _____ under the supervision of the Department of Corrections, subject to Florida law.
or

Page 1 of 7

Revised 07/01/13

MILLICHG, D.S.
DC# T32787
Case No. 12-7866

☐     confined in the County Jail
for a term of _____ with credit for _____ jail time, as a special condition of supervision.

IT IS FURTHER ORDERED that you shall comply with the following standard conditions of supervision as provided by Florida law:

(1) You will report to the probation officer as directed

(2) You will pay the State of Florida the amount of $forty per month, as well as 4% surcharge, toward the cost of your supervision in accordance with s. 948.09, F.S., unless otherwise exempted in compliance with Florida Statutes.

(3) You will remain in a specified place   You will not change your residence or employment or leave the county of your residence without first procuring the consent of your officer

(4) You will not possess, carry or own any firearm.   You will not possess, carry, or own any weapon without first procuring the consent of your officer.

(5) You will live without violating any law.   A conviction in a court of law is not necessary for such a violation of law to constitute a violation of your probation, community control, or any other form of court ordered supervision

(6) You will not associate with any person engaged in any criminal activity

(7) You will not use intoxicants to excess or possess any drugs or narcotics unless prescribed by a physician   Nor will you visit places where intoxicants, drugs or other dangerous substances are unlawfully sold, dispensed or used.

(8) You will work diligently at a lawful occupation, advise your employer of your probation status, and support any dependents to the best of your ability, as directed by your officer

(9) You will promptly and truthfully answer all inquiries directed to you by the court or the officer, and allow your officer to visit in your home, at your employment site or elsewhere, and you will comply with all instructions your officer may give you

(10) You will pay restitution, court costs, and/or fees in accordance with special conditions imposed or in accordance with the attached orders

(11) You will submit to random testing as directed by your officer or the professional staff of the treatment center where you are receiving treatment to determine the presence or use of alcohol or controlled substances.

(12) You will submit a DNA sample, as directed by your officer, for DNA analysis as prescribed in ss. 943.325 and 948.014, F.S.

(13) You will submit to the taking of a digitized photograph by the department.   This photograph may be displayed on the department's website while you are on supervision, unless exempt from disclosure due to requirements of s. 119.07, F.S.

(14) You will report in person within 72 hours of your release from incarceration to the probation office in Hillsborough County, Florida, unless otherwise instructed by the court or department   (This condition applies only if section 3 on the previous page is checked.)   Otherwise, you must report immediately to the probation office located in Tampa, FL.

## SPECIAL CONDITIONS

☒     1   You must undergo a Mental Health evaluation and, if treatment is deemed necessary, you must successfully complete the treatment, and be responsible for the payment of any costs incurred while receiving said evaluation and treatment, unless waived by the court.
Additional instructions ordered: Psychological/mental health assessment within thirty days of release from incarceration   Any necessary mental health treatment is to be completed within three years of release from incarceration.

Page 2 of 7                                        Revised 07/01/13

P697

MICCICHE, D.J.
DO# 792787
Case No. 12-7366

☒  2  You will make restitution to the following victim(s), as directed by the court, until the obligation is paid in full.
NAME  Please see below.
TOTAL AMOUNT: $Please see below.
Additional instructions ordered, including specific monthly amount, begin date, due date, or joint & several. You shall pay restitution to the Crimes Compensation Trust Fund for any payments awarded in this case under the Florida Crimes Compensation Act.

NAME  Please see below.
TOTAL AMOUNT: $Please see below.
Additional instructions ordered, including specific monthly amount, begin date, due date, or joint & several. You shall make restitution to the victim for restitution not related to medical, physical, psychiatric or psychological care.

## SPECIAL CONDITIONS – CONTINUED

☐  3  You will be required to pay for drug testing unless exempt by the court.

☐  4  You will enter the Department of Corrections Non-Secure Drug Treatment Program or other residential treatment program/Probation and Restitution Center for a period of successful completion as approved by your officer. You are to remain until you successfully complete said Program and Aftercare. You are to comply with all Rules and Regulations of the Program. You shall be confined in the county jail until placement in said program, and if you are confined in the jail, the Sheriff will transport you to said program.

☐  5  You will abstain entirely from the use of alcohol and/or illegal drugs, and you will not associate with anyone who is illegally using drugs or consuming alcohol.

☐  6  You will submit to urinalysis testing on a  monthly  basis to determine the presence of alcohol or illegal drugs. You will be required to pay for the tests unless exempt by the court.

☐  7  You will not visit any establishment where the primary business is the sale and dispensing of alcoholic beverages.

☒  8  You will successfully complete  50  hours of community service at a rate of  five hours per month , at a work site approved by your officer.
Additional instructions ordered  All hours to be completed within the first five years of supervision.

☐  9  You will remain at your residence between 10 p.m. and 6 a.m. due to a curfew imposed, unless otherwise directed by the court.

☐  10. You will submit to electronic monitoring, follow the rules of electronic monitoring, and pay $_____ per month for the cost of the electronic monitoring service.

☐  11  You will not associate with _____ during the period of supervision.

☐  12  You will have no contact (direct or indirect) with the victim or the victim's family during the period of supervision.

☐  13  You will have no contact (direct or indirect) with _____ during the period of supervision.

☐  14  You will maintain full time employment or attend school/vocational school full time or a combination of school/work during the term of your supervision.

☐  15  You will make a good faith effort toward completing basic or functional literacy skills or a high school equivalency diploma.

☐  16. You will successfully complete the Probation & Restitution Program, abiding by all rules and regulations.

☐  17. You will attend a support group with a focus on _____ at least monthly, unless otherwise directed by the court.

☐  18  You must successfully complete  Anger Management , and be responsible for the payment of any costs incurred while receiving said treatment, unless waived.  If convicted of a Domestic Violence offense, as defined in s. 741.28, F.S., you must attend and successfully complete a batterer's intervention program, unless otherwise directed by the court.
Additional instructions ordered. _____

12-CF-007886    F13-013308220-001
MICCICHE, DAVID    7.PAGE2
J CELL    08/17/2013    FORMS

McClain D. J.
DC# 792787
Case No. 12-7806

☐ 19  You will attend an HIV/AIDS Awareness Program consisting of a class of not less than two (2) hours or more than four (4) hours in length, the cost for which will be paid by you

☐ 20.  If you have been found to have committed a crime on or after October 1, 2003 for the purpose of benefiting, promoting, or furthering the interests of a criminal gang, you are prohibited from knowingly associating with other criminal gang members or associates, except as authorized by law enforcement officials, prosecutorial authorities, or the court, for the purpose of aiding in the investigation of criminal activity.

☐ 21.  You will successfully complete a Post-adjudicatory treatment-based drug court program, as provided in s. 397.334(3), FS

☒ 22  Other: You are deemed a sexual offender and shall fulfill all requirements of such

☒ 23.  Other. You shall forfeit to the Hillsborough County Sheriff's Office all evidence seized during the investigation of this case.

☒ 24  Other. You shall abide by any other condition which the court finds appropriate to impose.

☐ 25.  Other. _____

☐ 26.  Other. _____

☐ 27.  Other. _____

AND, IF PLACED ON PROBATION OR COMMUNITY CONTROL FOR A SEX OFFENSE PROVIDED IN CHAPTER 794, s. 800.04, s. 827.071, s. 847.0135(5), or s. 847.0145, COMMITTED ON OR AFTER OCTOBER 1, 1995 YOU WILL COMPLY WITH THE FOLLOWING STANDARD SEX OFFENDER CONDITIONS, IN ADDITION TO THE STANDARD CONDITIONS LISTED ABOVE AND ANY OTHER SPECIAL CONDITIONS ORDERED BY THE COURT.

(15) A mandatory curfew from 10 p.m. to 6 a.m. The court may designate another 8-hour period if the offender's employment precludes the above specified time, and the alternative is recommended by the Department of Corrections. If the court determines that imposing a curfew would endanger the victim, the court may consider alternative sanctions.

(16) If the victim was under the age of 18, a prohibition on living within 1,000 feet of a school, child care facility, park, playground, or other place where children regularly congregate, as prescribed by the court. The 1,000-foot distance shall be measured in a straight line from the offender's place of residence to the nearest boundary line of the school, child care facility, park, playground, or other place where children congregate. The distance may not be measured by a pedestrian route or automobile route.

(17) Active participation in and successful completion of a sex offender treatment program with qualified practitioners specifically trained to treat sex offenders, at the offender's own expense. If a qualified practitioner is not available within a 50-mile radius of the offender's residence, the offender shall participate in other appropriate therapy. You shall enroll in the program within thirty days of release from incarceration. Any necessary treatment is to be completed within four years of release from incarceration.

(18) A prohibition on any contact with the victim, directly or indirectly, including through a third person, unless approved by the victim, a qualified practitioner in the sexual offender treatment program, and the sentencing court

(19) If the victim was under the age of 18, a prohibition on contact with a child under the age of 18 except as provided in this paragraph. The court may approve supervised contact with a child under the age of 18 if the approval is based upon a recommendation for contact issued by a qualified practitioner who is basing the recommendation on a risk assessment. Further, the sex offender must be currently enrolled in or have successfully completed a sex offender therapy program. The court may not grant supervised contact with a child if the contact is not recommended by a qualified practitioner and may deny supervised contact with a child at any time

(20) If the victim was under age 18, a prohibition on working for pay or as a volunteer at any place where children regularly congregate, including, but not limited to any school, child care facility, park, playground, pet store, library, zoo, theme park, or mall

(21) Unless otherwise indicated in the treatment plan provided by a qualified practitioner in the sexual offender treatment program, a prohibition on viewing, accessing, owning, or possessing any obscene, pornographic, or sexually stimulating visual or auditory material, including telephone, electronic media, computer programs, or computer services that are relevant to the offender's deviant behavior pattern

(22) A requirement that the offender submit a DNA sample to the Florida Department of Law Enforcement to be registered with the DNA data bank

P699

MicUONS, D. J
DCA 1TB2-787
Case No. 12-7866

(23) A requirement that the offender make restitution to the victim as ordered by the court under s. 775.089, for all necessary medical and related professional services relating to physical, psychiatric, and psychological care.

(24) Submission to a warrantless search by the community control or probation officer of the offender's person, residence, or vehicle

**EFFECTIVE FOR PROBATIONER OR COMMUNITY CONTROLLEE WHOSE CRIME WAS COMMITTED ON OR AFTER OCTOBER 1, 1997, AND WHO IS PLACED ON COMMUNITY CONTROL OR SEX OFFENDER PROBATION FOR A VIOLATION OF CHAPTER 794, s. 800.04, s. 827.071, s.847.0135(5) or s. 847.0145, IN ADDITION TO ANY OTHER PROVISION OF THIS SECTION, YOU MUST COMPLY WITH THE FOLLOWING CONDITIONS OF SUPERVISION:**

(25) As part of a treatment program, participation at least annually in polygraph examinations to obtain information necessary for risk management and treatment and to reduce the sex offender's denial mechanisms A polygraph examination must be conducted by a polygrapher who is a member of a national or state polygraph association and who is certified as a postconviction sex offender polygrapher, where available, and at the expense of the offender

(26) Maintenance of a driving log and a prohibition against driving a motor vehicle alone without the prior approval of the supervising officer.

(27) A prohibition against obtaining or using a post office box without the prior approval of the supervising officer

(28) If there was sexual contact, a submission to, at the offender's expense, an HIV test with the results to be released to the victim and/or the victim's parent or guardian

(29) Electronic monitoring when deemed necessary by the probation officer and supervisor, and ordered by the court at the recommendation of the Department of Corrections   If you are placed on electronic monitoring, you must pay the department for the cost of the electronic monitoring service.

(30) Effective for an offender whose crime was committed on or after July 1, 2005, and who are placed on supervision for violation of chapter 794, s. 800.04, s. 827.071, or s. 847.0145, a prohibition on accessing the Internet or other computer services until a qualified practitioner in the offender's sex offender treatment program, after a risk assessment is completed, approves and implements a safety plan for the offender's accessing or using the Internet or other computer services

(31) Effective for offenders whose crime was committed on or after September 1, 2005, there is hereby imposed, in addition to any other provision in this section, mandatory electronic monitoring as a condition of supervision for those who.
- Are placed on supervision for a violation of chapter 794, s. 800.04(4), (5), or (6), s. 827.071, or s. 847.0145 and the unlawful sexual activity involved a victim 15 years of age or younger and the offender is 18 years of age or older; or
- Are designated as a sexual predator pursuant to s. 775.21, or
- Has previously been convicted of a violation of chapter 794, s. 800.04(4), (5), or (6), s. 827.071, or s. 847.0145 and the unlawful sexual activity involved a victim 15 years of age or younger and the offender is 18 years of age or older

You are hereby placed on notice that should you violate your probation or community control, and the conditions set forth in s. 948.063(1) or (2) are satisfied, whether your probation or community control is revoked or not revoked, you shall be placed on electronic monitoring in accordance with F.S. 948.063.

(32) Effective for offenders who are subject to supervision for a crime that was committed on or after May 26, 2010, and who has been convicted at any time of committing, or attempting, soliciting, or conspiring to commit, any of the criminal offenses listed in s 943.0435(1)(a)1.a.(I), or a similar offense in another jurisdiction, against a victim who was under the age of 18 at the time of the offense: the following conditions are imposed in addition to all other conditions:
  (a) A prohibition on visiting schools, child care facilities, parks, and playgrounds, without prior approval from the offender's supervising officer   The court may also designate additional locations to protect a victim   The probation ordered under this paragraph does not prohibit the offender from visiting a school, child care facility, park, or playground for the sole purpose of attending a religious service as defined in s 775.0861 or picking up or dropping off the offender's children or grandchildren at a child care facility or school.
  (b) A prohibition on distributing candy or other items to children on Halloween, wearing a Santa Claus costume, or other costume to appeal to children, on or preceding Christmas, wearing an Easter Bunny costume, or other costume to appeal to children, on or preceding Easter, entertaining at children's parties, or wearing a clown costume, without prior approval from the court

P700

McCliENG, D. J.
DC# 782737
Case No. 12-7360U

**YOU ARE HEREBY PLACED ON NOTICE** that the court may at any time rescind or modify any of the conditions of your probation, or may extend the period of probation as authorized by law, or may discharge you from further supervision. If you violate any of the conditions of your probation, you may be arrested and the court may revoke your probation, adjudicate you guilty if adjudication of guilt was withheld, and impose any sentence that it might have imposed before placing you on probation or require you to serve the balance of the sentence.

**IT IS FURTHER ORDERED** that when you have been instructed as to the conditions of probation, you shall be released from custody if you are in custody, and if you are at liberty on bond, the sureties thereon shall stand discharged from liability. (This paragraph applies only if section 1 or section 2 is checked.)

**IT IS FURTHER ORDERED** that you pay the following charges/costs/fees if checked.

CHECK ALL THAT ARE ORDERED:

**FINES**

☐ $_____   Total of fines assessed in sentence, pursuant to s. 775.083 (1)(a) through (g) or Chapter 316, F.S.
☐ $_____   Statutorily mandated 5% surcharge on all fines assessed (on first line) pursuant to s. 938.04, F.S.

**MANDATORY COSTS IN ALL CASES**

☐ $225.00   Additional court cost for felony offenses, pursuant to s. 938.05(1)(a), F.S
☐ $ 60.00   Additional court cost for misdemeanor or criminal traffic offense, pursuant to s. 938.05(1)(b) or (c), F.S
☐ $ 50.00   Crimes Compensation Trust Fund pursuant to s. 938.03(1), F.S
☐ $ 50.00   County Crime Prevention Fund pursuant to s. 775.083(2), F.S
☐ $ 3.00    Additional Court Costs Clearing Trust Fund pursuant to s. 938.01(1), F.S. (Requires an adjudication except when adjudication withheld pursuant to s. 318.14(9) or (10), F.S.)
☐ $_____   Prosecution Costs, pursuant to s. 938.27, F.S (Minimum of $100 Felony/$50 Misdemeanor)
☐ $_____   Investigative Costs, pursuant to s. 938.27, F.S. (if applicable and requested)
☐ $20.00    Crime Stoppers Trust Fund pursuant to s. 938.06(1), F.S

**MANDATORY COURT COSTS FOR COURT-APPOINTED COUNSEL CASES**

☐ $50.00    Public Defender/Appointed Counsel Application Fee, if not previously collected, pursuant to s. 27.52 and s. 938.29, F.S
☐ $_____   Public Defender/Appointed Counsel fees and Costs, pursuant to s. 938.29, F.S as determined locally (Minimum of $100 Felony/$50.00 Misdemeanor)

**MANDATORY COSTS IN SPECIFIC TYPES OF CASES**

☐ $151.00   Rape Crisis Program Trust Fund, pursuant to s. 938.085, F.S. for any violations of ss. 784.011, 784.021, 784.03, 784.041, 784.045, 784.043, 784.07, 734.08, 784.081, 784.082, 784.083, 784.085, or 794.011, F.S
☐ $201.00   Domestic Violence Trust Fund, pursuant to s. 938.08, F.S. for any violations of ss. 784.011, 784.021, 784.03, 784.041, 784.045, 784.048, 784.07, 784.08, 784.081, 784.082, 784.083, 784.085, 794.011, or any offense of Domestic Violence described in s. 741.23, F.S
☐ $151.00   Certain Crimes Against Minors, pursuant to s. 938.10(1), F.S. for any violations of s. 784.085, chapter 787, chapter 794, s. 796.03, s. 800.04, chapter 827, s. 847.012, s. 847.0133, s. 847.0135(5), s. 847.0138, s. 847.0145, s. 893.147(3), or s. 985.701, or any offense in violation of s. 775.21, s. 825.07, s. 847.0125, s. 847.0134, or s. 943.0435, F.S
☐ $135.00   DUI Court Costs, pursuant to s. 938.07, F.S for any violations of ss. 316.193 or 327.35, F.S
☐ $ 1.00    State Agency Law Enforcement Radio System Trust Fund, pursuant to s. 318.18(17), F.S. for any violations of offenses listed in s. 318.17 including ss. 316.1935, 316.027, 316.061, 877.111, chapter 893, ss. 316.193, 316.192, 316.057, 316.072(3), 316.545(1), or any other offense in chapter 316 which is classified as a criminal violation.

**MANDATORY COURT COSTS AUTHORIZED BY LOCAL GOVERNMENTAL ENTITIES**

☐ $ 2.00    Criminal Justice Education by Municipalities and Counties, pursuant to s. 938.15, F.S
☐ $_____   Additional court costs for local requirements and other county funded programs pursuant to s. 939.185(1)(a), F.S.
☐ $ 3.00    Teen Court pursuant to s. 938.19(2), F.S

**DISCRETIONARY**

☐ $ 1.00    Per month during the term of supervision to the following nonprofit organization established for the sole purpose of supplementing the rehabilitative efforts of the Department of Corrections, pursuant to s. 948.039(2), F.S. _____
☐ Other _____
☐ Other _____
☐ Other _____

**DISCRETIONARY COSTS FOR SPECIFIC TYPES OF CASES**

☐ $_____   County Alcohol and Other Drug Abuse Trust Fund, pursuant to s. 938.21 and s. 938.23, F.S for violations of s. 316.193, s. 856.011, s. 856.015, s. 562, chapter 567, or chapter 568, F.S.

Page 6 of 7                                                Revised 07/01/13

☐ $100.00   Operating Trust Fund of the FDLE, pursuant to s. 938.25, F.S. for violations of s. 893.13 offenses

TOTAL AMOUNT OF COURT COSTS ORDERED = $ _____

## OTHER OBLIGATIONS IMPOSED

☐ $ 1.00   Per month for each month of supervision for Training Trust Fund Surcharge, pursuant to s.943.09, F.S
☐ Other _____
☐ Other _____

Payments processed through the Department of Corrections will be assessed a 4% surcharge pursuant to s. 945.31, F.S.

☐   Court Costs/Fines Waived
☐   Court Costs/Fines is the amount of _____ converted to _____ community service hours
☒   Court Costs/Fines in the amount of all court costs imposed in this case reduced to civil judgment.

SPECIFIC INSTRUCTIONS FOR PAYMENT _____

IT IS FURTHER ORDERED that the clerk of this court file this order in the clerk's office and provide certified copies of same to the officer for use in compliance with the requirements of law

DONE AND ORDERED, on August 27, 2013

NUNC PRO TUNC N/A

_____
Chat A. Tharpe, Circuit Judge

I acknowledge receipt of a copy of this order and that the conditions have been explained to me and I agree to abide by them

Date _____

Instructed by _____                    _____
                  Supervising Officer                              Defendant

Page 7 of 7                                                   Revised 07/01/13

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

STATE OF FLORIDA,
            Plaintiff,

Vs                                                    Case No., 2010-CF-007566

DAVID MICCICHE,
            Defendant
_____/

### 3 850 MOTION FOR POSTCONVICTION RELIEF
### (with incorporated "Memorandum of Law")

COMES NOW, the Defendant, David Micciche, proceeding pro se, pursuant

to Fla R Crim P., Rule 3 850, and moves this Honorable Court to grant the

appropriate relief due with respect to the grounds and argument presented, as a

prima facie case for relief is evident, and said grounds are both cognizable and

meritorious  This motion is being filed in good faith and with the belief that the

Defendant is entitled to redress  The following facts and grounds are asserted in

support thereof:

1).    On April 24, 2012, Hillsborough County Sheriff's Deputies executed a

search warrant at Mr. Micciche's home in connection with information received

regarding the viewing of child pornography which had been traced back to that

address.  Interviews were conducted and property was seized

2)   On May 23, 2012, nearly one month later, deputies returned to Mr. Micciche's home with a warrant for his arrest  Mr. Micciche was arrested without incident for allegations pertaining to 10 counts of possession of child pornography, in violation of F S  827.071(5)(a), enhanced to 2nd degree felonies pursuant to F.S 775.0847(2) and (3), and one count of video voyeurism (Defendant 24 years or older, victim less than 16), in violation of F S  810 145(2)(a) and (8)(a)3. Mr. Micciche was booked and released on bond.

3)   The following day, May 24, 2012, deputies returned to Mr. Micciche's home and re-arrested him for an additional count of video voyeurism (defendant 24 or older, victim less than 16), in violation of F.S. 810 145(2)(a) and (8)(a)3.  Again, Mr  Micciche was booked and released on bond.

4)   On June 6, 2012, the State filed an information, charging Mr. Micciche with 10 counts of possession of child pornography, in violation of F.S  827.071(5)(a), enhanced to 2nd degree felonies pursuant to F S. 775.0847(2) and (3), two counts of video voyeurism (Defendant 24 years or older, victim less than 16), in violation of F.S  810 145(2)(a) and (8)(a)3, and two counts of promotion of a sexual performance by a child, in violation of F S. 827.071(3)

2

5). Mr. Micciche retained Debora Moss, Attorney-At-Law, from the Law Offices of Carlson and Meissner, to represent the defense. The State was represented by Assistant State Attorney Courtney H. Derry  The presiding Judge was the Honorable Chet A. Tharpe.

6). Upon receipt of advice from his attorney, Mr. Micciche agreed to enter into a negotiated plea agreement on the counts pertaining to possession of child pornography and video voyeurism  The two counts of promotion of a sexual performance by a child were nolle prossed by the State, as, legally, no sexual performance, as defined by statute, was present in any video possessed by Mr Micciche.

7) On August 27, 2013, Mr. Micciche entered a guilty plea to 10 counts of possession of child pornography, enhanced to 2nd degree felonies; and two counts of video voyeurism (defendant 24 or older; victim less than 16). Mr. Micciche was adjudicated guilty and sentenced by Judge Tharpe to the terms agreed upon in the negotiated plea agreement, 10 years in Florida State Prison, to be followed by 10 years of sex offender probation with special conditions imposed

8). No direct appeal was filed to challenge the judgment and sentence imposed. This is the first postconviction motion filed in this cause.

The Defendant presents the following grounds and argument·

3·

## GROUND ONE

DEFENSE COUNSEL WAS INEFFECTIVE FOR
FAILING TO INVESTIGATE ALLEGATIONS OF
FALSE INFORMATION PROVIDED TO THE STATE,
IN POLICE REPORTS THAT WERE CONSIDERED
TO ISSUE AN ARREST WARRANT AND SECURE A
CONVICTION      COUNSEL'S      DEFICIENT
PERFORMANCE    HAS    PREJUDICED    THE
DEFENDANT,   AND   VIOLATED   HIS   U.S
CONSTITUTIONAL    RIGHT    TO    EFFECTIVE
ASSISTANCE OF COUNSEL AND DUE PROCESS

"We are troubled by the possibility that a false police report was submitted

and then relied on by defense counsel  Without an evidentiary hearing to explore

this issue, we are left with mere speculation as to what in fact occurred, what the

police knew, what the prosecutor knew ." Mungin v. State, 79 So.3d 726 (Fla.

2011).

On April 24, 2012, Mr Micciche was interviewed, post-Miranda, by

Detective  Karen DiPaolo, from the Hillsborough County Sheriff's Office. This

interview took place during the execution of a search warrant that had been issued

in connection with information compiled that led police to believe that specific

images of child pornography, that had been purposely planted by law enforcement,

had been viewed at Mr Micciche's address

Mr Micciche waived his Miranda rights and chose to speak openly with

Detective DiPaolo, in order to protect his family, and because he believed he had

4

P706

nothing to hide, as his past behavior had absolutely nothing to do with any intentional viewing of child pornography

The interview was conducted in Mr. Micciche's home, and in the presence of Detective Heavern, also of the Hillsborough County Sheriff's Office. This interview was neither videotaped nor recorded, and no transcription is available for review.

Many general questions were asked, and then specific inquires were made concerning Mr. Micciche's use of the internet to view pornography. Mr. Micciche openly admitted to using the website Limewire/Frostwire to view adult pornography. He admitted that he felt he had an addiction to "internet porn", and that he had actively searched and received help for his addiction, via an 11 week course conducted at his church. He advised Detective DiPaolo that he had not been on any pornographic websites in a long time, a fact confirmed upon investigation.

When questioned as to his interest in child pornography, Mr. Micciche adamantly denied intentionally or knowingly viewing any images containing underage children in compromising situations. Mr. Micciche further advised that he had never searched for child pornography, and would be sickened by the mere thought of a child being abused, sexually or otherwise.

5

When asked the purpose of his viewing of adult pornography, Mr Micciche responded that he was curious, and that he would, at times, masturbate to the adult images portrayed. At no time during the interview did Mr. Micciche claim to be curious about child pornography or admit to masturbating to images of child pornography.

Mr Micciche did acknowledge the fact that his viewing included the use of a preview feature and that once he saw that the file did contain an image and not a virus, he would allow the image to be shown  He further acknowledged that a few times during his viewing, an image containing an obviously underage participant was shown, and upon this realization, was deleted, within seconds

Mr Micciche was shown photographs, that had been pre-printed, of images of child pornography that had been planted by law enforcement and viewed by a user at Mr. Micciche's address. Mr. Micciche did acknowledged that he was able to recognize some of the images, and admitted to previewing said images up to the point that it became apparent that the images were of children in sexual situations. Mr. Micciche reiterated that these images were immediately deleted upon this realization

When asked about contact with children, Mr Micciche informed Detective DiPaolo that he was active with the Boy Scouts of America, but only as an adult training facilitator and as a medic  He also stated that he worked at times as a

6

security guard at Grace Family Church, and was occasionally at work when youth groups would meet

Upon drafting a document entitled, "Interview-suspect", Detective DiPaolo fabricated what would appear to be a confession to the allegations presented against Mr. Micciche Admissions that were provided specifically pertaining to the viewing of adult/mature pornography were taken out of context and re-written to apply to the child pornography in question

Mr. Micciche was made out to be a "textbook pedophile", as not only did the detective's report appear as if Mr. Micciche had confessed to intentionally viewing and masturbating to child pornography, a statement that could not be farther from the truth, but due to Mr Micciche's close contact with children in the Boy Scouts (also untrue) and his "capacity" as a "small groups leader" at his church, (Mr. Micciche was only a security guard) in the words of Mr Micciche's attorney, the allegations, the statements provided, and his activities involving children, had created "the perfect storm".

Mr. Micciche explained to his attorney that he did not confess to any crime involving child pornography, and many statements provided in Detective DiPaolo's police report were either taken out of context, or simply untrue.

The false statements drafted in the lead detective's police report were material to the case, as said statements were composed to create a confession,

7

where no confession was actually provided  This "confession evidence" was the

single most pertinent piece of information provided to the State for the purpose of

conviction.  It is well-settled, as a matter of law, that a confession is the most

convincing evidence that can be presented to a jury, regardless of the physical

evidence available. Mr  Micciche was severely prejudiced by counsel's failure to

investigate the allegations that a confession was falsely presented in police reports

This failure to investigate, either through additional demand for discovery or

through depositions, allowed this most damaging false evidence to stand.

This false police report being relied upon by Mr. Micciche's counsel was the

functional equivalent of a failure to develop a visible defense to the alleged

offenses  This deficient performance that has prejudiced Mr. Micciche is a glaring

example of how counsel's performance had fallen well below the level set for

professional standards, as outlined in Strickland v  Washington, 466 U.S. 668

(1984).

Below are examples of false statements and comments taken out of context,

contained in the lead detective's police report, that have prejudiced Mr. Micciche.

1)   "He stated he knew what he has been doing is wrong but that he is in

'counseling' now for his issue.  In an attempt to clarify what his issue was,

Micciche stated viewing pornography both adult and child." (never stated and

untrue)

8

2)    "He would only briefly look at the child porn <u>sometimes masturbate</u> and delete it " (never stated and untrue)

3).    "He acknowledged that he knows that peer to peer software is a file sharing and that be must have <u>accidentally downloaded child pornography</u> " (never stated and untrue)

4)    "He then stated after saying that he utilized the preview function of the files that he <u>purposefully</u> downloaded the files because he was <u>curious</u>, (admitted to as reason for viewing adult/mature pornography only) but he would <u>view it for 30 seconds then delete the file</u> " (taken out of context from separate line of questioning)

5)    "Miccuche stated that the only computer that he had ever downloaded <u>child</u> pornography on was his own computer in his office " (only confirmed downloading adult pornography on his computer)

6)    Miccuche, when asked, confirmed that he sometimes masturbates to the child pornography as well as adult pornography " (an outright lie, never stated and untrue)

7).    "He is a Boy Scout leader and has been for many years " (only stated that he served as an adult training facilitator and a medic)

9

8)     "He is also a "small groups leader" at his church (Grace Family Church)

over teenagers." (only stated that he worked as a security guard, and was on duty

when teenage groups would meet, at times)

   A review of these fabricated statements will make it apparent that the lead

detective made an attempt to provide evidence to the State that made it appear as if

Mr Micciche had confessed and was guilty of all counts.  As this fabrication was

brought to the attention of Mr Micciche's attorney, her failure to follow through is

a clear example of a failure to protect Mr Micciche's Constitutional right to due

process, and has rendered her assistance ineffective

   Mr Micciche should be provided an opportunity to present evidence and

question witnesses at an evidentiary hearing, in support of this most meritorious

claim, and relief should be provided in any form this Honorable Court deems to be

appropriate

10

## GROUND TWO

DEFENSE COUNSEL WAS INEFFECTIVE FOR
MISADVISING THE DEFENDANT CONCERNING
THE ENTRANCE OF A GUILTY PLEA FOR TWO
COUNTS OF VIDEO VOYEURISM, WHERE A
VIABLE DEFENSE EXISTED TO DEMAND AN
ACQUITTAL AT TRIAL. COUNSEL'S DEFICIENT
PERFORMANCE HAS CAUSED PREJUDICE AND
HAS VIOLATED THE DEFENDANT'S U.S.
CONSTITUTIONAL RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL AND DUE PROCESS

To prove the offense of video voyeurism, in violation of F S 810 142(2)(a)
and (8)(a)3, the State was required to prove that Mr Micciche recorded images of
the victim, his step-daughter, without her knowledge or consent. Furthermore, the
State was required to prove that Mr. Micciche did so for his own amusement,
entertainment, sexual arousal, gratification, or profit or for the purpose of
degrading or abusing his step-daughter. Neither of these essential elements could
have been proven at trial and, in fact, evidence to the contrary was possessed by
Mr. Micciche's attorney.

The initial contact made by detectives was conducted in reference to a
search warrant obtained due to a report of computer activity which had indicated
the viewing of child pornography Upon conducting said search, a videotape was
discovered in the bedroom shared by Mr Micciche and his wife This video
contained two specific occurrences of Mr Micciche's step-daughter returning from

11

a shower and getting dressed.  The tape had been edited to only play these two occurrences.

Upon questioning, Mr. Micciche had admitted to police that he had installed a surveillance camera in his step-daughter's bedroom many years ago.  He explained that the purpose of this camera was to catch the person in his home who had been stealing from his step-daughter and daughter, who shared the room   He explained that his son, David Jr., who was 16 at the time of the recording, was using drugs and was always in trouble   He further explained that the camera was hooked directly into a V C.R. and not any T.V. or monitor   He denied editing the tape and was unaware of its presence in his bedroom   He further denied ever viewing the tape.  The tape was found in plain view and not hidden or being kept in secret

As the camera was placed in an effort to catch David Jr. stealing, the placement of said camera does not lend to the accusation that its presence was intended for any illegal or illicit use.  Additionally, Mr Micciche's step-daughter recalled being informed of said placement, and would have been available to testify as such.  His step-daughter had written a letter to Mr. Micciche's attorney explaining and admitting to this knowledge of placement

The testimony of Mr. Micciche's step-daughter, if presented to a jury, would have given rise to doubt the element of recording without the victim's knowledge,

12

as required to prove the offense. Furthermore, testimony could have been acquired from other family members who recalled the incidents of theft and the subsequent installation of surveillance equipment

There was no proof available to show that Mr. Micciche was the person who created and/or edited the videotape, and discovery of the tape in an unhidden location in Mr. Micciche's room is merely circumstantial. In all likelihood, the tape was created by Mr. Micciche's delinquent son. As Mr. Micciche is self-employed in the home theatre and electronics industry, it was not unusual for him to possess home surveillance equipment, and his entire family is tech-savvy.

Upon meeting with his retained counsel, Mr. Micciche explained how he did not produce, edit, or view the tape, and did not know of its existence. Counsel advised Mr. Micciche to enter a plea of guilt to these two counts of video voyeurism as part of a negotiated plea agreement, even though counsel was aware of her client's innocence. It was explained that even though an acquittal may be obtained on these counts, the remaining 10 unrelated counts may be lost, and the State would seek a harsher penalty. The option to sever counts was never explored, nor was a trial strategy analysis performed to determine if proceeding on the severed counts would be a sound strategy.

No effort was put forth by counsel to determine the validity of the allegations of video voyeurism. Mr. Micciche's son, David Jr., was able to be

13

contacted, and his wife was available to testify to her knowledge of the equipment. When Mr. Micciche informed his attorney of this fact, he was told that if his family members testified on his behalf, they could be charged with the crime also.

There was a legitimate reason to enter a motion to sever counts, as evidence of guilt on the possession of child pornography counts (although falsified) would lend inference to allow a jury to believe that Mr. Micciche would have videotaped his pre-teen daughter in stages of undress. Counsel was ineffective for failing to move to sever the voyeurism counts from the possession counts, and for failing to investigate and inform Mr. Micciche that a viable defense existed to require an acquittal. "Courts have recognized that a danger of improper consolidation lies in the fact that evidence relating to each of the crimes may have the effect of bolstering the proof of the other." Dupree v. State, 705 So.2d 90, 95 (Fla. 4th DCA, 1998) citing Crossley v. State, 596 So.2d 447, 450 (Fla. 1992) "The presumption of innocence may be destroyed by proof of a similar related offense." State v. Harbaugh, 754 So.2d 691, 693 (Fla. 2000)

Had counsel moved to sever counts or at least advised Mr. Micciche that the two counts of video voyeurism could have been tried separately, and that a viable defense did exist to the alleged offenses, Mr. Micciche never would have entered into a negotiated plea agreement with the State which contained these two counts. Mr. Micciche would have insisted on having a jury hear testimony and evidence

14

proving that not only did he not commit this heinous crime, but also that, by law, the elements required to secure a conviction could not have been proven beyond a reasonable doubt Mr Micciche and his entire family have been scarred by these false accusations, and Mr Micciche would have proceeded to trial and protected his family if it hadn't been for the misadvise and deficient performance provided by his attorney "In the context of a plea, the prejudice prong of the test for ineffective assistance of counsel requires a showing that there is a reasonable probability that, but for counsel's errors, the defendant would not have plead guilty and would have insisted on going to trial " Munroe v. State, 28 So.3d 973 (Fla. 2nd DCA 2010)

It was held in Woodly v. State, 937 So.2d 193, 196 (Fla 4th DCA 2006) that "misadvise of counsel as to the availability of defenses can demonstrate the requisite manifest injustice". A severance of counts and a plea withdrawal as to the two counts of video voyeurism is only fair and just Mr Micciche has provided examples of counsel's deficient performance and has demonstrated the required prejudice to justify a claim of ineffective assistance of counsel.

Not only is counsel required to conform to an acceptable standard under Strickland v Washington, 466 U.S. 668 (1984), but the "accused shall have the right to effective assistance of counsel in all criminal prosecutions " Missouri v. Frye, 132 S.Ct 1399, 1404 (2012)

15

In an attempt by detectives to fabricate evidence indicating that Mr. Micciche's intentions were less than innocent, a comment made concerning Mr. Micciche's curiosity about adult pornography was taken out of context and presented in a police report to read that the reason a tape was made showing his step-daughter getting dressed was because he was "curious", when nothing could be further from the truth.

Mr Micciche is entitled to present evidence of this most meritorious claim, and be provided relief in any form this Honorable Court deems to be appropriate.

"Defendant was entitled to an evidentiary hearing on his claim that trial counsel was ineffective for failing to advise him of a viable defense." Munroe, Id.

16

## GROUND THREE

DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO FILE A MOTION TO SUPPRESS EVIDENCE IN THE STATE'S POSSESSION WHICH WAS FALSELY INCRIMINATING AND WOULD HAVE GIVEN RISE TO A GIGLIO VIOLATION IF PRESENTED AT TRIAL TO SECURE A CONVICTION COUNSEL'S DEFICIENT PERFORMANCE HAS PREJUDICED THE DEFENDANT, AND VIOLATED HIS U.S. CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS.

As stated and clarified in an earlier ground, Mr. Micciche's attorney was aware of evidence in the State's possession that was falsified. Said evidence was incriminating and as material to the case against Mr. Micciche

The police report written by Detective DiPaolo was listed in the State's discovery disclosure was the only evidence of any statement or confession provided by Mr. Micciche. Said police report was relied upon by the State as proof positive that Mr. Micciche did commit the crimes he was accused of committing.

The fact that defense counsel was aware of this false evidence, yet chose to ignore this violation of Mr. Micciche's rights has rendered her assistance ineffective

A viable defense existed to prove that Mr. Micciche could have been searching for adult pornography and had viewed the files in question without intending to download child pornography. To support this claim, it could have

17

P719

been argued that unlike the vast majority of offenders of this type, no images of child pornography were present or stored on any computer or hidden location in Mr. Micciche's home, as none existed.  This fact is pertinent "given that collectors of child pornography tend to retain their materials in secure places, including their homes " State v. Sabourin, 39 So.3d 376 (Fla 1st DCA 2010) "History teaches that (pornography) collectors prefer not to dispose of their dross, typically obtaining obscene materials for years." U.S. v Ricciardelli, 998 F 2d 8, 12 (1st Cir , 1993) The fact that images were inadvertently viewed and immediately deleted could not be argued with Mr. Micciche's "falsified confessions" on the record

"To prove the crime of possession of child pornography, a person must knowingly possess a photograph, representation, or other presentation which, in whole or in part, he or she knows to include any sexual conduct by a child." (emphasis added) Parker v  State, 81 So 3d 451 (Fla  2nd DCA 2011) The falsified confession allowed the State to satisfy the "knowing" prong of the offense, when, in fact, this was not so.

Had counsel exercised due diligence in determining that said police report and its contents were, in fact, false, and filed a motion to suppress said report, thus removing the alleged "confession" from the State's possession, it is doubtful that a conviction could have been obtained as no factual basis would have been available to present to the Court to accept a plea.

18

Defense counsel was ineffective for failing to file a motion to suppress where evidence and testimony could have been presented to compel the Court to grant said motion. Mr. Micciche was prejudiced by counsel's deficient performance, as, previously argued, no confession evidence would have been available to support the allegations against Mr. Micciche, and there is a reasonable probability that the outcome of the proceeding would have been different

Counsel's deficient performance further allowed the existence of a Giglio violation to go untested, as the State would have been charged with constructive knowledge of the falseness of the confession, if presented at a trial.

"To establish a Giglio claim alleging that the State presented false evidence, a defendant must show that (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material." Rhodes v State, 986 So.2d 501, 508-509 (Fla. 2008) "As to the knowledge prong, in Guzman v. State, 868 So 2d 498 (Fla 2003), we have clarified that Giglio is satisfied where the lead detective testifies falsely at trial because the knowledge of the detective. is imputed to the prosecutor who tried the case." Id @ 505. "Under Giglio, the evidence is considered material simply if there is any reasonable 'possibility' that it could have affected the jury's verdict Rhodes @ 509 (emphasis added)

19

Counsel's failure to shield Mr Micciche from a Giglio violation, and her failure to file a suppression motion are clear examples of ineffective assistance of counsel, and prejudice has been proven  Mr Micciche is entitled to further establish this claim in an evidentiary hearing, and relief should be provided in any manner this Court deems to be appropriate

20

P722

## GROUND FOUR

DEFENSE COUNSEL WAS INEFFECTIVE FOR FAILING TO DEPOSITION WITNESSES, BOTH DEFENSE AND STATE, WHOM, UPON QUESTIONING, WOULD HAVE PROVIDED BOTH EXCULPATORY TESTIMONY AND DOUBT, AS TO THE ALLEGATIONS RAISED AGAINST THE DEFENDANT AND THE RELIABILITY OF THE EVIDENCE PROVIDED TO THE STATE. COUNSEL'S DEFICIENT PERFORMANCE HAS PREJUDICED THE DEFENDANT, AND VIOLATED HIS U.S. CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS.

From day one, Mr. Micciche has professed his innocence as to the allegations of knowingly and intentionally viewing child pornography, and videotaping his underage step-daughter for illicit purposes. This claim of innocence was reviewed in great detail with defense counsel, however, Mr. Micciche's attorney only advised that due to the evidence presented against him and the statements made to detectives that have created the "perfect storm", his innocence did not matter, and the acceptance of a plea would be in his best interest.

Rather than playing the role of an active advocate, as required to satisfy her role as an effective attorney, Mr. Micciche's attorney chose to ignore the claims made by her client and act as an agent of the State, to aid in securing a conviction.

Currently, Mr. Micciche stands convicted of 12 counts charged by information that, by law, he did not commit. He accepted poor advise from his attorney and entered into a negotiated plea agreement because he was ignorant to

21

P723